## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSIAH COLON, *et al.*,

     *Plaintiffs*,

     v.

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES, *et al.*,

     *Defendants.*

Case No. 8:23-cv-223

## DEFENDANTS' PARTIAL MOTION TO DISMISS

1

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ..............................................................................................3

I.    Statutory and Regulatory Background ............................................................3

II.    ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces" ...............................................6

III.   The Rule ...................................................................................................10

IV.   This Lawsuit .............................................................................................14

LEGAL STANDARDS ...................................................................................14

ARGUMENT ..................................................................................................15

I.    The Rule does not violate the APA. .............................................................15

    A.    The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the statutory definition of "rifle." ...........15

    B.    Notice and comment was not required, and in any case, the Rule is a logical outgrowth of the NPRM. ..................................................24

II.    The NFA and Rule are constitutional. ..........................................................28

    A.    Rule does not infringe Second Amendment rights. .............................28

        1.    Firearm braces are not bearable arms protected by the Second Amendment. ..................................................................29

        2.    Registration of short-barreled rifles does not implicate the Second Amendment. ..............................................................30

        3.    Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment. ...................33

        4.    Historical tradition of regulation supports the Rule and the NFA ..........................................................................................36

    B.    The NFA is a constitutional exercise of Congress's taxing power. ......39

    C.    Plaintiffs' vagueness claim fails as a matter of law. ............................40

D.      The Rule does not violate the Takings Clause. ...................................42

CONCLUSION ...................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Am. Iron & Steel Inst. v. OSHA*,
 182 F.3d 1261 (11th Cir. 1999)..............................................................26

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)...............................................................................15

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
 910 F.3d 106 (3d Cir. 2018), *abrogated on other grounds* ..........................44

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).........................................................................14, 15

*Bezet v. U.S.*,
 714 F. App'x 336 (5th Cir. 2017)..........................................................31

*Caetano v. Massachusetts*,
 577 U.S. 411 (2016).........................................................................34, 35

*Chem. Mfrs. Ass'n v. EPA*,
 870 F.2d 177 (5th Cir. 1989) ...............................................................26

*Crenshaw v. Lister*,
 556 F.3d 1283 (11th Cir. 2009)..............................................................43

*District of Columbia v. Heller*,
 554 U.S. 570 (2008)...............................................................................29

*Flight Training Int'l, Inc. v. FAA*,
 58 F.4th 234 (5th Cir. 2023)...................................................................25

*Garelick v. Sullivan*,
 987 F.2d 913 (2d Cir. 1993) ..................................................................44

*Gonzales v. Oregon*,
 546 U.S. 243 (2006)................................................................................16

*Guedes v. ATF*,
 356 F. Supp. 3d 109 (D.D.C. 2019)........................................................17

*Gun Owners of Am., Inc. v. Garland,*
    19 F.4th 890 (6th Cir. 2021) ...................................................................19

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) ........................................................*passim*

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021)......................................................................26

*Huddleston v. U.S.,*
    415 U.S. 814 (1974) ...................................................................................4

*Int'l Harvester Co. v. Wisc. Dep't of Tax'n,*
    322 U.S. 435 (1944) .................................................................................40

*James v. Global Tel\*Link Corp.,*
    2020 WL 998858 (D.N.J. Mar. 2, 2020)..................................................44

*Kanarr Corp. v. U.S.,*
    188 Ct. Cl. 1051 (1969) .....................................................................20, 21

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
    846 F.3d 857 (6th Cir. 2017) ...................................................................23

*Knick v. Township of Scott,*
    139 S. Ct. 2162 (2019) .......................................................................42, 43

*Kolender v. Lawson,*
    461 U.S. 352 (1983) .................................................................................41

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ...................................................................31

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) .................................................................................42

*Lomont v. O'Neill,*
    285 F.3d 9 (D.C. Cir. 2002) ......................................................................3

*McCutchen v. U.S.,*
    14 F.4th 1355 (Fed. Cir. 2021) ................................................................44

*Md. Shall Issue, Inc. v. Hogan,*
    963 F.3d 356 (4th Cir. 2020) ...................................................................44

*Mock v. Garland*,
   2023 WL 2711630 (N.D. Tex. Mar. 30, 2023),
   *appeal filed*, No. 23-10319 (5th Cir. Mar. 31, 2023)..........................................*passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).............................................................................................18

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ...................................................................................*passim*

*Nat'l Nutritional Foods Ass'n v. Mathews*,
   557 F.2d 325 (2d Cir. 1977) .............................................................................23

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023) ........................................................................38

*Nat'l Rifle Ass'n v. Brady*,
   914 F.2d 475 (4th Cir. 1990) ............................................................................17

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ..........................................................................................15

*Newbauer v. Carnival Corp.*,
   26 F.4th 931 (11th Cir. 2022) ...........................................................................15

*NFIB v. Sebelius*,
   567 U.S. 519 (2012) ..........................................................................................39

*Omanwa v. Catoosa Cnty.*,
   711 F. App'x 959 (11th Cir. 2017) ....................................................................15

*Or. Firearms Fed'n, Inc. v. Brown*,
   2022 WL 17454829 (D. Or. Dec. 6, 2022) .......................................................32

*Oxford Asset Mgmt., Ltd v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2022)........................................................................15

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015).............................................................................................25

*Posters 'N' Things, Ltd. v. U.S.*,
   511 U.S. 513 (1994) .....................................................................................23, 24

*Preseault v. ICC*,
   494 U.S. 1 (1990)...............................................................................................42

v

*Rancho de Calistoga v. City of Calistoga,*
   800 F.3d 1083 (9th Cir. 2015) ............................................................45

*Reg'l Rail Reorganization Act Cases,*
   419 U.S. 102 (1974) ..........................................................................43

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   140 S. Ct. 1492 (2020) ......................................................................21

*Ruckleshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) ..................................................................... 43, 44

*Rupp v. Becerra,*
   2018 WL 2138452 (C.D. Cal. May 9, 2018) ......................................44

*S. Terminal Corp. v. EPA,*
   504 F.2d 646 (1st Cir. 1974) .............................................................27

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ....................................................... 22, 23

*Sipes v. U.S.,*
   321 F.2d 174 (8th Cir. 1963),
   *overruled on other grounds by Haynes v. U.S.,* 390 U.S. 85 (1968) ............................21

*Sozinsky v. U.S.,*
   300 U.S. 506 (1937) ..........................................................................39

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007) ............................................................................5

*Texas v. EPA,*
   389 F. Supp. 3d 497 (S.D. Tex. 2019) ...............................................25

*U.S. v. Al-Azhari,*
   2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ...................................29

*U.S. v. Boggess,*
   511 F. Supp. 3d 735 (S.D.W.V. 2021) ...............................................40

*U.S. v. Bolatete,*
   977 F.3d 1022 (11th Cir. 2020) ................................................... 30, 39

*U.S. v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ................................................... 29, 34

vi

*U.S. v. Gilbert,*
  286 F. App'x 383 (9th Cir. 2008)........................................................................34

