```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3

 4   JOSIAH COLON, et al.,        )
                                  )
 5              Plaintiffs,       )
                                  )
 6                                ) Case No.
          vs.                     ) 8:23-CV-00223-MSS-MRM
 7                                )
                                  )
 8   BUREAU OF ALCOHOL, TOBACCO,  )
     FIREARMS AND EXPLOSIVES, et al., )
 9                                )
                Defendants.       )
10

11
    _____
12
                        MOTION HEARING
13       BEFORE THE HONORABLE MARY S. SCRIVEN
            UNITED STATES DISTRICT JUDGE
14
                       JULY 13, 2023
15                      10:02 A.M.
                      TAMPA, FLORIDA
16  _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
      transcript produced using computer-aided transcription.
22  _____

23            DAVID J. COLLIER, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24          801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
25
```

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFFS:**

4

5            *Matthew Larosiere*

6            6964 Houlton Circle

7            Lake Worth, Florida   33467

8            (561) 452-7575

9

10   **FOR THE DEFENDANTS:**

11

12           *Taylor Pitz*

13           *Michael Drezner*

14           Department of Justice - Civil Division

15           1100 L Street NW

16           Washington, D.C.   20005

17           (202) 305-5200

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    - - - o0o - - -

 3            THE COURT:  Good morning.  Call the case, please.

 4            COURTROOM DEPUTY:  Good morning.  We are together in

 5    Case 23-CV-223, Colon, et al. versus Bureau of Alcohol,

 6    Tobacco, Firearms and Explosives, et al.

 7            If counsel could please identify themselves,

 8    beginning with the plaintiffs.

 9            MR. LAROSIERE:  Your Honor, Matthew Larosiere for the

10    plaintiffs.

11            THE COURT:  Good morning.

12            MR. LAROSIERE:  Good morning.

13            THE COURT:  And with you at counsel table is who?

14            MR. LAROSIERE:  My paralegal, Samantha Katzenberger.

15            THE COURT:  Good morning.

16            And for the defense?

17            MS. PITZ:  Good morning, Your Honor.  Taylor Pitz for

18    defendants.

19            THE COURT:  I can't hear you.

20            MS. PITZ:  Good morning.  Taylor Pitz for the

21    defendants.

22            THE COURT:  Good morning.

23            And with you at counsel table?

24            MR. DREZNER:  And Michael Drezner, Your Honor.

25            THE COURT:  Good morning.
```

1          All right.  We're here for the purpose of addressing

2     the question of this motion for preliminary injunctive relief

3     sought by the plaintiffs in the case.

4          Over the course of time the Court has attempted to

5     really find out who is making a claim and why for injunctive

6     relief.  I have managed to get in from the plaintiffs' side

7     affidavits from certain of the plaintiffs that sort of resolve

8     their status.  I'm still curious about Second Amendment

9     Armory's status and its principal's status insofar as the SAF

10    injunction is concerned and insofar as, for the corporation's

11    rights, its possession of the challenged weapons or its prior

12    possession or its intent to possess the challenged devices, so

13    could we start there.

14          MR. LAROSIERE:  Yes, Your Honor.  May it please the

15    Court.

16          The interesting thing about Plaintiff Second

17    Amendment Armory is that it also represents the equities and

18    interests of its customers, and I agree with Your Honor that --

19    plaintiffs are confused.  Where it seems clear to plaintiffs

20    that at the present moment Second Amendment Armory attempted to

21    come into compliance by, as it said in its affidavit, removing

22    the braces from any firearms that it had in its possession

23    which had those braces affixed beforehand, it appears the

24    Government's response is to say that it thinks it may be able

25    to still prosecute for a constructive possession of regulated

1    articles.

2         Frankly, that kind of hands plaintiffs the most

3    aggressive interpretation that it could seek, is that in fact

4    Second Amendment Armory is still under a real credible threat

5    of irreparable harm, despite its removal of the articles from

6    the braces; and furthermore all of its customers which had

7    purchased these firearms in the intervening decade of

8    reasonable reliance upon defendants, we're not aware of their

9    compliance; and that factors into why we have asked for

10   nationwide or at the very, very minimum statewide relief.

11   Its customers ought be able to rely on that --

12        THE COURT:  What authority do you have that the

13   seller of a weapon can stand to support the rights of its

14   previous purchasers or its expected purchases of weapons in the

15   context of a Second Amendment claim?

16        MR. LAROSIERE:  Well, in the very limited context of

17   the post-*Bruen* world, we do look to *Mock v. Garland*, as we've

18   discussed quite heavily, which does specifically give

19   protection to all of the customers and their potential

20   customers of the business defendants in the Second Amendment

21   Foundation case.  Similarly, customers of the business

22   defendants were -- their rights were rightly asserted through

23   the business entity.  It is indeed a novel --

24        THE COURT:  The Fifth Circuit doesn't offer any

25   reasoning for that, it simply issues a standdown injunction

1   pending the resolution of the case, so in a post-*Bruen* world,

2   post-*Mott*, unpublished, non-binding, limited injunction, under

3   what authority does a corporate entity that is not selling the

4   offending items stand in the shoes of its customers in regard

5   to those items?

6           MR. LAROSIERE:  Your Honor, I think with respect to

7   those previous customers, those previous sales, it has been

8   held that -- I don't have the case cite in front of me, I'm

9   happy to provide it to Your Honor later on, that a later damage

10  to business goodwill, et cetera, from, "hey, I purchased this

11  product, you indicated it was okay," relying on the Government,

12  again, reflects poorly on that business.

13          Furthermore, we --

14          THE COURT:  So you're relying on a potential

15  reputational interest of Second Amendment Armory in regard to a

16  statute that wasn't in effect at the time, or regulation or

17  interpretation or whatever you want to call it that wasn't in

18  effect at the time of the sale, someone is going to hold that

19  against Second Amendment Armory?

20          MR. LAROSIERE:  That is one theory, Your Honor.

21          THE COURT:  Do you have a plausible theory?

22          MR. LAROSIERE:  The Second Amendment does protect and

23  it has been found in several Circuit Courts of Appeal that it

24  does protect a right to sell and acquire firearms.

25          THE COURT:  By an individual.

1          MR. LAROSIERE:  By an individual, and therefore all

2     of those --

3          THE COURT:  Were those individuals corporate

4     individuals in those cases or were they individuals?

5          MR. LAROSIERE:  I do believe there were -- there were

6     cases specifically protecting the right to sell.

7          THE COURT:  By an individual or by a corporation?

8          MR. LAROSIERE:  By a corporation.  And so

9     I understand I am arguing for a merger of different theories

10    here.  I do fully understand that.  I don't believe that there

11    is a case that directly points to the conclusion I'm drawing,

12    but I think it's a fairly fair inference to say if the sale of

13    these arms was protected, the institutional association between

14    business and client falls under that penumbral right.

15         THE COURT:  Well, we're going away from penumbral

16    rights, the last I checked, in the Supreme Court.

17         MR. LAROSIERE:  Yes.  Bad choice of words.  Falls

18    under that clearly enumerated right, and it's clearly related

19    because the ability -- keep and bear, that's the plain text of

20    the Second Amendment, and it would be difficult to bear

21    something without the ability to acquire it.  I think it's a

22    necessary outflow that there are certain protected acquisition

23    interests as well as privacy interests that flow from the

24    purchase of these firearms, and in fact that's reflected in the

25    U.S. Code, where the Government is forbidden from keeping a