*U.S. v. Gonzalez,*
  2011 WL 5288727 (D. Utah Nov. 2, 2011)..........................................................34

*U.S. v. Hall,*
  714 F.3d 1270 (11th Cir. 2013)............................................................................33

*U.S. v. Hasson,*
  2019 WL 4573424 (D. Md. Sept. 20, 2019) .........................................................30

*U.S. v. Hayes,*
  555 U.S. 415 (2009) ..............................................................................................22

*U.S. v. Majid,*
  2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) ....................................................34

*U.S. v. Mazurie,*
  419 U.S. 544 (1975) .........................................................................................40-41

*U.S. v. Rose,*
  695 F.2d 1356 (10th Cir. 1982).......................................................................20, 21

*U.S. v. Royce,*
  2023 WL 2163677 (D.N.D. Feb. 22, 2023)......................................................30, 33

*U.S. v. Ruggiero,*
  791 F.3d 1281 (11th Cir. 2015)............................................................................41

*U.S. v. Rush,*
  2023 WL 403774 (S.D. Ill. Jan. 25, 2023) ...........................................................33

*U.S. v. Saleem,*
  ---F. Supp. 3d---, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) .....................29, 32

*U.S. v. Santoro,*
  242 F. App'x 627 (11th Cir. 2007).......................................................................20

*U.S. v. Schuhmann,*
  963 F.2d 381 (9th Cir. 1992) ...............................................................................21

*U.S. v. Spoerke,*
  568 F.3d 1236 (11th Cir. 2009).......................................................................39, 40

*U.S. v. Syverson,*
  90 F.3d 227 (7th Cir. 1996) ................................................................23

*U.S. v. Tagg,*
  572 F.3d 1320 (11th Cir. 2009)...........................................................33

*U.S. v. Thompson/Center Arms Co.,*
  504 U.S. 505 (1992) ............................................................. 3, 17, 20

*U.S. v. Wayerski,*
  624 F.3d 1342 (11th Cir. 2010).............................................................40

*U.S. v. Zeidman,*
  444 F.2d 1051 (7th Cir. 1971) ...........................................................20

*United Steelworkers of Am. v. Schuylkill Metals Corp.,*
  828 F.2d 314 (5th Cir. 1987) ..............................................................28

*Va. Hosp. & Healthcare Ass'n v. Roberts,*
  2023 WL 3132005 (E.D. Va. Apr. 27, 2023).......................................44

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.,*
  455 U.S. 489 (1982) .............................................................................42

*Ziyadat v. Diamondrock Hospitality Co.,*
  3 F.4th 1291 (11th Cir. 2021) .............................................................15

## U.S. Constitution

U.S. Const., amend. V .............................................................................42

## Federal Statutes

5 U.S.C. § 706 ..............................................................................42, 43

18 U.S.C. §§ 921–931.................................................................................4

18 U.S.C. § 921 .......................................................................*passim*

18 U.S.C. §§ 922–923...............................................................................4

18 U.S.C. § 922 .......................................................................................5

18 U.S.C. § 926 ..................................................................................5, 16

26 U.S.C. §§ 5801–5872...........................................................................3

26 U.S.C. § 5801 ................................................................................................4

26 U.S.C. § 5802 ................................................................................................4

26 U.S.C. § 5811 ................................................................................................4

26 U.S.C. § 5812 ................................................................................................4

26 U.S.C. § 5821 ................................................................................................4

26 U.S.C. § 5822 ................................................................................................4

26 U.S.C. § 5841 .............................................................................................1, 4

26 U.S.C. § 5845 ........................................................................................*passim*

26 U.S.C. § 7801 ...........................................................................................5, 16

26 U.S.C. § 7805 .......................................................................................5, 16, 17

28 U.S.C. § 1346 ..............................................................................................42

28 U.S.C. § 1491 ..............................................................................................42

Pub. L. No. 90-351, § 1201 (1968) .....................................................................4

**State Statutes**

11 R.I. Gen. Laws Ann. § 11-47-8 ....................................................................35

Ala. Code § 13A-11-63 .....................................................................................35

Alaska Stat. Ann § 11.61.200 ...........................................................................35

Ariz. Rev. Stat. Ann. § 13-3101 ........................................................................35

Cal. Penal Code § 16590 ..................................................................................35

Colo. Rev. Stat. Ann. § 18-12-102 ....................................................................35

D.C. Code Ann. § 7-2502.02 .............................................................................35

Fla. Stat. Ann. § 790.221 ..................................................................................35

Ga. Code Ann § 16-11-121 ...............................................................................35

Ga. Code Ann § 16-11-122 ...............................................................................35

Haw. Rev. Stat. Ann. § 134-8 ................................................................................35

Iowa Code Ann § 724.1C ......................................................................................35

La. Stat. Ann. § 40:1785 .......................................................................................35

Md. Code Ann., Pub. Safety § 5-203 ....................................................................35

Mich. Comp. Laws Ann. § 750.224b .....................................................................35

Mo. Ann. Stat. § 571.020 ......................................................................................35

Mont. Code Ann. § 45-8-340 .................................................................................35

N.C. Gen. Stat. Ann. § 14-288.8 ...........................................................................35

N.D. Cent. Code Ann. § 62.1-02-03 ......................................................................35

N.J. Stat. Ann. § 2C:39-1 ......................................................................................35

N.J. Stat. Ann. § 2C:39-3 ......................................................................................35

N.Y. Penal Law § 265.00 .......................................................................................35

N.Y. Penal Law § 265.01-b ....................................................................................35

Neb. Rev. Stat. Ann. § 28-1203 .............................................................................35

Nev. Rev. Stat. Ann. § 202.275 .............................................................................35

Ohio Rev. Code Ann. § 2923.17 ............................................................................35

Okla. Stat. Ann. tit. 21, § 1289.18 .........................................................................35

Or. Rev. Stat. Ann. § 166.272 ...............................................................................35

S.C. Code Ann. § 16-23-250 .................................................................................35

Tex. Penal Code Ann. § 46.05 ..............................................................................35

Va. Code Ann. § 18.2-303.1 ..................................................................................35

Wash. Rev. Code Ann. § 9.41.190 ........................................................................35

Wis. Stat. Ann. § 941.28 ........................................................................................35

## Rules

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 3, 14

## Legislative Materials

H.R. Rep. No. 83-1337 (1954) ....................................................................... 3, 20

S. Rep. No. 90-1097 (1968) ............................................................................... 4

## Regulations

27 C.F.R. part 478 ..................................................................................... 5, 16

27 C.F.R. § 478.11 ................................................................................... 11, 19

27 C.F.R. part 479 ..................................................................................... 5, 16

27 C.F.R. § 479.11 ................................................................................... 11, 19

28 C.F.R. § 0.130 ...................................................................................... 5, 16

*Factoring Criteria for Firearms With Attached "Stabilizing Braces*,"
   86 Fed. Reg. 30,826 (June 10, 2021) ................................................... 11, 24, 26, 27