```
 1    record of all firearms transactions, so I think that pretty
 2    clearly shows a historical tradition of, one, respecting the
 3    sale of common firearms, and, two, the related right to privacy
 4    in that exercise of a fundamental right, Your Honor.
 5             THE COURT:  And if Second Amendment Armory doesn't
 6    have a right that's protected or that is being infringed, then
 7    I think the only other person I am principally concerned about
 8    is the principal of Second Amendment Armory, and is his name
 9    Martin?
10             MR. LAROSIERE:  Yes, Your Honor.  Will --
11             THE COURT:  I beg your pardon?
12             MR. LAROSIERE:  Ted William Martin.  Yeah, his last
13    name is Martin.
14             THE COURT:  Well, he's your client.  What is his
15    name?
16             MR. LAROSIERE:  Yeah, last name is Martin.
17             THE COURT:  Right.  Martin is asserting his claim,
18    but he hasn't really told me his status vis-à-vis SAF, and it
19    appears to be purposeful, and I can't tell.
20             MR. LAROSIERE:  I don't think that was purposeful.
21    I --
22             THE COURT:  Is he a member of SAF?
23             MR. LAROSIERE:  I'm not sure.  It is hard to
24    determine sometimes, but I think it's --
25             THE COURT:  It's hard for him to determine whether he
```

1  joined SAF?

2          MR. LAROSIERE:  Whether one -- because a lot of these

3  organizations don't have like membership cards and membership

4  is triggered by a $15 donation, so there's a suspicion that he

5  is, but we didn't want to assert that to the Court.

6          THE COURT:  I don't understand what you mean by

7  there's a suspicion about whether your client sent $15 to the

8  Second Amendment Foundation.

9          MR. LAROSIERE:  Yes, Your Honor.  We're not exactly

10 aware of whether Mr. Martin himself is a member.

11         THE COURT:  Why doesn't he know?

12         MR. LAROSIERE:  Again, because oftentimes, as I

13 understand it, Your Honor, these memberships can come about

14 from Facebook drives or what have you that is triggered by a

15 $15 donation, and when an individual says they're not sure,

16 I -- and, furthermore, I don't believe Mr. Martin has

17 specifically indicated that he possessed a braced weapon at

18 this time.  I do believe that he -- as he said, in his

19 possession and in the shop's pos -- so all of those firearms

20 have had the braces removed, in any event, and yet the

21 Government still -- which we assert is an attempt at

22 compliance, which shows the depth of vagueness and wild

23 inequity inherent in the Government's --

24         THE COURT:  Well, people are the source of lawsuits,

25 theories or not, and I need to know who is the plaintiff that

1    I have to be concerned about and whose rights I have to be

2    concerned about protecting, not ultimately but on an expedited

3    basis with the issuance of extraordinary relief, and insofar as

4    I can tell, all your clients are protected by the Fifth Circuit

5    injunction so far.  Martin doesn't want to say but probably is

6    also.  We don't know, I guess.  And so if that injunction is in

7    place and is going to be in place until the Fifth Circuit rules

8    on this very weighty question, what is the imminent and

9    irreparable harm your clients will face if this Court doesn't

10   issue another injunction on top of the Fifth Circuit

11   injunction?

12          MR. LAROSIERE:  Yes, Your Honor.  I understand.  And

13   there is case law showing that the fact that other injunctions

14   exist in other courts outside of this jurisdiction does not

15   count against a grant of injunction here because the plaintiffs

16   here are -- at any point, without any action or inaction from

17   these plaintiffs, that injunction could be dissolved, and that

18   could happen tomorrow.

19          THE COURT:  And tomorrow we can come back in here and

20   have this argument.

21          MR. LAROSIERE:  But during that intervening time they

22   would face that -- the problem is, one, they've disclosed the

23   status to the Government; two, the Government has indicated

24   that even where those people are clearly protected by the

25   injunction, the Government didn't admit that they were safe in