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
   88 Fed. Reg. 6,478 (Jan. 31, 2023) ............................................................... *passim*

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
   85 Fed. Reg. 82,516 (Dec. 18, 2020) ................................................................... 11

*Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of*
*Guidance,*
   85 Fed. Reg. 86,948 (Dec. 31, 2020) ................................................................... 11

## Other Authorities

2 General Laws of Massachusetts from the Adoption of the Constitution to
   February 1822 (1823) .................................................................................. 37

15 The Public Records of the Colony of Connecticut 191 (1890) ............................... 37

1775-1776 Mass. Acts 18 ................................................................................. 37

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191,
   (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)) .............................................. 37

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 .....................................................37

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25,
(codified at 1879 Tex. Crim. Stat. 24)...........................................................37-38

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352.............................................38

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27 ................................38

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412. ........................38

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59........................................38

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39 ............................................37

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175 ...................................................37

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210,
(codified at Kan. Gen. Stat. § 1003 (1901)).........................................................38

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231.....................38

An Act About Powder Money,
1759-1776 N.H. Laws 63 ....................................................................................38

"An Act for the better regulating of the Militia of this Province,"
1747, McCord, *Statutes at Large*, 9:647.............................................................37

An Act to License the Carrying of Fowling Pieces and other Fire-Arms,
1870 Haw. Sess. Laws 26....................................................................................38

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the
Limits of this State, § 1, 1890 S.C. Acts 653 ......................................................37

ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*,
https://perma.cc/BK6C-BRGQ ...........................................................................6

ATF, *Current Processing Times*,
https://perma.cc/8VW8-CCDZ...........................................................................32

ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
https://perma.cc/MRR9-ZBJ2.............................................................................14

ATF, *FINAL RULE 2021R-08F*,
https://perma.cc/W6ZW-8FUL ..........................................................................18

ATF, *National Firearms Act Handbook* (Apr. 2009),
   https://perma.cc/P3NL-G35G ............................................................5, 6

Cameron Knight, *Dayton shooter used a modified gun that may have exploited a legal loophole,* USA Today (Aug. 6, 2019),
   https://perma.cc/89XK-SNVR ...............................................................11

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890)...........37

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28 .........................................38

Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record,*
   https://perma.cc/TVS8-NNVW .........................................................35

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) .................20

Joseph Abram Walker, The Revised Code of Alabama 169 § 10,
   (Reid & Screws, State Printers, 1867).....................................................38

Laws of the Commonwealth of Massachusetts from November 28, 1780 to
   February 28, 1807 (1807)......................................................................37

Laws of the State of Maine 546 (1830) ....................................................................37

Laws of the State of New Hampshire; with the Constitutions of the United
   States and of the State Prefixed 277 (1830)............................................37

Melissa Macaya *et al.*, 10 killed in Colorado grocery store shooting, CNN (Mar. 23, 2021),
   https://perma.cc/HG5S-3NAF................................................................11

*Records of the Colony of Rhode Island and Providence Plantations, In New England,*
   2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother
   vol. 2, 1857) .......................................................................................37

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34..................................................38

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep
   Arms in Early America: The Legal Context of the Second Amendment,"
   25 Law & Hist. Rev. 139 (2007)..........................................................37

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51
   (James T. Mitchell & Henry Flanders comps. 1911)............................38

Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ ..........................................................................35

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and sale of short-barreled rifles, weapons that it determined were especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though stabilizing braces are frequently advertised to wrap around a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them to be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a stabilizing brace are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan.

1

31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a stabilizing brace or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a brace device is designed, made, and intended to be fired from the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs have filed the present action challenging the Rule as unlawful, but the majority of their claims fail on the face of the Complaint.[1] First, many of Plaintiffs' Administrative Procedure Act ("APA") claims provide no basis for relief. The Rule comports with the relevant statutes, and indeed, Congress empowered and obligated ATF to determine whether and when brace-equipped weapons become "rifles," as defined under federal law. Further, in promulgating the Rule, ATF complied with proper procedure, and while notice and comment was not required, the Rule is a reasonable outgrowth of ATF's proposed rule. Second, the Rule suffers from no constitutional defect. The modest registration requirements that federal law impose do not violate the Second Amendment and, in any event, the right to bear arms does not protect the use of firearm modifications to evade federal firearms laws. Likewise, as the Supreme Court held over 80 years ago, the NFA is a valid exercise of Congress's taxing power. Lastly, the Rule is not unconstitutionally vague, nor does it effect an

---

[1] Defendants move to dismiss all of Plaintiffs' claims except for their arbitrary and capricious claim under the Administrative Procedure Act.

2

unconstitutional taking in violation of the Fifth Amendment. The Court should therefore dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

### I.    Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see*, *e.g.*, *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles—*i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *U.S. v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes.").[2] The Act defines "rifle" to mean any weapon designed or redesigned, made or remade, and intended to be

---

[2] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

> fired from the shoulder and designed or redesigned and made or remade
> to use the energy of the explosive in a fixed cartridge to fire only a single
> projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National

Firearms Registration and Transfer Record to a person entitled to possess the firearm.

*Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and

must be approved by the Attorney General before they are made or transferred, *id.*

§§ 5812, 5822. Moreover, any person engaged in the business of importing,

manufacturing, or dealing in NFA firearms must register with the Attorney General

and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C.

§§ 921–931, to comprehensively regulate the manufacture and distribution of firearms

and ammunition. Acknowledging the inadequacy of federal controls over "the

widespread traffic in firearms," and motivated by concerns that "the ease with which

firearms could be obtained" had "contributed significantly to the prevalence of

lawlessness and violent crime" in the country, *Huddleston v. U.S.*, 415 U.S. 814, 824

(1974) (citing Pub. L. No. 90-351, § 1201 (1968); S. Rep. No. 90-1097, at 108 (1968)),

the GCA increased federal controls for persons engaging in the business of importing,

manufacturing, or dealing in firearms.[3] *See, e.g.*, 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of "short-barreled

---

[3] The GCA defines the term "firearm" more broadly than the NFA, such that it includes, *inter alia*, "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

rifles" and the obligation of Federal Firearms Licensees (or "FFLs") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's definition. *See id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *See* ATF, *National Firearms Act Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G ("NFA Handbook").[4] The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later

---

[4] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of brace devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *see also, e.g.*, ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ (providing visual examples of weapons configured with common brace devices). And though manufacturers have nominally claimed that brace devices are meant to attach to or stabilize against a shooter's forearm, stabilizing braces often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a stabilizing brace falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. *See* 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. *Id.* According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular brace device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of stabilizing braces of varying designs. *Id.* at 6,479. But unlike the 2012 prototype, these newer brace designs began to include characteristics common to shoulder stocks. *Id.* at 6,479; *see also, e.g.*, *id.* at 6,529

7

(comparing two stabilizing braces to similarly designed shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a stabilizing brace as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some stabilizing braces were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g.*, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different brace devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a brace device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a brace device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters, as well as a 2015 Open Letter, suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the stabilizing brace, as either a device assisting single-handed fire or for shoulder fire. *See, e.g.*, *id.* at 6,484, 6,487–88. ATF also occasionally focused on the brace device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several brace-equipped firearms as short-barreled rifles after

considering, for example, whether the brace device served any purpose other than to extend the rearward surface to enable shouldering, *see*, *e.g.*, *id.* at 6,485, or whether the device, as configured with the firearm, created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel brace-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the weapon. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a brace device affects a weapon's classification, the agency needs to examine the overall configuration of the weapon with the brace device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 brace device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the

SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a stabilizing brace as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

## III.   The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling brace devices as "ATF compliant" without having submitted that particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using brace devices to create short-barreled rifles without complying with NFA requirements, *see id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *see supra* at p. 3.