```
 1   any way.  The Government asserted that it isn't sure whether --
 2            THE COURT:  Are those cases that you're relying on
 3   cases with nationwide injunctions governing an entire group of
 4   people with whom your client is associated and thus falls under
 5   the protection of?
 6            MR. LAROSIERE:  So this was specifically -- in those
 7   cases, no, they were actually similar, where here there was not
 8   a nationwide injunction, there is --
 9            THE COURT:  I'm sorry?
10            MR. LAROSIERE:  There is no nationwide injunction
11   here in the Fifth Circuit.
12            THE COURT:  There is a nationwide injunction in the
13   Fifth Circuit to the extent that the folks are members of the
14   SAF, as I read the injunction fairly.  I assume the Government
15   doesn't intend to enforce this law against members of the
16   Second Amendment Foundation, wherever they might exist.
17   Am I wrong about that?
18            MS. PITZ:  No.  You're absolutely right, Your Honor.
19            THE COURT:  Okay.  So the SAF people are protected,
20   all of your people are SAF members, we're not sure about
21   Mr. Martin, but he suspects he might be, and so insofar as that
22   injunction sits over to protect the rights of your clients,
23   unless and until it's dissolved by the Fifth Circuit, why do we
24   need a second injunction to protect them?
25            MR. LAROSIERE:  For one, because, again, I do believe
```

1   that that case law shows that there is no points to be taken

2   away from our award for objection.  The question is --

3            THE COURT:  No points to be taken away from what?

4            MR. LAROSIERE:  Your Honor is very aware of the

5   factors regarding motions for preliminary injunction.  I won't

6   waste your time by --

7            THE COURT:  I just didn't understand what you said

8   because you trailed off at the end of your sentence.

9            MR. LAROSIERE:  The case law, Your Honor --

10           THE COURT:  You said there are no points to be taken

11   away from our --

12           MR. LAROSIERE:  The eminency, by the existence of an

13   injunction in another court, especially -- I can understand if

14   there was an injunction as to the particular client, but the

15   clients' interests are here in the Middle District.

16           THE COURT:  Well, the clients' interests are to bear

17   these types of arms, and the Fifth Circuit, which is a spot

18   above my pay grade, has said the Government cannot enforce this

19   provision against them until it lifts its injunction, and

20   I suspect, as the Government acknowledges here, it's not going

21   to, and your clients are telling me they are all members of the

22   SAF, then they are protected.  So that is the biggest hurdle,

23   is the available proof of irreparable harm, and that burden

24   falls on plaintiff.

25           MR. LAROSIERE:  Well, with respect to Mr. Martin, we

1  have no evidence that he's a member of these organizations.

2  That was the answer that we got.  And so -- and again --

3          THE COURT:  That is the answer that you got from him?

4          MR. LAROSIERE:  Yes, Your Honor.

5          THE COURT:  Is he doesn't know?

6          MR. LAROSIERE:  Yes, Your Honor.

7          THE COURT:  Because he doesn't remember whether he

8  sent a check or a donation to the SAF?

9          MR. LAROSIERE:  The way some of these -- I understand

10 that --

11         THE COURT:  Yes or no.  He can't remember?

12         MR. LAROSIERE:  That sounds -- that sounds correct,

13 Your Honor.

14         THE COURT:  I don't understand what you mean when you

15 say "that sounds correct."  I can only ask you --

16         MR. LAROSIERE:  Right.

17         THE COURT:  -- as a person who has had a conversation

18 with Mr. Martin whether he sent a check to the SAF.  And you're

19 telling me he doesn't know?

20         MR. LAROSIERE:  Yes, Your Honor.  And I understand

21 how that might sound, given -- Your Honor might not be aware

22 how these organizations do their memberships.  Like I said,

23 they -- there are many bizarre ways that they collect members,

24 and I think that leads to, frankly, why we shouldn't be resting

25 on this Fifth Circuit injunction, which, frankly, makes this a

1    pay-to-play regime in the exercise of a fundamental right.

2            My client can't prove that he's a member of the SAF.

3    Now the Government is aware of -- despite my client's attempt

4    to comply, the Government is still saying that they may

5    prosecute him for constructive possession of an SBR, so I think

6    at the very, very, very, very minimum we need an injunction as

7    to the individual client there to protect him from that very

8    real threat.  And, again, that is -- that leads into some of

9    the other factors and, frankly, into our likelihood of success

10   on the merits, but I do think it's necessary to prevent harm as

11   to Mr. Martin, Your Honor.

12           THE COURT:  Does the Government know whether

13   Mr. Martin is a member of the SAF?

14           MS. PITZ:  No, we do not.

15           THE COURT:  And if the Government doesn't know and if

16   the injunction insofar as these plaintiffs are concerned only

17   covers members of the SAF, in addition to the plaintiffs in the

18   Texas case, then does the Court need to be concerned about

19   Mr. Martin's rights being infringed in this interim period?

20           MS. PITZ:  Respectfully, Your Honor, the Court does

21   not need to be worried at this stage.  It is plaintiffs' burden

22   to demonstrate that they are likely to suffer irreparable harm,

23   and plaintiffs' have failed to provide sufficient facts from

24   which we could make any sort of determination as to whether or

25   not that plaintiff is in possession -- in constructive

1    possession of short-barreled rifles.

2          THE COURT:  Well, I'm not asking about that piece.

3    My question is about his coverage under the prior injunction.

4          MS. PITZ:  Well, even assuming that plaintiff is not

5    covered by the prior injunction --

6          THE COURT:  Well, I don't want you to assume that for

7    purposes of my question.  I want you to answer my question, if

8    we assume that he is not covered by the injunction, does the

9    injunction provide any cover for him?

10          MS. PITZ:  No, it does not.

11          THE COURT:  So then we do have to reach the merits of

12    this case to address the question of the violation of his

13    Second Amendment rights?

14          MS. PITZ:  We would at least need to turn to the

15    merits of whether or not plaintiffs have demonstrated

16    irreparable harm.  I think that question has been presented

17    wholly apart from the existence of the Fifth Circuit

18    injunction, and, once again, I would reiterate that on the

19    facts before the Court plaintiffs have failed to make that

20    showing.

21          THE COURT:  All right.  Let me hear from you on the

22    question of irreparable harm, assuming that Mr. Martin is not a

23    member of the SAF.

24          MR. LAROSIERE:  Yes, Your Honor.

25          Irreparable harm -- this is why the Second Amendment

1    allows us -- under *Bruen* makes this so clean.  If we have a

2    likelihood of success on a Second Amendment challenge, we've

3    established irreparable harm right there.  A right delayed or

4    infringed for even a moment is irreparable harm, and it's a

5    clean and easily-applied framework.  The simple question is --

6              THE COURT:  You may use the podium if you prefer.

7              MR. LAROSIERE:  Yes, Your Honor.

8              The simple question is is the Government targeting

9    conduct targeted by the plain text of the Second Amendment, and

10   it obviously is, the keeping and bearing of an arm.  The

11   Government attempts to escape Second Amendment analysis in

12   two ways which are unsupportable.  First, it argues that these

13   are not an arm by arguing out of both sides of their mouth, on

14   the one hand saying we're only regulating firearms with

15   attached pistol braces --

16             THE COURT:  Let's slow down --

17             MR. LAROSIERE:  Okay.

18             THE COURT:  -- just a little bit to the first point.

19             Does Mr. Martin have such an arm, has he ever had

20   such an arm, and do I have any evidence in front of me he has

21   any intent to have such an arm?

22             MR. LAROSIERE:  Well, yes, Your Honor, the affidavit

23   that he had in his as well as the shop's possession, because

24   he's the owner of the shop, these firearms, and the fact that

25   he removed the brace, if Your Honor thinks that defeats the

1    question, it directly contends with the Government's position,

2    whose interpretation is what we're fighting here.  So there is

3    evidence before the Court that Mr. Martin and, frankly, Second

4    Amendment Armory, possessed these items that the Government is

5    threatening enforcement of, and --

6            THE COURT:  Not to make such a fine distinction, but

7    do these weapons belong to Second Amendment Armory or do they

8    belong to Mr. Martin?

9            MR. LAROSIERE:  Your Honor, I'm not sure.  It's a --

10   it's -- as I understand, this is a privately-held business.

11   You could argue that all of its personal property is owned --

12   personal property -- all of the business property is owned by

13   him.  I am aware that -- I think we would rest on the affidavit

14   itself, which says that he has in his own possession, right,

15   firearms which previously had these braces and which are just

16   separated, and then we go to the Government saying that's

17   regulable.  So I think it's handled on the face of the

18   affidavit.

19           THE COURT:  All right.

20           MR. LAROSIERE:  Shall I proceed?

21           THE COURT:  You may.

22           MR. LAROSIERE:  So in *Bruen* the Supreme Court

23   eliminated a multistep framework for Second Amendment analysis

24   which the Government is here trying to resurrect.  "It's not an

25   arm" argument is unsupportable, it draws analysis from a case

1    involving suppressors, which is an outlier case, and also

2    which -- suppressors are separately defined as their own

3    firearms under the act, so it's completely inapplicable.

4           And then the other case it points to saying

5    pipe bombs -- we're not arguing about pipe bombs here, we're

6    arguing about ordinary firearms, which were held by in the

7    Government's estimation 3 million Americans, and in the

8    Congressional Research Service's estimation over 10 million,

9    which is multiple, multiple times, in fact an exponent more

10   than were found to be in common lawful use in *Caetano*, which

11   was only a quarter million weapons, so the "not an arm"

12   argument, it's just a nonstarter.  They are out of one side of