In March 2021, a 21-year-old individual armed with brace-equipped AR-type pistol opened fire at a supermarket in Boulder, Colorado, killing ten people, including

an on-duty police officer.[5] This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual armed with a brace-equipped AR-type pistol killed nine people and injured 14 others within approximately 30 seconds from firing the first shot.[6] In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.[7]

**2.** In light of its pre-existing concerns, as well as the real-world violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of brace-equipped weapons. *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to the regulations in 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. *See Factoring Criteria for Firearms With Attached "Stabilizing Braces*," 86 Fed. Reg. 30,826 (June 10, 2021).[8] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with stabilizing braces or other similar attachments. NPRM, 86 Fed. Reg. at 30,826. The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

---

[5] *See* Melissa Macaya *et al.*, 10 killed in Colorado grocery store shooting, CNN (Mar. 23, 2021), https://perma.cc/HG5S-3NAF (cited at 88 Fed. Reg. at 6,495 n.67).

[6] *See* Cameron Knight, *Dayton shooter used a modified gun that may have exploited a legal loophole*, USA Today (Aug. 6, 2019), https://perma.cc/89XK-SNVR (cited at 88 Fed. Reg. at 6,495 n.67).

[7] Since 2014, ATF has received 104 classification requests in connection with federal criminal investigations involving firearms equipped with a stabilizing brace. 88 Fed. Reg. at 6,499.

[8] In December 2020, ATF published a notice of proposed rulemaking entitled *Objective Factors for Classifying Weapons with "Stabilizing Braces," 85 Fed. Reg. 82,516 (Dec. 18, 2020), but withdrew the notice two weeks later, *see* 85 Fed. Reg. 86,948 (Dec. 31, 2020).

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, *id.* at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a stabilizing brace) that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–13—are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

     (iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

     (v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

     (vi) information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

     *Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with stabilizing braces, including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. As relevant here, an individual who was an unlicensed possessor of a brace-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

     (i) filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

     (ii) removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the brace device so that it cannot be reattached to the weapon;

     (iii) turning the firearm into a local ATF office; or

     (iv) destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

     *Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with stabilizing

braces prior to the Rule's publication. *Id.* at 6,571. As relevant here, these individual possessors will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with stabilizing braces. *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[9]

## IV.   This Lawsuit

Plaintiffs—four individuals who possess at least one pistol equipped with a stabilizing brace and a firearms retailer—filed this lawsuit on February 1, 2023, claiming, *inter alia*, that the Rule is unconstitutional and otherwise violates the APA. Compl. ¶¶ 54–96, ECF No. 1.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a claim for relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[9] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with stabilizing braces that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

(2007), which requires alleging "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions," *Twombly*, 550 U.S. at 555, "threadbare recitals of the elements of a cause of action," *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678), or "naked assertions that the defendant acted unlawfully," *Omanwa v. Catoosa Cnty.*, 711 F. App'x 959, 964 (11th Cir. 2017), are insufficient.

A court must accept as true all well-pleaded facts in the complaint, *Ziyadat v. Diamondrock Hospitality Co.*, 3 F.4th 1291, 1295 (11th Cir. 2021), but it need not accept the truth of conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *Oxford Asset Mgmt., Ltd v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2022). Nor must it accept as true legal conclusions couched as factual allegations. *Id.* If, "as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the [well-pleaded] allegations," a court must dismiss the claim. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted).

## ARGUMENT

## I. The Rule does not violate the APA.

### A. The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the statutory definition of "rifle."

Plaintiffs claim that ATF lacked authority to promulgate the Rule because the Rule "impermissibly expands" the statutory definition of "rifle" so that it is "incompatible" with the NFA and the GCA. Compl. ¶ 82. But the Rule fits squarely

15

within ATF's delegated authority and correctly construes the relevant statutory provisions. Plaintiffs' claim, on the other hand, rests on bare assertions that, in any event, are contrary to basic principles of statutory construction.

**1.** As an initial matter, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *See, e.g.*, *Mock v. Garland*, 2023 WL 2711630, at *4 (N.D. Tex. Mar. 30, 2023) (rejecting demand for preliminary injunction in similar challenge

to the Rule at issue here), *appeal filed*, No. 23-10319 (5th Cir. Mar. 31, 2023)[10]; *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500 (collecting examples). And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers [a] measure of discretion" to ATF "to determine what regulations are in fact 'necessary.'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

---

[10] The Fifth Circuit has granted an injunction pending appeal as to the plaintiffs in *Mock. See Mock v. Garland*, No. 23-10319 (5th Cir.), ECF No. 52-1.

Then the stabilizing brace arrived and quickly proliferated. As explained, *supra* pp. 7–10, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of brace devices, as the need for ATF to determine these weapons' classifications was clear to manufacturers from the start. While stabilizing braces are purportedly meant to assist single-handed fire by resting against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a stabilizing brace, it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; ATF, *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various brace devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used braced-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing

18

regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a stabilizing brace may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a brace device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying brace-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**2.** Still, Plaintiffs contend that the Rule is "incompatible" with the NFA and the GCA because it "impermissibly expands" the statutory definition of "rifle." Compl. ¶¶ 80–82. But Plaintiffs offer no serious interpretive analysis to support that claim, nor do they articulate any better interpretation of the relevant statutory provisions. At any rate, their claim does not comport with the statute's text or purpose or prior judicial constructions. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a stabilizing brace can be a "rifle," and thus a short-barreled rifle,

within the meaning of the NFA and the GCA.

Start with two points that Plaintiffs cannot reasonably dispute. *First*, a pistol can be modified into a "rifle" within the meaning of § 5845(c) and § 921(a)(7). That is clear not only from the statutory text—which delimits the definition of "rifle" based on how a "weapon" (a broad and inclusive term) is designed and intended to be fired—but also from the Supreme Court's decision in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (citation omitted); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *E.g.*, *U.S. v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *U.S. v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as a component part, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[11]

*Second*, the fact that a weapon may be designed to *also* allow effective single-

---

[11] That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *E.g.*, *Kanarr Corp. v. U.S.*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *U.S. v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." H.R. Rep. No. 83-1337, at A395. ATF also has long recognized that pistols can be modified to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).

handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued that the definition of "rifle" should be limited only to weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *U.S. v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. U.S.*, 321 F.2d 174, 178 (8th Cir. 1963) ("That" a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. U.S.*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57. As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a stabilizing brace that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501. Indeed, the opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is not found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there.").