13   their mouth saying "we are regulating firearms with attached

14   stabilizing braces" and out of the other side saying, "oh,

15   we're just regulating an accessory."

16          Well, it doesn't work like that, because on the one

17   hand the text of the rule is very clear, on the other hand even

18   to the extent that they are arguing, oh, well, you can do some

19   unknown modification of the firearm in order to keep it, well,

20   that exact argument was shot down in *Heller*.  New York,

21   fascinatingly, here attempted the exact opposite distinction

22   when defending its handgun ban, saying, oh, well, you can just

23   put a stock and a 16-inch barrel on your handgun, right,

24   flipping the roles here, and that is -- and you'll be just fine

25   and you won't be prevented from keeping it operable in the

1    home, and the Supreme Court explicitly said no, the

2    availability of other arms in other configurations is not a

3    defense to a Second Amendment analysis.  So that simply fails

4    there, the attachment theory.

5         Furthermore, to the extent the Government is

6    attempting to rest its head on dangerous and unusual, again,

7    number one, it's a conjunctive text, it's not disjunctive, so

8    the simple fact that in *Caetano* a quarter million stun guns

9    were found to be in common lawful use, here the Government's

10   estimate is 3 million, so it's at least common, and to the

11   extent that the Government argues that it's dangerous

12   generally, it's a weapon, they are dangerous, right?  So

13   dangerous and unusual, when it was first brought up by the

14   Supreme Court in *Heller*, was not a blank check to say anything

15   that the Government can articulate is rare or in some way

16   unique is regulable.  In fact, what the Supreme Court said was,

17   taking a step back, statutes regulating the carriage of

18   dangerous and unusual arms, should those be Constitutional, the

19   historical justifications will emerge in future litigation.

20        Here the Government has attempted to bring up

21   historical justifications, which are under *Bruen* clearly

22   exclusively its burden, and it was articulated in *Bruen* that it

23   is a very substantial burden that must be carefully

24   scrutinized, how the analogous regulations asserted by the

25   Government regulate the keeping and bearing of firearms,

1   specifically the right to defend oneself through a firearm and

2   why they were done.

3       The Government here points to Colonial era militia

4   enabling statutes, which went door to door checking muskets.

5   It's very clear why that was done.  It was so that they could

6   fight at a moment's notice and to be sure that they could use

7   community ammunition reserves.  If you actually look to those

8   cited statutes, they go to check whether the caliber of the

9   musket or what have you, rifle in the later statutes, was

10  compatible.  The result there was not to confiscate

11  particularly interesting or what have you firearms, but to

12  ensure that a firearm existed.  In fact, the result of failure

13  of that statute was the provision of a firearm, another gun,

14  not ten years in jail.  The how and why there is completely

15  inapplicable.

16      Insofar as the Government refers to statutes

17  involving proof houses, requiring proofing of firearms, that

18  was done to prevent the sale of dangerous firearms to the user,

19  firearms that would blow the hand off of a user, so they would

20  ensure that the firearm could function with the caliber that it

21  was said to function with.  Nowhere near criminal consequences,

22  nowhere near an analysis and confiscation potentially or

23  destruction of a protected firearm.

24      These are simply not historically analogous.  In no

25  way are they historically analogous to the complaint of conduct

1    here, which is if you possess this firearm, which we admit

2    there are millions of which in circulation, you go to prison

3    unless you pay us a special tax, and if you pay us a special

4    tax you can't freely alienate it, you need our permission to

5    alienate it.  By the way --

6              COURT REPORTER:  Counsel, I need you to slow down a

7    little and speak clearly into the microphone.  I couldn't

8    understand the last thing you said.

9              THE COURT:  Even if you pay us a fee --

10             MR. LAROSIERE:  Even if you do pay us that fee, you

11   now can no longer freely alienate the item, you cannot travel

12   interstate with the item.  If your spouse or significant other

13   is in possession of that item without you physically being

14   present, there are felonious consequences.

15             Again, there is no historical analogue to the

16   treatment of commonly available firearms, especially not to the

17   extent that the Government has admitted that these are

18   available, to felonious consequences and what amounts to

19   outright prohibition.  By the Government's own estimation, only

20   some 100,000 people of the Government's estimated 3 million

21   affected population did actually even attempt to register.

22             So, again, this is a wildly problematic issue which

23   threatens massive criminal consequences for the simple

24   peaceable possession of a firearm, which is a protected

25   instrument.

1      THE COURT:  Before the weapons that Mr. Martin owned

2  were affixed to a brace, what was their status?

3      MR. LAROSIERE:  As I understand, the firearms came

4  equipped with braces, and those were sold and transferred as

5  pistols.

6      THE COURT:  The firearm was sold and transferred as a

7  pistol with the brace affixed to it?

8      MR. LAROSIERE:  Correct, as was the encouraged

9  practice by Government defendants to specific firearms.

10     THE COURT:  And when the brace was removed from the

11 weapon in response to the new regulation, what happened to the

12 brace?

13     MR. LAROSIERE:  As I understand, it was stored

14 separately.

15     THE COURT:  But not destroyed?

16     MR. LAROSIERE:  No, Your Honor.

17     THE COURT:  And not rendered incapable of being

18 reaffixed?

19     MR. LAROSIERE:  No, Your Honor.  And, frankly,

20 plaintiffs aren't aware of how that can be done without

21 substantially damaging the firearm.

22     THE COURT:  The firearm or the brace?

23     MR. LAROSIERE:  The firearm.  Because the rule says

24 either destruction of the brace or modification of the firearm

25 to no longer accept the brace.  Well, with AR-15s, which are

1    the subject of all of our plaintiffs but one, the firearms --

2    the brace attaches to the buffer assembly, which is an integral

3    mechanical component.  Destruction or cutting or modification

4    thereof would result in a nonfunctional firearm.

5           THE COURT:  Do you have a photograph of the firearm

6    with a brace and a firearm without a brace?

7           MR. LAROSIERE:  I do not have that with me,

8    Your Honor.

9           THE COURT:  All right.  Let me hear from the

10   Government on the irreparable harm piece.

11          MR. LAROSIERE:  Thank you kindly, Your Honor.

12          THE COURT:  Yes.

13          MS. PITZ:  Good morning, Your Honor.

14          On the irreparable harm, we would underscore once

15   again the *Wreal versus Amazon* case in the Eleventh Circuit,

16   which states clearly that a delay of even a few months is

17   sufficient to militate against a finding of irreparable harm.

18   Here plaintiffs were clearly on notice of the proposed rule.

19   They filed the Complaint the day after the rule was published.

20          THE COURT:  I'm not moved by that argument because

21   they filed before the implementation of the rule and they were

22   protected by the filing in Texas on their behalf under the SAF,

23   at least as it relates to some of the plaintiffs, and I suspect

24   Mr. Martin as well, and the rule didn't get implemented until

25   May -- what was the date?

1          MS. PITZ:  It was effective immediately, but it did

2     not go into effect, as Your Honor suggests, until May 31st,

3     2023.

4               THE COURT:  Did they file before the effective date?

5               MS. PITZ:  They did, one week --

6               THE COURT:  All right.

7               MS. PITZ:  -- prior to the effective date.

8               THE COURT:  I'm not sure that that theory protects

9     from a finding of irreparable harm, especially for the -- what

10    the *Bruen* Court has now said is one of the highest protected

11    Constitutional rights.  So what is your next argument?

12              MS. PITZ:  Even so, Your Honor, any harm is still

13    self-inflicted at this point, which cases within this district

14    have held is insufficient to constitute irreparable injury to

15    support a preliminary injunction.  Plaintiffs' had a 120 day

16    compliance period to comply with the rule, and still during

17    that time they did not --

18              THE COURT:  Well, self-inflicted means if you agree

19    to allow us to abridge your Second Amendment rights then we

20    won't come after you, and if you don't agree, we will?  How

21    is that self-inflicted rather than Government-imposed?  Because

22    you still have to give up your claimed Second Amendment rights

23    in order to not self-inflict the Government's imposed

24    parameters.

25              MS. PITZ:  Your Honor, I would respond that --

1          THE COURT:  Just like a First Amendment right, it's

2     self-inflicted if you choose to speak when the Government has

3     told you you cannot.  And if the Government's telling you

4     you cannot in whatever circumstance might exist is

5     unconstitutional, it's hardly a defense to say, well, you

6     shouldn't have said anything.

7          MS. PITZ:  Our response, I suppose, would then just

8     be to turn to the merits and argue that the Second Amendment is

9     not implicated in the sale or possession of brace-equipped

10    firearms.

11         THE COURT:  So those are the only two irreparable

12    harm arguments you make, is they waited too long and they

13    should just give up their arms until the Court determines that

14    they can bear them?

15         MS. PITZ:  Those are two -- those are two of our

16    arguments.  Additionally, I would note -- I would reiterate

17    plaintiffs' burden to show irreparable harm here.  Plaintiffs

18    have had multiple opportunities to present the Court with

19    sufficient facts to really understand the firearms they're in

20    possession of, what information -- what has been done to any

21    braces they are in possession of, and still --

22         THE COURT:  Well, they've told me now they've stored

23    the braces.  They haven't destroyed the weapons or altered the

24    weapons to make them incompatible with the braces because they

25    claim they don't know how, and the regulation doesn't expressly