Accordingly, and as the Rule repeatedly explains, the focal inquiry under the statutory definition of "rifle" is whether a weapon is designed, made, and intended to be fired from the shoulder. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). As the Rule explains, to properly apply that definition, ATF evaluates a particular weapon's objective design features, in addition to a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of

determining whether the weapon is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. These criteria are thus merely indicative of whether a particular weapon meets the statutory requirements of a "rifle."

And that ATF considers a weapon's objective design features to determine its design and intended use is especially sensible, particularly in this context, where the record shows that manufacturers' descriptions or labeling of brace-equipped weapons are often at odds with the weapons' design features and common use. *Id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47. While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also U.S. v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v.*

*Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." *Id.* at 601–02; *see also, e.g.*, *U.S. v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things, Ltd. v. U.S.*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").[12]

And, aside from a weapon's objective design features, ATF also considers other evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general

---

[12] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts have long relied on this type of evidence as well to discern intent in numerous contexts. *See, e.g.*, *Posters 'N' Things*, 511 U.S. at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use").

Therefore, the Rule's conclusion that a weapon equipped with a stabilizing brace is a "rifle" if its objective design features and other relevant objective evidence indicates that it is designed, made, and intended to be fired from the shoulder comports with the relevant statutory definition. Although Plaintiffs claim that the Rule "re-defines" or "expands" that definition, Compl. ¶¶ 47, 80–82, they offer no grounds for that assertion. *See Mock*, 2023 WL 2711630, at *4 (finding that the Rule challenged here "does not . . . rewrite the [statutory] definition" of "rifle," and that it is not substantially likely that the Rule exceeds ATF's statutory authority). Plaintiffs' claim that ATF exceeded its delegated authority in promulgating the Rule thus fails as a matter of law and, accordingly, should be dismissed under Rule 12(b)(6).

## B. Notice and comment was not required, and in any case, the Rule is a logical outgrowth of the NPRM.

Plaintiffs also contend that the Rule violates the APA because it is not a logical outgrowth of ATF's NPRM. Compl. ¶¶ 83-88; *see also* NPRM, 86 Fed. Reg. 30,826 (June 10, 2022). But the Rule poses no logical outgrowth problem, and Plaintiffs' claim should be dismissed. *See Mock*, 2023 WL 2711630, at *5.

The Rule poses no logical outgrowth problem because (1) notice and comment

was not required, and in any event, (2) the Rule is a reasonable outgrowth of ATF's proposed rule. First, ATF cannot have violated the logical outgrowth doctrine because it doesn't apply in the first instance. Plaintiffs simply assume notice and comment was required, but "[n]ot all 'rules' must be issued through the notice-and-comment process," and in particular, interpretive rules are exempt. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 97 (citation omitted), and "explain what an agency thinks a statute or regulation actually says," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023).

The Rule is interpretive: it merely advises the public of ATF's interpretation of the NFA and the GCA. *See Mock*, 2023 WL 2711630 at *5. The Rule repeatedly states it "does not impose any new legal obligations" and, instead, "merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes." 88 Fed. Reg. at 6,478; *id.* at 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). That ATF still gave the public "notice and opportunity to comment" to "reduce[] vagueness concerns," *id.* at 6,552, does not mean it was required to do so. And because notice and comment was unnecessary, Plaintiffs cannot show a legal violation for not following that process's specific requirements. *See Texas v. EPA*, 389 F. Supp. 3d 497, 504 (S.D. Tex. 2019) ("notice-and-comment requirement" includes "logical outgrowth" test).

Regardless, the Rule is a logical outgrowth of ATF's NPRM. The logical

outgrowth requirement is satisfied if the proposed rule "adequately frame[s] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (citations omitted); *see also Am. Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1276 (11th Cir. 1999). The NPRM need only "fairly apprise[] interested persons of the subjects and issues the agency is considering[,]" and need not "identify every precise proposal which [it might] ultimately adopt as a final rule." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989).

The NPRM fairly apprised the public of the subjects and issues ATF was considering. *Mock*, 2023 WL 2711630 at *5. Indeed, the NPRM and Rule both make clear that ATF contemplated and ultimately decided to amend the regulatory definition of rifle. *Compare* NPRM, 86 Fed. Reg. at 30,826 ("[DOJ] proposes amending [ATF] regulations to clarify when a rifle is 'intended to be fired from the shoulder.' [DOJ] proposes factors ATF considers when evaluating firearms equipped with a purported 'stabilizing brace' to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA or NFA].") *with* 88 Fed. Reg. at 6,478 ("[DOJ] is amending the regulations . . . to clarify when a rifle is designed, made, and intended to be fired from the shoulder" and the Rule sets forth "objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes").

Further, although the Rule did not adopt the NPRM's point-based Worksheet 4999 system, the NPRM provided notice that ATF was considering a factor-based

approach and notice of those factors. The NPRM proposed amending the regulatory definition of rifle to consider "objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder[]"—an aim nearly identical to the final rule. 86 Fed. Reg. at 30,829. And the Worksheet set forth "[f]actoring [c]riteria," just like the final rule. *Id.* at 30,830. Indeed, contrary to Plaintiffs' suggestion, the Rule is not inconsistent with the NPRM, as it adopts a balancing test akin to an unweighted variation of the Worksheet's approach. *See S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes "in character with the original scheme" that were "foreshadowed in proposals and comments" during rulemaking).

Perhaps most critically, "[a]ll of the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6,480; *see also id.* at 6,513; *id.* at 6,494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle.'"); *Mock*, 2023 WL 2711630 at *5 (that the Rule's criteria were derived from the NPRM was "enough [to] put the affected public on notice of the subjects and issues the Final Rule would address[]"). Indeed, ATF addressed public comments regarding the Worksheet's factors that the Rule ultimately adopted, indicating that the NPRM notified interested persons that the final rule might consider those factors. *E.g.*, 88 Fed. Reg. at 6,514–21 (weight and length comments); *id.* at 6,521–31, 6,537–41 (rear surface area comments); *id.* at 6,533–37 (length of pull

comments); *id.* at 6,541–43 (sights and scope comments); *see United Steelworkers of Am. v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) (nature of comments received and responses to comments supported NPRM was adequately descriptive of relevant issues). Moreover, the changes between the NPRM and the Rule evince a careful process based on the comments received, not a logical outgrowth problem. ATF weighed comments "regarding the complexity in understanding the proposed Worksheet 4999 and [its] methodology," and decided "not [to] adopt" the Worksheet; instead, "based on the comments," ATF "took the relevant criteria discussed in the NPRM" and "incorporated them into the rule's revised definitions of rifle." 88 Fed. Reg. at 6,480.[13] Thus, the Rule satisfies the logical outgrowth requirement.