```
 1    state how they are to do that.  So I guess you do need to turn
 2    to the merits of your claim that this is not a Second Amendment
 3    violation, and in that regard, contrary to the findings of the
 4    District Court in Texas, it would appear that this burden, even
 5    on a preliminary injunction motion, lies with the Government
 6    and not with the plaintiffs if the Government bears the burden
 7    of proof on the ultimate claim.  And so let me hear from the
 8    Government, since it is the Government's burden, on why this
 9    claim isn't viable as against the assertion that the
10    Government's conduct infringes the right to bear braced items,
11    which the Government has now by its regulation defined as
12    rifles.
13            MS. PITZ:  Yes, Your Honor.
14            The Second Amendment is not implicated here, as our
15    brief indicates, for three separate reasons.  And I would note,
16    just in response to plaintiffs' counsel's argument, that these
17    are arguments made in the alternative, so they need not be
18    completely reconciled with one another, but we would suggest
19    the Court consider each separately and determine what makes the
20    most sense to Your Honor in how she thinks about how braces are
21    configured with firearms.
22            THE COURT:  But you kind of have to accept the
23    reality of how it got here.  You can't say if you -- on the one
24    hand let's treat it this way, and on the other hand let's treat
25    it this other way, but don't consider the two together because
```

1   logically together they may be incongruous.

2          So let me hear what your three arguments are and then

3   I'll decide whether they are incompatible with each other in

4   light of the Government's conduct.

5          MS. PITZ:  Yes, ma'am.

6          First, stabilizing braces are not bearable arms

7   protected by the Second Amendment under *Heller*.  They are akin

8   to -- Courts have uniformly held that because instruments like

9   silencers are accessories, they are not directly protected by

10  the Second Amendment.

11         THE COURT:  But braces standing alone aren't being

12  regulated, are they?

13         MS. PITZ:  They are not.

14         THE COURT:  And so the argument that braces are

15  accessories and therefore the regulation of braces doesn't

16  infringe the Second Amendment assumes that you're regulating

17  standalone braces, which you are not.  You're only regulating

18  these if they are attached to a short-barreled rifle, a

19  sawed-off shotgun or a pistol, in which case they are now a

20  firearm interpreted as, defined as a rifle.

21         And so, standing alone, I think I agree with you that

22  if you told Mr. Martin he can't own a brace sitting in his

23  apartment on a shelf to look at because he thinks braces are

24  pretty, then that probably isn't a Second Amendment violation,

25  but that's not what you're saying.  What the Government is

```
 1   saying is you can't have a brace attached to a short rifle to
 2   avoid the implications of possession of short rifles for
 3   registration purposes.  Isn't that right?
 4        MS. PITZ:  Your Honor, what I would clarify is just
 5   that the Government -- or perhaps it's better framed as
 6   plaintiffs are indicating that the Second Amendment right
 7   implicates their ability to attach the brace to a pistol.
 8   Pistols are -- the Government does not purport to regulate
 9   pistols through this rule as they exist independent of braces,
10   it's only once the brace is attached.  And, once again, the
11   brace itself has no separate function, it has no independent
12   ability to cause harm.
13        THE COURT:  But you're not telling them they can't
14   attach the brace to a pistol or a short rifle, you're telling
15   them they have to detach it from a pistol or a short rifle or
16   be in violation and then subsequently can't attach them to new
17   weapons that they might possess.  So there are two
18   prohibitions, and arguably a third, that is, if you still kept
19   it with you and then you now have your old rifle back, you're
20   still in violation because now you have a rifle made from a
21   short -- a weapon made from a rifle, and so you can't have that
22   either.  So there are lots of things you cannot have, the only
23   one of which that you're not regulating is that you can have a
24   standalone brace sitting in your house not bothering anybody.
25   That's the only thing that you are not regulating, is the
```

1   ownership of a brace that has never previously been attached to
2   a weapon sitting in your house, and no one is complaining about
3   that.  There's no plaintiff here saying, "I want to buy a brace
4   and put it in my house and put it on a shelf and look at it and
5   the Government won't let me."  No one is making that argument.
6        So the argument the plaintiffs are making -- the
7   arguments they're making are that, one, we want to keep our
8   braces attached to our short -- previously short rifles, and we
9   want to be able to purchase said braced weapons in the future,
10  and then they have all their regulatory -- they don't want to
11  report them, that's another issue, but with respect to the
12  possession, this is not just a standalone, unregulated brace,
13  and the only way you even get to regulate it is if it is a
14  firearm, otherwise it's outside the parameters of the NFA and
15  the GCA anyway.  So what are you doing regulating nonfirearm
16  braces in the first place, if that's all you're doing?
17        MS. PITZ:  I take your point, Your Honor, and if you
18  prefer to see the regulation at issue addressing both the
19  attachment, the brace, and the firearm in combination as one
20  entity, I think our latter two arguments speak to that.
21        The NFA does not ban the sale or possession of
22  brace-equipped pistols, even if they're determined to be
23  short-barreled rifles, it only subjects them to the additional
24  regulatory requirements of the NFA.  Those requirements do not
25  implicate the Second Amendment.

```
1              THE COURT:  So if you have a pistol, an original

2     pistol that has a brace, your contention is this regulation

3     only requires registration and disclosure?

4              MS. PITZ:  Yes, ma'am.

5              THE COURT:  And you can keep your brace and you can

6     buy one in the future, a braced pistol?