## II.     The NFA and Rule are constitutional.

### A.     Rule does not infringe Second Amendment rights.

The Rule does not violate the Second Amendment for several reasons. *First*, "stabilizing braces" are not "bearable arms," and thus Plaintiffs lack a Second Amendment right to use them. *Second*, the NFA's basic registration requirements do not implicate the right to bear arms. *Third*, short-barreled rifles are dangerous and unusual weapons that do not enjoy Second Amendment protections. *And fourth*, even if the Rule and the NFA implicated the right to bear arms, they are supported by a robust history and tradition of firearm regulations.

---

[13] Contrary to Plaintiffs' suggestion, the Rule does not purport to classify any weapon, and the fact the NPRM provided examples of brace-equipped weapons that would not constitute SBRs does not change that the Rule's aim mirrors and its factors derive from the NPRM. Compl. ¶¶ 87-88. This is sufficient for purposes of the logical outgrowth doctrine.

1.      *Firearm braces are not bearable arms protected by the Second Amendment.*

Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment extends only to "instruments that constitute bearable arms[.]" *Id.* at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *U.S. v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[14] Courts have uniformly held that because a silencer is an accessory, "it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *accord U.S. v. Saleem*, ---F. Supp. 3d---, 2023 WL 2334417, at *11 n.9 (W.D.N.C. Mar. 2, 2023); *U.S. v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec.

---

[14] "Silencer" is defined as, *inter alia*, "any device for silencing, muffling, or diminishing the report of a portable firearm[.]" 18 U.S.C. § 921(a)(25).

14, 2020).[15] Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer" attached. *U.S. v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases). Stabilizing braces fall outside the scope of the Second Amendment for the same reasons.

Indeed, Plaintiffs repeatedly concede that stabilizing braces are merely "accessories installed on firearms." Compl. ¶ 24; *id.* ¶ 57 ("Pistol braces are commonly owned firearm accessories that firearms are commonly sold with[.]"); *id.* ¶ 64 (arguing that regulations should not be based on "the presence of an accessory"). The parties thus appear to agree that braces are not weapons or arms and serve no useful purpose except as attachments to firearms.

While individuals may wish to use a brace to "improve the usage of a firearm," the firearms at issue remain effective without any brace attached. *See Hasson*, 2019 WL 4573424, at *5. Attaching a firearm accessory, such as a brace, is thus "not protected by the Second Amendment." *See U.S. v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) (holding use of silencer attachments do not implicate the Second Amendment). Plaintiff's Second Amendment claim fails for this reason alone.

> 2.  *Registration of short-barreled rifles does not implicate the Second Amendment.*

---

[15] While the Eleventh Circuit has questioned, without deciding, "whether silencers are 'Arms' for Second Amendment purposes." *U.S. v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020).

The Rule does not ban any firearms; rather the NFA (and thus the Rule) permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiffs raise a Second Amendment claim, Plaintiffs appear to concede that they may lawfully possess their firearms if they submit an application to ATF and receive approval. *See* Compl. ¶ 40. And because Plaintiffs appear to have possessed their firearms before the Rule's effective date, assuming timely registration, they are exempt from any tax concerning possession. *See* 88 Fed. Reg. at 6,481.

Insofar as Plaintiffs suggest that the burdens of registration impinge their Second Amendment rights, that argument is meritless. Routine firearm registration procedures, like those required here, do not offend the right to bear arms. Requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear "under a government." *Bezet v. U.S.*, 714 F. App'x 336, 340 (5th Cir. 2017); *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, and distinguishing laws imposing "minor inconveniences" from those effecting "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court took pains to note this point, as well. *Id.* at 2138 n.9 (explaining that

31

"nothing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem under *Bruen*. *See*, *e.g., Saleem*, 2023 WL 2334417, at *11 n.9 (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *Or. Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (upholding under *Bruen* a state firearms permit requirement that includes a "background check, fingerprinting, a mental health check," etc.).

Nor can Plaintiffs show the extraordinary circumstances left open by *Bruen*, in which otherwise constitutional licensing may still infringe the Second Amendment because of "lengthy wait times" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. The time required for registration here is irrelevant to Plaintiffs' claim, because if they submit applications on or before May 31, 2023, they may retain possession of their firearms until they receive ATF's response. 88 Fed. Reg. at 6,559. Moreover, the Rule imposes no tax on Plaintiffs' possession of their firearms if they timely file their applications.

Finally, to the extent Plaintiffs argue that regulations governing travel with short-barreled rifles offend the Second Amendment, Compl. ¶ 65, those arguments are similarly unsuccessful. Plaintiffs claim that it "can take months," for ATF to respond to a request to transport NFA-regulated firearms between states, *id.* ¶ 50, but in fact the average processing time for such requests is just 14 days. *See* ATF, *Current Processing Times*, https://perma.cc/8VW8-CCDZ (providing average processing time for Form

5320.20). Plaintiffs cannot plausibly show this process involves such an "exorbitant" wait time that it potentially infringes their Second Amendment rights.

For all these reasons, Plaintiffs fail to demonstrate that registration or other NFA requirements offend the Second Amendment.

> 3. *Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.*

The Rule does not implicate the Second Amendment for another reason: there is no right to bear dangerous and unusual arms like short-barreled rifles. Lower courts have uniformly held that short-barreled rifles constitute dangerous and unusual weapons. *See*, *e.g.*, *Royce*, 2023 WL 2163677, at *3 (short-barrel rifles are "'dangerous and unusual' weapons that are easily concealable and thus not protected by the Second Amendment"); *U.S. v. Rush*, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023) (similar). The Court should conclude the same.

While the Eleventh Circuit has not directly addressed when a certain firearm is "dangerous and unusual,"[16] the analysis of other circuits compels the conclusion that the Second Amendment does not protect short-barreled rifles. For instance, the Fifth Circuit in *Hollis* looked to cases holding that unlawful possession of a machinegun is a crime of violence for purposes of a sentence enhancement. 827 F.3d at 449; *see also U.S. v. Hall*, 714 F.3d 1270, 1274 (11th Cir. 2013) (holding possession of short-barreled

---

[16] The Eleventh Circuit addressed this issue only in the context of upholding a conviction for possession of unregistered "pipe bombs," which are also "firearms" under the NFA, noting that the Second Amendment permits prohibitions on "the carrying of dangerous and unusual weapons." *U.S. v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009).

shotgun is a "crime of violence" under sentencing guidelines). The court also relied on decisions holding that machineguns are dangerous weapons outside the Second Amendment's ambit. *Hollis*, 827 F.3d at 448. Likewise, courts uniformly hold that the inherent dangerousness of short-barreled rifles places them beyond constitutional protection. *E.g.*, *Cox*, 906 F.3d at 1185; 88 Fed. Reg. at 6,499 (short-barreled rifles "are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy").[17]

*Hollis* also analyzed what it means for a firearm to be "unusual." On this score, the court looked to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, even assuming that there are now approximately 3.6 million short-barreled rifles in the United States (641,000 previously registered short-barreled rifles and 3 million with "stabilizing braces"), that falls far short of the numbers in *Hollis*. 827 F.3d at 449–50 (comparing numbers of machineguns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles").

Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms. *Id*. at 450. Conservatively

---

[17] *E.g.*, *U.S. v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008); *U.S. v. Gonzalez*, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *U.S. v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

estimating that there are 400 million civilian-owned firearms in the United States, the number of short-barreled rifles is less than one percent of this amount.[18] Where, as here, the relative number and percentage of firearms at issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Additionally, in his *Caetano* concurrence "Justice Alito did not think the absolute number by itself was sufficient" to demonstrate that a weapon was not dangerous and unusual. *Hollis*, 827 F.3d at 450. Rather, Justice Alito looked to the number of states where the weapon at issue could be "lawfully possessed." *Caetano*, 577 U.S. at 420. This evaluation requires looking to states that entirely ban a firearm and states that ban them unless possessed legally "under federal law." *Hollis*, 827 F.3d at 450. With 34 states prohibiting machinegun possession, the court found this to be further support that machineguns are unusual. *Id.* There are a similar number of state laws concerning possession of short-barreled rifles. At least six states ban them entirely, and 24 states ban them unless NFA registered.[19] Like in *Hollis*, these laws

---

[18] Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ. The number is likely far higher than 400 million, as consumers have purchased nearly 20 million firearms *per year* in recent years. Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*, https://perma.cc/TVS8-NNVW.

[19] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; 11 R.I. Gen. Laws Ann. § 11-47-8(b); Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann. § 16-11-122, § 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

further show that short-barreled rifles are dangerous and unusual. Consequently, such firearms "do not receive Second Amendment protection," *Hollis*, 827 F.3d at 451.

4.   *Historical tradition of regulation supports the Rule and the NFA.*

While the Rule does not implicate the Second Amendment, even if it did, the Rule and the NFA are constitutional because they rest upon centuries of similar taxation and registration requirements. Where a regulation affects the Second Amendment, the Government may justify it "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" by pointing to "a well-established and representative historical *analogue*[.]" *Bruen*, 142 S. Ct. at 2130, 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. A "historical *twin*" is not required. *Id.* at 2133. Accordingly, Plaintiffs err in suggesting the Government must locate a Founding era record of regulating short-barreled rifles. Compl. ¶¶ 62–65. Indeed, historical analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Bruen*, 142 S. Ct. at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Colonial and early state governments regularly sought to gather information regarding firearm ownership in their

jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition," and door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[20] Similarly, militia members in Massachusetts (1775) were required to have their firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements.[21] In 1805, Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[22] Certain states, such as Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820), also required licenses or inspection to export or sell gunpowder (akin to modern ammunition).[23] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[24] And personal firearm licenses for sporting purposes were required in

---

[20] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene & Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).
[21] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.
[22] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).
[23] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).
[24] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 §1498 (1894)). Other states also enacted prohibitions or other restrictions on the carrying of pistols. *See* Act

Hawaii (1870) and Wyoming (1899).[25] Moreover, as the Eleventh Circuit recently recognized in upholding a Florida state law barring those under 21 from buying firearms, "Alabama and Tennessee generally prohibited selling, loaning, or even giving handguns and other handheld arms to 18-to-20-year-olds in the years leading up to the Fourteenth Amendment's ratification." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1326, 1333 (11th Cir. 2023) (listing other similar laws).

Further, while individual Plaintiffs are exempt from the NFA's tax, it is supported by multiple historical statutes. In 1759, for instance, New Hampshire required that certain ships pay a tax of money or gunpowder.[26] Taxes on firearms specifically were also common through the 19th century. Indeed, taxes were specifically levied on pistols, and in certain cases other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[27]

Taken together, these laws reflect an unbroken historical tradition of firearm regulation "relevantly similar" to that required by the NFA. *Bruen*, 142 S. Ct. at 2132– 33. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA and its

---

of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[25] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

[26] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[27] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

corresponding regulations seek to raise revenue through taxation, regulate but not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Thus, any modest burden imposed by the NFA's regulations is "comparable" and "comparably justified" to these numerous historical laws.

### B.    The NFA is a constitutional exercise of Congress's taxing power.

Next, Plaintiffs' Taxing and Spending Clause claim is foreclosed by binding precedent. *See* Compl. ¶¶ 69-76. The Supreme Court upheld the NFA as a valid exercise of Congress's taxing authority more than 80 years ago, *Sozinsky v. U.S.*, 300 U.S. 506, 514 (1937), and more recently, the Eleventh Circuit has held the same. *See U.S. v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009) ("Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons."); *see also Bolatete*, 977 F.3d at 1031 ("The [NFA], and the criminal penalty for violating it, are grounded in Congress' power to tax.").

Plaintiffs primarily contend that the NFA unconstitutionally imposes a penalty, not a tax, or alternatively, that the NFA's taxing requirement was passed with a "prohibitory purpose." Compl. ¶¶ 71–72, 75–76 (citing *NFIB v. Sebelius*, 567 U.S. 519, 564 (2012)). But Plaintiffs' main case, *Sebelius*, expressly describes NFA taxes on firearms as "obviously regulatory," as opposed to impermissible penalties, and favorably describes *Sozinsky*. 567 U.S. at 567. Moreover, both before and after *Sebelius*, courts have recognized that the NFA's enforcement mechanisms—such as the required registration of firearms and criminalization of possession of unregistered firearms—make it more likely that appropriate taxes will be paid and thus do not

constitute impermissible penalties. *U.S. v. Boggess*, 511 F. Supp. 3d 735, 742 (S.D.W.V. 2021); *Spoerke*, 568 F.3d at 1246. Because the NFA's enforcement mechanisms are rationally related to the taxing power and revenue generation, they are a constitutional exercise of Congress's authority, and not an impermissible penalty. *Spoerke*, 568 F.3d at 1245 ("[T]he registration requirement . . . is part of the web of regulation aiding enforcement of the transfer tax provision in [the Act] and is plainly constitutional." (citation omitted)); *Boggess*, 511 F. Supp. 3d at 742.

Plaintiffs suggest this analysis somehow changes because of ATF's exercise of discretion in the Rule *not* to collect the taxes typically required for NFA firearms for qualifying brace-equipped weapons manufactured or transferred prior to the Rule's publication date. *See* Compl. ¶¶ 74, 76; 88 Fed. Reg. at 6,481. But the power to tax includes the power to forgive taxes, *see Int'l Harvester Co. v. Wisc. Dep't of Tax'n*, 322 U.S. 435, 441 (1944) ("power to tax . . . includes the power to postpone the tax"), and ATF has enforcement discretion under the NFA. And in any event, even if the Rule foregoes retroactive taxes, it still aids revenue-raising purposes: weapons manufactured or transferred *after* the Rule's publication date, which pursuant to the Rule's criteria are NFA weapons, will be subject to NFA making and transfer taxes.