7              MS. PITZ:  Yes, ma'am.

8              THE COURT:  And then with respect to sawed-off

9     shotguns and short rifles, what does the regulation prohibit?

10             MS. PITZ:  The regulation -- the rule only addresses

11    stabilizing braces as attached to a firearm when -- under the

12    factors the rule sets forth, it indicates that the weapon is

13    designed or intended to be fired from the shoulder.  That's the

14    statutory inquiry that brings any weapon under the regulatory

15    requirements of the NFA.

16             THE COURT:  Well, I'm a little confused.  What if a

17    pistol is intended to be fired from the shoulder with the

18    attached brace, is it then within the parameters or not?

19             MS. PITZ:  Assuming that under the factors the rule

20    sets forth that ATF would conclude that it is intended and

21    designed to be fired from the shoulder, then, yes, that pistol

22    would be considered a short-barreled rifle subject to the NFA's

23    registration requirements.

24             THE COURT:  Well, you have to help me here, because

25    we're under preliminary injunction, and you're telling me
```

1  assume this, assume that.  You have the regulation.  You

2  promulgated the regulation.  Tell me what the regulation says

3  is prohibited.

4        You initially told me pistols were fine, and now

5  you're telling me pistols are not fine if the pistol has a

6  brace and the point of attaching the brace is to fire it from

7  the shoulder.  What would be another purpose of attaching a

8  brace to a pistol?

9        MS. PITZ:  Well, as some of the prior examples cited

10  in the rule initially -- initial designs of stabilizing braces

11  were supposedly allowed to facilitate single-handled firing, as

12  pistols are traditionally and ordinarily fired just with

13  single-handed firing.  So the regulation was put into place to

14  clarify that when, instead, a brace doesn't facilitate

15  single -- stabilized single-handed firing but instead remakes

16  the weapon to facilitate firing from the shoulder, that is the

17  statutory definition of what a rifle is.  When a weapon is

18  designed and intended to be fired from the shoulder, that is

19  what the NFA says is a rifle.

20        THE COURT:  And so if it is a rifle and it has been

21  reconfigured to fire it from the shoulder, whether it was a

22  pistol or a short-barreled rifle before or a sawed-off shotgun

23  before, it is all regulated?

24        MS. PITZ:  That is correct, although I would note

25  that prior to the existence of the rule the NFA itself

1    specifically regulates short-barreled rifles and short-barreled

2    shotguns.  Instead pistols had previously been outside that

3    kind of regulatory umbrella, and now it's only with the

4    addition of a stabilizing brace that it has really transformed

5    the function or rather how the weapon is fired such that it

6    comes within the NFA's parameters.

7          THE COURT:  Beyond registration requirements, what

8    prohibitions does the rule establish in the possession of or

9    the subsequent acquisition of such attached weapons?

10         MS. PITZ:  The rule itself does not impose any

11   prohibitions.  The rule itself just indicates that this is how

12   ATF moving forward is going to determine what type of firearm a

13   braced pistol is.  It sets forth factors the agency will look

14   for in properly classifying such weapons, and it amends the

15   regulatory definition, but the legal obligations, as you

16   suggest, the prohibition, the taxing requirement, the

17   registration requirement, those requirements flow directly from

18   the NFA itself.

19         This rule simply is stating and clarifying for the

20   public how ATF is applying the NFA as to these somewhat

21   newly-developed, increasingly popular pistols equipped with

22   stabilizing braces.

23         THE COURT:  But by interpreting or expanding the

24   definition of rifle to include these braces or braced weapons

25   to be subject to regulatory oversight or ATF prohibition,

1    doesn't the rule have that effect?  Because if you sat silent,

2    like you were before January, we wouldn't be here, because

3    people would still be circumventing the ATF and the NFA

4    regulatory scheme by extending the length of their

5    short-barreled weapons, right?

6              MS. PITZ:  Well, Your Honor, prior to the existence

7    of the rule ATF had classified some firearms equipped with

8    stabilizing braces as short-barreled rifles subject to the NFA.

9    It had just done so inconsistently.  Prior to the rule there

10   had been a series of inconsistent classification

11   determinations, so instead of ATF, you know, going through

12   notice and comment or issuing something in the Federal

13   Register, instead ATF was kind of operating on a case-by-case

14   basis of a manufacturer submitting a particular firearm

15   combined with a particular brace to the ATF for classification.

16   And so ATF had issued classification orders, and some of those

17   had determined that those weapons were short-barreled rifles

18   subject to the NFA, but some didn't, so this rule simply seeks

19   to clarify what the agency's approach is going to be moving

20   forward in a sort of cohesive way that provides notice to the

21   regulated community.

22             THE COURT:  So was ATF operating outside its

23   authority in the prior circumstances when it was making these

24   case-by-case decisions, or was it acting within its authority?

25             MS. PITZ:  No, it was acting within its authority to

1    classify weapons, Your Honor.  It was just simply, for better

2    or for worse, wavering between different considerations in

3    coming to classification determinations.

4          THE COURT:  Are you here suggesting that the

5    implementation of this thing, whatever it is, a rule or an

6    interpretation of an existing rule, doesn't impact the right of

7    individuals to possess braced weapons?

8          MS. PITZ:  Your Honor, the rule itself simply is

9    amending the statutory definition and explaining the factors

10   that ATF will consider in making specific classification

11   determinations moving forward.  It doesn't per se specify

12   whether or not a particular firearm and particular brace

13   combination itself is a short-barreled rifle.  We would submit

14   that the rule itself does not do that; however, in full

15   recognition of that, of course, as a result of the rule

16   ATF will be making such classification determinations, but ATF

17   would submit that those determinations would properly be

18   challenged on their own, on the merits of whether or not,

19   you know, the application of the rule's factors aligns with the

20   statutory inquiry of whether or not a weapon is designed and

21   intended to be fired from the shoulder.

22         THE COURT:  So when the rule says "Persons in

23   possession of short-barreled rifles equipped with a stabilizing

24   brace device have until May 31, 2023 to come into compliance

25   with the NFA's requirements," it doesn't really mean that, it

1  just means you can do whatever you want to do, we don't know

2  what the ATF is going to do with you, do whatever you want to

3  do?

4          MS. PITZ:  I take your point, Your Honor.  That point

5  is clear, the rule sets forth clear means of compliance with

6  the rule, but --

7          THE COURT:  Not only clear means of compliance with

8  the rule, but a direct mandate to come into compliance with the

9  rule.  It doesn't -- it's not optional.  It doesn't say do or

10  don't, left up to you, we're not going to do anything if you

11  don't.  It says if you don't do this then you're going to face

12  penalties.

13          MS. PITZ:  Yes, but I would just reiterate that those

14  penalties all flow directly from the NFA itself, and so the

15  rule is just explaining how ATF will apply the NFA going

16  forward.

17          THE COURT:  So if the Court finds that the rule means

18  what it says, that you cannot any longer possess these items

19  without being in compliance, "compliance" I think means to

20  register them or segregate them and destroy the compatibility

21  of them with each other by, according to the plaintiff -- and I

22  didn't see that nuance, I'll go back and look -- changing the

23  weapon, not changing the brace, and also not acquiring any new

24  ones and also not giving the old ones to anyone without also

25  registering that transaction, that that rule doesn't abridge

1   the right to bear those items as arms in that fashion?

2          MS. PITZ:  Your Honor, I would again just reiterate

3   that even the rule, although it sets forth a uniform approach

4   to classification, does not ban all braces, it simply sets

5   forth -- or braces equipped on particular firearms, it just

6   sets forth how ATF is going to classify these weapons in the

7   future.  If such a weapon is classified as a short-barreled

8   rifle, then it falls within the NFA's existing prohibitions, or

9   additional regulatory requirements, excuse me, which unless

10  Your Honor would like to continue on this point, I would like

11  to just reiterate the Government's position that the NFA's

12  registration requirements do not implicate the Second

13  Amendment.

14         THE COURT:  Does the rule prohibit a person from

15  continuing to possess the weapons or acquire new weapons with

16  braces attached?

17         MS. PITZ:  If I understand Your Honor's question

18  correctly, no, it does not directly prohibit any weapon or the

19  acquisition of any weapon.  The NFA is what sets forth the

20  prohibition on unregistered firearms.

21         THE COURT:  So the rule doesn't say that you cannot

22  acquire a weapon post the May date that has a brace attached to

23  it that would ordinarily be a short rifle or sawed-off shotgun?

24         MS. PITZ:  I believe that would be determined by the

25  facts of the particular circumstance.  Certainly moving

1    forward, no, it just simply indicates that where braces and

2    braced-equipped pistols fall within the NFA, they're just

3    required to be registered with -- presented to the NFA, and

4    then there may -- they're subject to additional regulatory

5    controls, essentially, Your Honor, but they're not -- they're

6    not prohibited moving forward, and --

7              THE COURT:  Well, I need to pull the rule up.

8              Can you pull the rule up that you're talking about

9    that doesn't require the person to remove the brace and doesn't

10   prohibit the person from getting a new such equipped weapon?

11             MS. PITZ:  Your Honor, I would direct you to

12   88 Federal Register 6570, where it says that persons in

13   possession of short-barreled rifles equipped with a stabilizing

14   brace have until May 31st, 2023 to come into compliance with

15   the NFA's requirements.  So certainly the rule is directing

16   people how to comply with the statutory requirements, but the

17   Government's position is that the substantive legal

18   registration requirements, those all flow from the NFA and not

19   directly from the rule.

20             THE COURT:  But previously there was no such rule,

21   and so to the extent that the ATF was taking that position

22   under the NFA, the ATF was doing it on its own volition, and

23   now there is an express rule that says you must be in

24   compliance, and so any defense a person would have had to

25   ignorance, to that's not what the NFA says, those defenses are

1   gone, because the rule now makes it clear that you have to be

2   in compliance or face the consequences, up to and including

3   criminal penalties.

4          MS. PITZ:  I believe that's correct, Your Honor, but

5   I would add that prior to the promulgation of the rule ATF had

6   classified certain combinations of braces and pistols as

7   firearms, and so it's not -- this is not the first time that

8   individuals are being subjected to legal obligations and legal

9   consequences for being in possession of these weapons.  The

10  rule is just the first time ATF has sought to undertake a

11  comprehensive methodology in how it makes those determinations.

12         THE COURT:  So the Government's position here is that

13  this rule does not prohibit the possession of these weapons

14  beyond what was already prohibited by the NFA?

15         MS. PITZ:  Correct.

16         THE COURT:  How can you say that with the specific

17  provisions of this rule being so clearly spelled out in the

18  final rule?  And why were you doing all of this if you weren't

19  intending to inform the public of what they could or could not

20  do?

21         I'm trying to pull the final rule summary.

22  One second.

23         MS. PITZ:  Your Honor, if it's helpful --

24         THE COURT:  One second.

25         MS. PITZ:  -- I would just cite to page 4 of our

1  motion to dismiss, which sets forth the statutory provisions at

2  issue here, which specifies that short-barreled rifles must be

3  registered in the National Firearms Registration and Transfer

4  Record to a person entitled to possess that firearm, they're

5  also subject to making transfer taxes and must be approved by

6  the Attorney General before they are made or transferred, and

7  further any person engaged in the business of importing,

8  manufacturing or dealing in NFA firearms must register with the

9  Attorney General.  Those requirements are all flowing directly

10  from the NFA itself, and we would --

11        THE COURT:  What about the provision that -- under

12  the rule that requires them to remove the short barrel and

13  attach a 16-inch or longer rifle barrel to the firearm,

14  removing it from the scope of the NFA, that's not in the rule,

15  that's in the NFA itself?

16        MS. PITZ:  That's not, Your Honor.  That is in the

17  rule itself.

18        THE COURT:  "Permanently removing and disposing of or

19  altering the stabilizing brace such that it cannot be

20  reattached, thereby removing the weapon from regulation as a

21  firearm under the NFA," that's not in the rule, that's in the

22  NFA?

23        MS. PITZ:  We would highlight that that's simply one

24  option for compliance that the rule sets forth, but these are

25  just merely options for compliance to ensure that regulated

1   parties know what they need to do to comply with the

2   requirements of the NFA, assuming that individuals are in

3   possession of brace-equipped weapons that would be considered

4   short-barreled rifles subject to the NFA.

5           And we would just reiterate that these -- the

6   registration requirements that the NFA sets forth, such as --

7   comparable Courts have deemed such requirements, such as being

8   photographed and fingerprinted, do not harm any legally

9   protected interests and are just merely additional costs and

10  logistical hurdles that all citizens bear as ancillary living

11  under a Government.  Likewise, in *Bruen,* Justice Kavanaugh's

12  concurrence reiterated that 43 states employ concealed carry

13  licensing regimes that may demand similar regulatory

14  requirements, such as fingerprinting, a background check, a

15  mental health records check, and training in firearms handling

16  and in laws regarding the use of force, among other possible

17  requirements, and that this indicates that the Second Amendment

18  is not implicated by the NFA's regulatory requirements as they

19  exist.

20          Moreover, since *Bruen* other District Courts have

21  determined that the NFA's registration and taxation

22  requirements are of the type the Supreme Court in *Bruen*

23  determined were permissible.

24          Likewise, another District Court considering a

25  similar challenge to the rule separately determined that the

1   Second Amendment does not prohibit the imposition or reasonable

2   licensing regimes commonly associated with firearms ownership.

3   THE COURT:  Do you have any historical data that

4   establishes the 18th Century practice of prohibiting the

5   possession of braced pistols or braced short rifles or

6   sawed-off shotguns?

7   MS. PITZ:  Your Honor, once again I would reiterate

8   that neither the rule nor the NFA prohibits the possession of

9   these weapons, it simply subjects them to additional regulatory

10  requirements.  I believe our brief cites to comparable regimes

11  for inspection, for licensing, and for taxation.  I believe

12  this taxation example specifically applied to pistols.  Those

13  are set forth --

14  THE COURT:  Counsel suggests, and I haven't looked at

15  this history, that some of the history you've cited is history

16  intended to inspect to ensure that the militia is fully armed

17  and that the weapons aren't dangerous, such that they would

18  explode and hurt someone, not for the purpose of ensuring that

19  they are not in possession of things they're not supposed to be

20  in possession of.  Is that inaccurate, accurate, or do you

21  know?

22  MS. PITZ:  I do not know, Your Honor.  Counsel's

23  papers did not set forth specific critiques, they summarily

24  alleged that the rules that we had set forth were not

25  analogous, and I would --

1            THE COURT:  It's your burden though, right, on this

2      preliminary injunction to tell me the analogous law.  It's not

3      their burden to tell me what's not analogous.

4            MS. PITZ:  That's correct, Your Honor.  We would

5      submit that the regulations we've provided are sufficiently

6      analogous for purposes --

7            THE COURT:  Did you talk to a historian, or did you

8      just go to a website somewhere to see what searches were or

9      weren't permitted back in, what is this, 1789 or 1829 or

10     whenever these cases are?  Let me see.  1667, 1775, 1809, 1651.

11           Did a historian go back and look at the nature of

12     these door-to-door surveys and the purpose of them, or did you

13     just find that this activity occurred back then?

14           MR. DREZNER:  Your Honor, I could speak to that very

15     briefly.

16           THE COURT:  Yes, sir.

17           MR. DREZNER:  Just because I had the honor of doing

18     some of this historical research throughout these cases.

19           We did a fairly comprehensive dive into the

20     historical record trying to locate laws that were analogous to

21     the NFA's regulatory regime in a number of different ways, and

22     while the historical record is obviously challenging to mine

23     from a sort of issue of first impression, we believe that what

24     we uncovered, even in this fairly expedited timeframe, more

25     than sufficiently covers each aspect of the NFA's regime, and

1  so, you know, plaintiff tries to pick apart each separate

2  strand --

3          THE COURT:  My question was quite straightforward.

4          MR. DREZNER:  I hope I answered it.  Thank you,

5  Your Honor.

6          THE COURT:  You did not.

7          The question is:  In pulling these instances of

8  surveys and inspections of weapons that you identify in your

9  briefing, did you go behind the surveys that occurred to

10 ascertain the purpose of the surveys, or is plaintiffs' counsel

11 right that these surveys were really intended to ensure that

12 the militia was fully armed, and in some cases they would give

13 people weapons if they didn't have any, and they were to ensure

14 that the weapons were not defective, not to limit the types of

15 weapons or control the types of weapons that people could

16 possess?

17         MS. PITZ:  So we certainly read the statutory context

18 in which these laws arose and attempted to understand the

19 overall purpose and intent behind these laws, and certainly

20 I would -- I would concede that in some instances these laws

21 were meant to ensure the populace was armed, but the impact

22 upon the populace, which was a survey and understanding of

23 which members of the community owned which firearms so that

24 information could be centrally logged and controlled by the

25 Government, both at a local and state level, that's very

1    similar to the exact type of impact that we're seeing here.

2    No more, no less.

3           THE COURT:  Did the consequence of this inspection

4    yield any punitive measure for possession of the types of

5    weapons that were identified in the survey?  Was there a fee

6    associated with it?  What happened in these scenarios?  Or did

7    they just go down with their paper and quill and write down who

8    had a weapon and say, well, the people on Sycamore Street don't

9    have enough, let's take them some more?

10          MR. DREZNER:  I think certainly in some instances the

11   goal was to provide further weapons.  However, I would simply

12   point the Court back -- the analysis in *Bruen* isn't to ask

13   whether there were similar consequences associated with

14   historical laws.  The question I think the Court asked is

15   is there a historical tradition of sufficiently analogous

16   regulatory measures that we can point to to say this falls

17   within the ambit of the Second Amendment.

18          THE COURT:  And analogous becomes the question,

19   right?  What is sufficiently analogous?  And an analogy has to

20   draw across the field of the behavior, and so if the analogy

21   is, yes, they went and did surveys, but they gave people

22   weapons who didn't have weapons, an analogy to a regulatory

23   regime that says if you have this type of weapon we're going to

24   take it from you unless you do X, Y or Z, or if you have this

25   type of weapon you can either register it with us or destroy it

1  so that it cannot ever be used this way again, that's a

2  different and not quite analogous scenario, wouldn't you agree?

3  　　　　MR. DREZNER:  I would point to two things,

4  Your Honor.  First, the proceeding issue that's being raised by

5  all this, as my co-counsel pointed out, this is not something

6  the rule is implying, so to the extent that plaintiff is

7  challenging these regulatory measures, he's not challenging the

8  rule, he's challenging the entire structure of the NFA.  So if

9  the argument here is that these types of taxation and

10 registration requirements are unconstitutional, then they would

11 be unconstitutional as to any firearm, they could not be

12 imposed as to sawed-off shotguns, machine guns or any other

13 type of dangerous weapon regulated by the NFA.  That's the

14 general argument.

15 　　　　Now, to Your Honor's more specific question,

16 certainly in some of these cases the penalties or the

17 consequences were very different, but I think it's almost

18 extraordinary the way that we were able to find strands of

19 regulations that reflect almost each aspect of the NFA here.

20 There are taxation requirements, there are survey requirements,

21 there are licensing and other regulatory requirements dating as

22 far back as the Virginia Colonies, and so if the plaintiff --

23 　　　　THE COURT:  Well, is there a regulation that says

24 after May 31, 2023, or 1776, you can no longer protect your

25 weapon from the implications of a subsequent penal measure?

1          MR. DREZNER:  Is Your Honor asking, and I apologize,

2     is there a historical law that imposes a penalty for failing to

3     comply with some sort of regulatory measure on that firearm?

4          THE COURT:  Including the confiscation of or the

5     destruction of the weapon as the penalty.

6          MR. DREZNER:  So certainly I would point to several

7     of the taxation laws that we point to where numerous states

8     imposed specific tax amounts on pistols and other types of

9     firearms, and I don't have the exact penalties associated with

10    that offhand, but I'm fairly confident there was either a

11    monetary or confiscatory penalty associated with those laws.

12         THE COURT:  You're confident based on what?

13         MR. DREZNER:  These were taxation requirements, so

14    I'm not sure how a citizen could escape these requirements

15    without some type of penalty being threatened in response.

16         We're happy to provide supplemental briefing if this

17    is a point of interest to Your Honor.

18         But, again, I would point back to the language of

19    *Bruen* which says that the Government need not come up with a

20    historical twin, which is essentially what I think plaintiff is

21    asking for, that we find some sort of 17th Century law talking

22    about confiscating braced firearms.  That's not the requirement

23    of *Bruen*.  *Bruen* says, as Your Honor notes, sufficiently

24    analogous, and it's certainly sufficiently analogous to note

25    that there were laws on taxation, laws on inspection, laws on

1  licensing, again, which underpin not this rule, which is

2  supposedly the point of this case, but underpin the entire

3  scheme of the NFA.

4      THE COURT:  Well, I cannot get a straight answer from

5  the Government about what happens after May 31, 2023 if a

6  person has not come into compliance.

7      MS. PITZ:  At that point if the person has not come

8  into compliance they are -- unless protected by an existing

9  injunction, they are vulnerable to consequences, but those

10 consequences are under the NFA.  They're subject to an

11 enforcement action in the event that ATF becomes aware that

12 they're --

13     THE COURT:  Can they any longer possess their weapons

14 the way they were previously configured?

15     MS. PITZ:  Not without registration, Your Honor.

16     THE COURT:  Can they even register those same weapons

17 post-May 31, 2023 to come into compliance?

18     MS. PITZ:  I would also clarify my previous point and

19 say they must either register or modify the weapon.  So,

20 for example, you could add a longer barrel onto an existing

21 weapon such that it would remain outside the NFA, that would be

22 one option; or, of course, as you're well familiar, remove the

23 brace, modify the brace.

24     After --

25     THE COURT:  Modify the brace or modify the weapon?

1    Because plaintiff said you have to modify the weapon, not the

2    brace, under the rule.

3           MS. PITZ:  I believe that it is modification of the

4    brace, but I would want to quickly refer to the text of the

5    rule to confirm that.

6           I think regardless, and I would agree with plaintiff,

7    the point is just so that they cannot be readily reattached,

8    whether that's a modification on the part of the firearm or the

9    brace.  What matters is --

10          THE COURT:  Can they do any of that if they haven't

11   done it by May 31, 2023?

12          MS. PITZ:  I don't believe there is anything that

13   would prohibit someone from modifying their firearm, but after

14   May 31st, 2023, as the rule is written, those weapons are no

15   longer able to be registered.

16          THE COURT:  And therefore no longer able to be used.

17          MS. PITZ:  Correct.

18          THE COURT:  They need to be destroyed.

19          MS. PITZ:  They need to be destroyed or modified such

20   that they do not come within the parameters of the NFA.

21          THE COURT:  Well, can they even now be modified after

22   May 31, 2023?

23          MS. PITZ:  Yes.

24          THE COURT:  And be in compliance?

25          MS. PITZ:  If they are modified such that they fall

1    outside without -- outside the ambit of the NFA.

2            THE COURT:  So the deadline is meaningless?

3            MS. PITZ:  The deadline is meaningful insofar as it

4    provided a 120 day compliance period where people were able to

5    submit registration forms tax-free, just so that they were

6    un -- would not need to worry about this, would not need to

7    modify their firearms, would not need to destroy their

8    firearms, that was -- that deadline was relevant for the

9    registration period.

10           THE COURT:  I am not trying to drill you or grill

11   you, but if I had a weapon, or Mr. Martin has a weapon, and he

12   never -- he ignored the regulation, kept the weapon just as it

13   was, and you learned that after the injunction -- well, he's

14   maybe not even covered by the injunction.  You learned that

15   about him, and he said, oh, I'm sorry, I'll fix it now, I know

16   I missed the deadline by -- now it's July, I know I missed the

17   deadline and I had since January to get started, I'm sorry.

18   Can he rectify that under the rule as currently written and

19   keep his weapon in his possession in the form that it

20   previously existed?

21           MS. PITZ:  I don't believe so, Your Honor.  The rule

22   is clear, it set forth compliance options, and it gave

23   individuals a period of time to come into compliance with the

24   rule.  That said, I would reiterate that plaintiffs' have been

25   very withholding of specific facts, and it is their burden for

```
 1    irreparable harm or on the merits to carry their burden to show
 2    that that would be the situation presented here precisely.  We
 3    don't -- we don't know the exact state of plaintiffs' weapons,
 4    and they haven't shown any information to demonstrate that ATF
 5    has an imminent enforcement action or anything like that
 6    pending.  The Government is not aware of any imminent
 7    enforcement proceedings of those kinds.
 8              THE COURT:  And if he has taken the brace off but has
 9    not modified the weapon or the brace to render it
10    non-reattachable, he's still not in compliance?
11              MS. PITZ:  He's not in full compliance.  That said,
12    that issue kind of falls within the Thompson Center case that's
13    cited in our brief, which goes to what is constructive
14    possession of a firearm, and that can be a very fact-specific
15    circumstance.  The rule is just setting forth the clearcut
16    compliance options that will certainly push everyone outside
17    the ambit of the NFA.  That said, for any type of enforcement
18    proceeding, of course it would be the Government's burden to
19    show that the statutory inquiry or the statutory demands for
20    that enforcement proceedings are met, so they would have to
21    demonstrate by contrast, you know, this plaintiff was in
22    constructive possession, which would require significantly more
23    facts.  So it would be our position at this point that any
24    claims that that is likely for purposes of issuing a
25    preliminary injunction is incredibly speculative.
```

 1                THE COURT:  Any rebuttal from the plaintiff, brief?

 2                MR. LAROSIERE:  Just briefly, Your Honor.

 3                I just have three points.  I'm sorry to the

 4      court reporter.  I've let my caffeine wear off.

 5                One major issue that the Government repeatedly

 6      addressed was that -- was kind of putting it off on the NFA,

 7      saying no, this is just us saying how it's going to go in the

 8      future.  What they're missing here is a critical component

 9      which is essential to our both likelihood of success and

10      irreparable harm, and that is the retroactivity --

11                THE COURT:  That is what?

12                MR. LAROSIERE:  The retroactivity, retroactivity of

13      the rule.  They are applying it retroactively, and, again,

14      that's relevant for a tax clause analysis, this Court not reach

15      that, I think the Second Amendment properly covers that, and to

16      the extent the Government cites *Bruen* for approving NFA

17      regulations by referencing shall issue concealed permit

18      requirements, the discretionary manner of those compliance was

19      the core of the *Bruen* issue, and I would just like to point out

20      that the Government has repeatedly maintained -- defendants

21      here have repeatedly maintained absolute unfettered discretion

22      in NFA applications and registration, and I would just like to

23      highlight the importance that I think it's very emergent as to

24      Plaintiffs Martin and Second Amendment Armory, because, again,

25      they are effectively one and the same, that the Government has

 1    more or less threatened enforcement by saying "we think you may

 2    be in possession of short-barreled rifles constructively," and

 3    they cite *Thompson Center* in support of themselves, which

 4    I find odd, because the core holding of *Thompson Center*, as I

 5    understand it, was as long as there is some plausible legal

 6    configuration from the parts, then it cannot be a NFA

 7    violation, and they won on that theory.  The Government doesn't

 8    dispute that you can have the pistol, so having the pistol,

 9    having -- and not attaching the brace, because the Government,

10    again, says they're not regulating just the brace themselves,

11    I don't think they can have both sides of that, or both halfs

12    of that cake.

13              So that's all I have.  Thank you so much for the

14    Court's time.

15              THE COURT:  The plaintiff doesn't raise any -- make

16    any argument concerning the Government's exceeding the

17    authority of the APA in the issuance of the final rule.  Did

18    you intend to stand down from that argument in light of the

19    motion to dismiss, or is that still a central focus of the

20    plaintiffs' contentions?

21              MR. LAROSIERE:  Your Honor, no, we do not stand down

22    from that, and it is pled in the alternative.  The central

23    focus is the Second Amendment analysis, but -- which is invoked

24    vis-à-vis the APA as well.

25              THE COURT:  What is the irreparable harm in the

1   Government's alleged failure to follow the APA parameters?

2         MR. LAROSIERE:  It tracks very closely because the

3   result is a -- I have my notes on that bit.

4         THE COURT:  It's not a Constitutional deprivation.

5         MR. LAROSIERE:  So it is a substantive rule making

6   though, and so it does result in a effectively legislative

7   result which would otherwise not be permissible, and so the

8   same harms get avoided, and one of the harms being a violation

9   of right, which is actionable under the APA, Your Honor.

10        THE COURT:  In the sense that is the contention, that

11  the Government exceeded its rule making authority and really

12  passed an amended statute?

13        MR. LAROSIERE:  Yes, Your Honor.

14        THE COURT:  Does the Government have a response to

15  that contention?

16        MR. LAROSIERE:  Oh.

17        THE COURT:  Yes, sir.

18        MR. LAROSIERE:  If I may, and in the alternative, as

19  we asserted, that the final rule is not a logical outgrowth and

20  thus it violated the APA, the final rule is not a logical

21  outgrowth of the proposed rule.

22        THE COURT:  How does the Government respond to that?

23        MS. PITZ:  The Government's response is just that

24  statutory violations are insufficient for irreparable harm, and

25  we've opposed plaintiffs' arguments on the merits of their APA

1   cases, or their APA claims.

2          THE COURT:  And several times, Counsel, the Court

3   raised concerns about the Government's argument and you say

4   "point taken" and then you move to another argument.  By

5   "point taken" do you mean "we yield on that"?  I don't

6   understand what that means.

7          MS. PITZ:  I apologize, Your Honor.  That just is my

8   frame of speech for "I mean no disrespect."  We do not concede

9   any of the points.

10          THE COURT:  So you continue to maintain that the

11   regulation of braces is -- as stabilizing braces is apart from

12   and disassociated with the regulation of the weapons attached

13   to said braces?

14          MS. PITZ:  Yes, for purposes of Second Amendment.

15          THE COURT:  Why?

16          MS. PITZ:  We maintain that braces are -- I'm sorry,

17   Your Honor.  Would you be able to repeat your question?

18          THE COURT:  Why?

19          MS. PITZ:  We maintain --

20          THE COURT:  Well, your ventriloquist said to say yes

21   to that question.  If he wants to argue it, he can.

22          MS. PITZ:  I'm sorry, Your Honor.  I'm not sure

23   I understood your original point.

24          THE COURT:  The original question is you're

25   contending that this brace is regulated or interpreted quite

1    apart from the brace as attached to a weapon, and therefore it

2    doesn't implicate the Second Amendment rights to bear arms with

3    the brace attached to it, and I said how is the brace being

4    regulated separate and apart from the weapon, and you maintain

5    that you're making that argument, and I said why.

6           MS. PITZ:  Your Honor, the rule regulates when a

7    brace and a pistol are combined such that they remake a firearm

8    such that it is designed and intended to be fired from the

9    shoulder, which is the statutory inquiry under the NFA.

10          THE COURT:  And so it is no longer a standalone brace

11   that's being regulated, it's a brace attached to a weapon,

12   making the weapon now a regulated weapon.

13          MS. PITZ:  That's correct.

14          THE COURT:  And again I say:  How is that a separate

15   regulation of the brace outside of its status as a rifle?

16          MS. PITZ:  The rule does not purport to regulate the

17   brace on its own and apart from how it operates in conjunction

18   with a firearm.

19          THE COURT:  All right.  Anything else from the

20   plaintiff or the defense?

21          MR. LAROSIERE:  Just noting that we never brought up

22   some of the other claims raised in the PI, but we -- the

23   plaintiff stands on the motion --

24          THE COURT:  What claims are you talking about?

25          MR. LAROSIERE:  It's the tax and spend clause.

1    We already discussed APA.  And to the -- to the -- to the

2    extent relevant, stands on the other positions made in the

3    motion as to scope of the injunction, et cetera, but nothing

4    aside from that, Your Honor.

5            THE COURT:  Nothing other than that.

6            I need for Mr. Martin to file an affidavit with the

7    Court under oath as to whether he is or is not a member of the

8    Second Amendment Foundation, to include whether he did or did

9    not pay a fee or a payment or a donation that would bring him

10   within the ambit of the SAF; and I may require the defense to

11   brief more thoroughly the question of the corporation's

12   standing to assert a Second Amendment claim where it does not

13   sell the allegedly infringing items, and I will send out an

14   order if I wish for that additional briefing shortly.

15           Anything else from the plaintiff or the defense?

16           MR. LAROSIERE:  A timeline for that.

17           THE COURT:  I'll give it to you in the order.

18           MR. LAROSIERE:  Thank you, Your Honor.  Nothing

19   further.

20           MS. PITZ:  Nothing further.

21           THE COURT:  How often are you in contact with him?

22   How easy is it for you to contact him?

23           MR. LAROSIERE:  I expect to go there after --

24   immediately after these proceedings and discuss --

25           THE COURT:  So a week would be sufficient?

1        MR. LAROSIERE:  Yes, Your Honor.  However, given the

2   nature of these proceedings, I think some intermediate relief

3   to protect my client before, again, he --

4        THE COURT:  Your client waited until when he waited

5   til to get his relief, so I'm not going to be pushed by that

6   procrastination.  How long will it take him -- he can tell me

7   tomorrow if he wants.  I'm giving you how much time I think you

8   might reasonably need to turn in the affidavit.

9        MR. LAROSIERE:  Oh.  No.  Yes, Your Honor.  Within

10  ten calendar days would be fine.

11       THE COURT:  So why does he need ten calendar days if

12  he's in an all-fired hurry to get some relief?

13       MR. LAROSIERE:  Just in case I couldn't reach him.

14  I just wouldn't want to put myself in a position where --

15       THE COURT:  Five days.

16       MR. LAROSIERE:  Five calendar days?

17       THE COURT:  Five calendar days to turn in an

18  affidavit, one sentence if he needs to, that says "I am not a

19  member of the SAF and I have never sent any money to them," or

20  "I am a member of the SAF and have made numerous donations to

21  them."  That you can do, you can write it on your way over

22  there on your phone and have him sign it when you get there.

23       MR. LAROSIERE:  Understood, Your Honor.

24       The one issue there is could we potentially file that

25  under seal just to -- because this is the one client that,

```
1   again, has no shield of protection?
2           THE COURT:  No, you cannot file it under seal,
3   because that's his principal basis for asserting irreparable
4   harm, and the Government has to be able to counter that, and if
5   he says "I am not a member and therefore I am imminently
6   subject to enforcement," then the Government would have to
7   concede, to the extent that it is seeking enforcement, that
8   that is a problem.
9           MR. LAROSIERE:  Understood, Your Honor.
10          THE COURT:  All right.  Thank you.  We're dismissed.
11                          - - - - -
12              (Proceedings concluded at 11:36 a.m.)
13                          - - - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

1            C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4 proceedings taken in a motion hearing in the United States

5 District Court is a true and accurate transcript of the

6 proceedings taken by me in machine shorthand and transcribed by

7 computer under my supervision, this the 28th day of July, 2023.

8

9

10                       /S/ DAVID J. COLLIER

11

12                       DAVID J. COLLIER

13                       OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25