### C.    Plaintiffs' vagueness claim fails as a matter of law.

Plaintiffs also allege the Rule is unconstitutionally vague in violation of the Fifth Amendment. Compl. ¶ 95. Not so. As an initial matter, where "a vagueness challenge does not involve the First Amendment, the analysis must be applied to the facts of the case." *U.S. v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010); *accord U.S. v. Mazurie*,

419 U.S. 544, 550 (1975). Therefore, Plaintiffs' argument fails, if for no other reason, because they have brought facial vagueness challenge to the Rule in the abstract, as opposed to an as-applied challenge to the facts of their case.

Regardless, the Rule is not unconstitutionally vague. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted); *accord U.S. v. Ruggiero*, 791 F.3d 1281, 1290-91 (11th Cir. 2015).

The Rule provides regulated parties with ample opportunity to understand ATF's view of what the NFA requires and prohibits. *See Mock*, 2023 WL 2711630 at *7 (Rule's criteria track statutory definition and Rule is "comprehensible enough to put a person of ordinary intelligence on notice that their weapon may be subject to federal firearms laws"). Indeed, the Rule is clearer and provides *more* notice than ATF's previous classification system to which Plaintiffs would have ATF revert if their claims were to succeed. Prior to the Rule, ATF had not uniformly classified brace-equipped weapons or even adopted a framework for classifying such weapons; instead, ATF issued varied classification determinations for particular weapons, classifying some as short-barreled rifles and others as not. *Supra* pp. 6–9. By contrast, the Rule adopts a consistent, predictable framework for classification: ATF first considers whether a weapon provides surface area allowing it to be shoulder fired, and then weighs six additional factors to determine whether the weapon is designed, made, and

intended to be fired from the shoulder; it also specifies four options for compliance by a specific date. *Supra* pp. 12–14. And an individual may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6,552; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 498 (1982) (relaxing vagueness test when party may clarify a regulation's meaning "by its own inquiry"). Simply put, ATF has gone beyond what the Fifth Amendment requires to provide fair notice.

### D.   The Rule does not violate the Takings Clause.

Plaintiffs appear to claim that the Rule violates the APA, 5 U.S.C. § 706(2)(B), because it offends the Fifth Amendment's Just Compensation Clause, which requires the government to pay just compensation when it takes private property for public use, U.S. Const., amend. V; *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–40 (2005) (The Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." (citation omitted)). But that claim should be dismissed for at least two reasons.

*First*, Plaintiffs claim is foreclosed by *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). There, the Supreme Court explained that the proper remedy for a just-compensation claim is just that—just compensation—which must be sought from the federal government under the Tucker Act or Little Tucker Act. *Id.* at 2175–79; *see also* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). Those statutes establish a comprehensive scheme for seeking just compensation from the federal government for an alleged taking and waive the United States' sovereign immunity for such claims. *See, e.g.*, *Preseault v. ICC*, 494 U.S. 1, 11–12 (1990). And where (as here) "the availability of the Tucker Act" and

Little Tucker Act would "guarantee[] an adequate remedy" if a taking were to occur, *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 107 (1974), other remedies will be unavailable in federal court, *see Knick*, 139 S. Ct. at 2175, 79.

Yet here, Plaintiffs have alleged their just-compensation claim under the APA—*not* the Tucker Act or Little Tucker Act—and seek only declaratory and injunctive relief and that the Rule be "set aside" under 5 U.S.C. § 706(2)—*not* just compensation. *See* Compl., Prayer for Relief. But as *Knick* makes clear, federal courts will not grant equitable relief or "set aside agency actions as unconstitutional" under the Just Compensation Clause "as long as just compensation remedies" are available for any uncompensated taking of personal property, as they are against the federal government under the Tucker Act and Little Tucker Act. 139 S. Ct. at 2179; *see also Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use . . . when a suit for compensation can be brought against the sovereign subsequent to the taking."). Accordingly, there is no relief that this Court could grant Plaintiffs on their just-compensation claim.

*Second*, even setting aside that threshold issue, Plaintiffs have failed as a matter of law to allege a "taking" within the meaning of the Fifth Amendment. Plaintiffs just-compensation claim rests on the allegation that the Rule "works an unconstitutional taking" by allegedly "recommend[ing] the destruction of personal property." Compl. ¶¶ 95–96. As a factual matter, Plaintiffs' allegation is contradicted by the Rule they challenge. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009). Contrary to their assertions, the Rule does not recommend destruction of any property, but instead

simply explains that a possessor of a brace-equipped short-barreled rifle may voluntarily destroy the firearm or the brace device as one of several options to comply with the NFA. *See* 88 Fed. Reg. at 6,570. Other options include, *inter alia*, registration of the firearm or re-barreling the firearm with a 16-inch or longer barrel.

That range of options "can hardly be called a taking." *See Ruckelshaus*, 467 U.S. at 1007. Government action must "legally compel[]" an obligation affecting property for it "to give rise to a taking." *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993); *accord, e.g.*, *Va. Hosp. & Healthcare Ass'n v. Roberts*, 2023 WL 3132005, at *23 (E.D. Va. Apr. 27, 2023); *James v. Global Tel*Link Corp.*, 2020 WL 998858, at *3 (D.N.J. Mar. 2, 2020) ("'Taken,'" as used in the Fifth Amendment, "implies legal compulsion."); *cf. Ruckelshaus*, 467 U.S. at 1007 (voluntary relinquishment of property as condition of registration under federal statute was not a taking). Because the Rule provides possessors with a number of options to comply with the NFA's requirements, several of which do not involve the destruction of personal property, there is no legal compulsion supporting Plaintiffs' just-compensation claim.[28] *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 124 (3d Cir. 2018) (rejecting takings claim challenging firearms regulation that provided alternative compliance options, many of which did not result in a taking), *abrogated on other grounds*; *Rupp v. Becerra*, 2018 WL 2138452, at *8 (C.D. Cal. May 9, 2018) (same). Plaintiffs' failure to allege a

---

[28] Even where (unlike here) regulations *prohibited* the possession of personal property, courts have rejected takings claims challenging those regulations. *See, e.g.*, *McCutchen v. U.S.*, 14 F.4th 1355, 1363–68 (Fed. Cir. 2021); *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364–67 (4th Cir. 2020).

taking also forecloses their claim. *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims.

Dated: May 24, 2023          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ (CA Bar No. 332080)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
MICHAEL DREZNER (VA Bar No. 83836)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-5200
Email: taylor.n.pitz@usdoj.gov

*Attorneys for Defendants*

## **LOCAL RULE 3.01(g) CERTIFICATION**

Defendants certify that they conferred with Plaintiffs regarding the filing of this motion. The parties conferenced by telephone and discussed the arguments put forth, but they were unable to reach a resolution as to all or part of this motion.

/s/ Taylor Pitz
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

On May 24, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Middle District of Florida, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Taylor Pitz
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice