## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

Golden-Collum Memorial Federal Building & U.S. Courthouse
207 NW Second Street
Ocala, Florida 34475
(352) 369-4860

Elizabeth M. Warren                                                        Lisa Fannin
Clerk of Court                                                        Division Manager

**DATE:** March 26, 2024

**TO:** Clerk, U.S. Court of Appeals for the Eleventh Circuit

---

**JOSIAH COLON, BRANDON
KLING, ERIC MELE, WILLIAM
MARTIN and 2ND AMENDMENT
ARMORY,**

      **Plaintiffs,**

**v.**                                                        **Case No: 8:23-cv-223-MSS-NHA**

**BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,
STEVEN DETTELBACH, UNITED
STATES DEPARTMENT OF JUSTICE
and MERRICK B. GARLAND**

      **Defendants.**

---

**U.S.C.A. Case No:**                     **NEW APPEAL**

Enclosed are documents and information relating to an appeal in the above-referenced action.  Please acknowledge receipt on the enclosed copy of this letter.

- Honorable Mary S. Scriven, United States District Judge appealed from.

- Appeal filing fee was not paid. Upon filing a notice of appeal, the appellant must pay the district clerk all required fees. The district clerk receives the appellate docket fee on behalf of the court of appeals.  If you are filing informa pauperis, a request for leave to appeal in forma pauperis needs to be filed with the district court.

- Certified copy of Notice of Appeal, docket entries, judgment and/or Order appealed from.  Opinion was not entered orally.

ELIZABETH M. WARREN, CLERK

By:     s/LB, Deputy Clerk

APPEAL

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: <u>8:23−cv−00223−MSS−NHA</u>

| | |
|---|---|
| Colon et al v. Bureau of Alcohol, Tobacco, Firearms and Explosives et al | Date Filed: 02/01/2023 |
| Assigned to: Judge Mary S. Scriven | Jury Demand: None |
| Referred to: Magistrate Judge Natalie Hirt Adams | Nature of Suit: 440 Civil Rights: Other |
| Cause: 05:0551 Administrative Procedure Act | Jurisdiction: Federal Question |

**<u>Plaintiff</u>**

**Josiah Colon**                    represented by    **Zachary Z. Zermay**
Zermay Law
1762 Windward Way
Sanibel, FL 33957
239−699−3107
Email: <u>zach@zermaylaw.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Larosiere**
6964 Houlton Circle
Lake Worth, FL 33467
561−452−7575
Email: <u>larosieremm@gmail.com</u>
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Brandon Kling**                    represented by    **Zachary Z. Zermay**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Larosiere**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Eric Mele**                    represented by    **Zachary Z. Zermay**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Larosiere**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**William Martin**                          represented by   **Zachary Z. Zermay**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Larosiere**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**2nd Amendment Armory**                    represented by   **Zachary Z. Zermay**
*a Florida profit corporation*                               (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Larosiere**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Bureau of Alcohol, Tobacco, Firearms**    represented by   **Taylor Pitz**
**and Explosives**                                           DOJ−Civ
                                                             Federal Programs Branch
                                                             1100 L Street NW
                                                             Washington, DC 20005
                                                             202−305−5200
                                                             Email: taylor.n.pitz@usdoj.gov
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Jody D. Lowenstein**
                                                             DOJ−Civ
                                                             Federal Programs Branch
                                                             1100 L Street NW
                                                             Washington, DC 20005
                                                             202−598−9280
                                                             Email: jody.d.lowenstein@usdoj.gov
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Michael Drezner**
                                                             DOJ−Civ
                                                             1100 L. St. NW
                                                             Room 12210
                                                             Washington, DC 20005
                                                             202−514−4505
                                                             Email: michael.l.drezner@usdoj.gov
                                                             *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Steven Dettelbach**
*in his official capacity as Director of the
Bureau of Alcohol, Tobacco, Firearms,
and Explosives*

represented by **Taylor Pitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody D. Lowenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Drezner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Justice**

represented by **Taylor Pitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody D. Lowenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Drezner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Merrick B. Garland**
*in his official capacity as Attorney
General, U.S. Department of Justice*

represented by **Taylor Pitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jody D. Lowenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Drezner**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2023 | 1 | COMPLAINT against All Defendants (Filing fee $402 receipt number AFLMDC−20466291) filed by All Plaintiffs. (Attachments: # 1 Civil Cover Sheet)(Zermay, Zachary) (Entered: 02/01/2023) |
| 02/02/2023 | 2 | NEW CASE ASSIGNED to Judge Mary S. Scriven and Magistrate Judge Mac R. McCoy. New case number: 8:23−cv−0223−MSS−MRM. (SJB) (Entered: 02/02/2023) |
| 02/02/2023 | 3 | |

| | | |
|---|---|---|
| | | NOTICE to counsel of Local Rule 2.02(a), which requires designation of one lead counsel who − unless the party changes the designation − remains lead counsel throughout the action. File a **Notice of Lead Counsel Designation** to identify lead counsel. (Signed by Deputy Clerk). (LD) (Entered: 02/02/2023) |
| 02/03/2023 | 4 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (KAC) (Entered: 02/03/2023) |
| 02/09/2023 | 5 | NOTICE of Appearance by Zachary Z. Zermay on behalf of 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele (Zermay, Zachary) (Entered: 02/09/2023) |
| 02/09/2023 | 6 | PROPOSED summons to be issued by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Zermay, Zachary) (Entered: 02/09/2023) |
| 02/09/2023 | 7 | PROPOSED summons to be issued by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Zermay, Zachary) (Entered: 02/09/2023) |
| 02/09/2023 | 8 | PROPOSED summons to be issued by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Zermay, Zachary) (Entered: 02/09/2023) |
| 02/09/2023 | 9 | PROPOSED summons to be issued by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Zermay, Zachary) (Entered: 02/09/2023) |
| 02/10/2023 | 10 | SUMMONS issued as to Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice, U.S. Attorney and U.S. Attorney General. (LD) (Entered: 02/10/2023) |
| 02/23/2023 | 11 | ***TERMINATED−INCORRECT EVENT. COUNSEL TO REFILE AS "SUMMONS RETURNED EXECUTED***PROOF of service by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele (Zermay, Zachary) Modified on 2/24/2023 (LSS). (Entered: 02/23/2023) |
| 02/28/2023 | 12 | RETURN of service executed on by Eric Mele, Brandon Kling, Josiah Colon, William Martin, 2nd Amendment Armory as to All Defendants. (Zermay, Zachary) (Entered: 02/28/2023) |
| 04/13/2023 | 13 | NOTICE of Appearance by Taylor Pitz on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice (Pitz, Taylor) (Entered: 04/13/2023) |
| 04/21/2023 | 14 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by All Defendants. (Pitz, Taylor) (Entered: 04/21/2023) |
| 05/02/2023 | 15 | NOTICE of Appearance by Jody D. Lowenstein on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice (Lowenstein, Jody) (Entered: 05/02/2023) |

| | | |
|---|---|---|
| 05/02/2023 | 16 | Joint MOTION for Extension of Time to File Case Management Report by All Defendants. (Pitz, Taylor) (Entered: 05/02/2023) |
| 05/02/2023 | 17 | **ENDORSED ORDER GRANTING 14 Defendants' Consent Motion for Extension of Time to File Response to Plaintiffs' Complaint. Defendants shall have up to and including May 24, 2023 to answer or otherwise respond to the complaint. Signed by Judge Mary S. Scriven on 5/2/2023. (EOJ)** (Entered: 05/02/2023) |
| 05/02/2023 | 18 | **ENDORSED ORDER GRANTING 16 the Parties' Joint Motion for Extension of Time to Submit Case Management Report. The deadline for the Parties to file a case management report is extended until 21 days after the Court's resolution of the Defendants' impending motion to dismiss. Signed by Judge Mary S. Scriven on 5/2/2023. (EOJ)** (Entered: 05/02/2023) |
| 05/19/2023 | 19 | Unopposed MOTION to File Excess Pages by All Defendants. (Pitz, Taylor) (Entered: 05/19/2023) |
| 05/19/2023 | 20 | **ENDORSED ORDER GRANTING 19 Defendants' Unopposed Motion for Leave to File Motion Exceeding Twenty−Five Pages. Defendants shall be permitted to file a Motion that does not exceed forty−five (45) pages, exclusive of captions, tables of contents or authorities, certifications or certificates, and exhibits. Signed by Judge Mary S. Scriven on 5/19/2023. (EOJ)** (Entered: 05/19/2023) |
| 05/24/2023 | 21 | MOTION for Preliminary Injunction by All Plaintiffs. (Zermay, Zachary) (Entered: 05/24/2023) |
| 05/24/2023 | 22 | MOTION to Dismiss Plaintiffs' Complaint by All Defendants. (Pitz, Taylor) (Entered: 05/24/2023) |
| 05/26/2023 | 23 | Consent MOTION for Extension of Time to File Response to Motion for Preliminary Injunction by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. (Pitz, Taylor) (Entered: 05/26/2023) |
| 06/01/2023 | 24 | **ENDORSED ORDER GRANTING 23 Defendants' Consent Motion for Extension of Time to Respond to Plaintiffs' Motion for Preliminary Injunction. Defendants shall have up to and including June 7, 2023 to respond to Plaintiffs' motion. This matter is set for a status conference via the Zoom platform on June 8, 2023 at 9:30 AM before United States District Judge Mary S. Scriven. Zoom details will be provided by separate notice. Signed by Judge Mary S. Scriven on 6/1/2023. (EOJ)** (Entered: 06/01/2023) |
| 06/07/2023 | 25 | NOTICE of Appearance by Michael Drezner on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice (Drezner, Michael) (Entered: 06/07/2023) |
| 06/07/2023 | 26 | RESPONSE in Opposition re 21 MOTION for Preliminary Injunction filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. (Pitz, Taylor) (Entered: 06/07/2023) |
| 06/08/2023 | 27 | Minute Entry. Virtual Proceedings held before Judge Mary S. Scriven: STATUS CONFERENCE held on 6/8/2023. Court Reporter: David Collier (CAB) (Entered: 06/09/2023) |
| 06/12/2023 | 28 | |

| | | |
|---|---|---|
| | | **ORDER SETTING HEARING on 21 Plaintiffs' Motion for Preliminary Injunction : Motion Hearing set for 7/13/2023 at 10:00 AM in Tampa Courtroom 7 A before Judge Mary S. Scriven. Signed by Judge Mary S. Scriven on 6/12/2023. (EOJ)** (Entered: 06/12/2023) |
| 06/14/2023 | 29 | MEMORANDUM in opposition re 22 Motion to Dismiss filed by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Zermay, Zachary) (Entered: 06/14/2023) |
| 06/15/2023 | 30 | AFFIDAVIT of Josiah Colon, Brandon Kling, & Eric Mele by Josiah Colon, Brandon Kling, Eric Mele. (Zermay, Zachary) Modified text on 6/20/2023 to remove all caps (LSS). (Entered: 06/15/2023) |
| 06/16/2023 | 31 | **ENDORSED ORDER DIRECTING COMPLIANCE. Plaintiff Kling is DIRECTED to file a copy of the injunction he believes he was covered by due to his membership in a gun rights group no later than Wednesday, June 21, 2023. Plaintiff's Counsel is DIRECTED to advise this Court of the status of Plaintiffs Ted Martin and 2nd Amendment Armory's Compliance with this Court's Order dated June 12, 2023. Counsel's response is due no later than Wednesday, June 21, 2023. Defendants' responsive deadline is extended to June 28, 2023. Signed by Judge Mary S. Scriven on 6/16/2023. (EOJ)** (Entered: 06/16/2023) |
| 06/21/2023 | 32 | Statement of Counsel as to Ted William Martin and 2nd Amendment Armory and Affidavit by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele(Zermay, Zachary). Modified on 6/22/2023 to edit text (ABC). (Entered: 06/21/2023) |
| 06/21/2023 | 33 | Injunctions Covering Plaintiff Kling by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele (Zermay, Zachary). Modified on 6/22/2023 to edit text (ABC). (Entered: 06/21/2023) |
| 06/23/2023 | 34 | Consent MOTION for Miscellaneous Relief, specifically File Reply and Consolidate Filings by All Defendants. (Drezner, Michael) (Entered: 06/23/2023) |
| 06/27/2023 | 35 | **ENDORSED ORDER GRANTING 34 Defendants' Consent Motion for Leave to File Reply. Defendants are permitted to file a reply brief consolidated with their response to Plaintiff's attestations no later than June 30, 2023. Signed by Judge Mary S. Scriven on 6/27/2023. (EOJ)** (Entered: 06/27/2023) |
| 06/30/2023 | 36 | REPLY to Response to Motion re 22 MOTION to Dismiss Plaintiffs' Complaint , 21 MOTION for Preliminary Injunction filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. (Pitz, Taylor) (Entered: 06/30/2023) |
| 07/13/2023 | 37 | Minute Entry. In Person Proceedings held before Judge Mary S. Scriven: MOTION HEARING held on 7/13/2023 21 MOTION for Preliminary Injunction filed by Josiah Colon et.al. Court Reporter: David Collier (DAY) (Entered: 07/13/2023) |
| 07/15/2023 | 38 | AFFIDAVIT of Ted William Martin by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Zermay, Zachary) Modified on 7/18/2023 as to docket text (ARL). (Entered: 07/15/2023) |
| 07/27/2023 | 39 | **ORDER Directing Supplemental Briefing. Signed by Judge Mary S. Scriven on 7/27/2023. (EOJ)** (Entered: 07/27/2023) |
| 07/28/2023 | 40 | |

| | | |
|---|---|---|
| | | TRANSCRIPT of motion hearing held on July 13, 2023 before District Judge Mary S. Scriven. Court Reporter: David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: (813) 301−5575.<br><br>NOTICE TO THE PARTIES − The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/18/2023. Redacted Transcript Deadline set for 8/28/2023. Release of Transcript Restriction set for 10/26/2023. (DJC) (Entered: 07/28/2023) |
| 07/31/2023 | 41 | Case Reassigned to Magistrate Judge Unassigned Magistrate. New case number: 8:23−cv−223−MSS−UAM. Magistrate Judge Mac R. McCoy no longer assigned to the case. (AG) (Entered: 07/31/2023) |
| 08/07/2023 | 42 | SUPPLEMENT *Brief* by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. (Drezner, Michael) (Entered: 08/07/2023) |
| 08/14/2023 | 43 | RESPONSE re 42 Supplement *Memorandum on Standing* filed by 2nd Amendment Armory, Josiah Colon, Brandon Kling, William Martin, Eric Mele. (Larosiere, Matthew) (Entered: 08/14/2023) |
| 09/12/2023 | 44 | NOTICE of supplemental authority by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. (Attachments: # 1 Exhibit A)(Drezner, Michael) (Entered: 09/12/2023) |
| 11/14/2023 | 45 | NOTICE of supplemental authority by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. (Pitz, Taylor) (Entered: 11/14/2023) |
| 01/03/2024 | 46 | Case Reassigned to US Magistrate Judge Natalie Hirt Adams. New case number: 8:23−cv−00223−MSS−NHA. Magistrate Judge Unassigned Magistrate no longer assigned to the case. (SAO) (Entered: 01/03/2024) |
| 01/26/2024 | 47 | **ORDER GRANTING in PART and DENYING in PART 21 Plaintiffs' Motion for Preliminary Injunction. See Order for Details. Signed by Judge Mary S. Scriven on 1/26/2024. (EOJ)** (Entered: 01/26/2024) |
| 03/11/2024 | 48 | **ORDER GRANTING in PART and DENYING in PART 22 Defendants' Partial Motion to Dismiss. Signed by Judge Mary S. Scriven on 3/11/2024. (EOJ)** (Entered: 03/11/2024) |
| 03/22/2024 | 49 | NOTICE OF APPEAL as to 47 Order on Motion for Preliminary Injunction by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick B. Garland, United States Department of Justice. Filing fee not paid. (Pitz, Taylor) (Entered: 03/22/2024) |

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSIAH COLON, BRANDON
KLING, ERIC MELE, WILLIAM
MARTIN, and 2ND AMENDMENT
ARMORY,

        Plaintiffs,

v.                             Case No: 8:23-cv-223-MSS-UAM

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES, STEVEN
DETTELBACH, UNITED STATES
DEPARTMENT OF JUSTICE, and
MERRICK B. GARLAND,

        Defendants.

_____

### ORDER

**THIS MATTER** is before the Court for consideration of Plaintiffs' Motion for

Preliminary Injunction, (Dkt. 21), and the responsive briefing in opposition thereto.

(Dkts. 26 and 36) Upon consideration of all relevant filings, case law, and being

otherwise fully advised, Plaintiffs' Motion for Preliminary Injunction is **GRANTED**

**in PART** and **DENIED in PART**.

### I.    INTRODUCTION

#### A. Statutory/Regulatory Background

The National Firearms Act of 1934 ("NFA"), as amended 26 U.S.C. § 5801 et

seq., was enacted "[t]o provide for the taxation of manufacturers, importers, and

dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulation interstate transportation thereof." National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934).

The NFA "regulates [certain] firearms . . . and requires the taxation and registration of [regulated] firearms by manufacturers, possessors, transferors, dealers, importers, and sellers." United States v. Spoerke, 568 F.3d 1236, 1245 (11th Cir. 2009); (Dkt. 1 at ¶ 18). The NFA identifies eight categories of "firearms" that fall within its purview, those categories are:

> (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device.

26 U.S.C. § 5845(a).

"Neither pistols nor rifles with barrels 16 inches long or longer are firearms within the NFA definition, but rifles with barrels less than 16 inches long, known as short-barreled rifles, are." § 5845(a)(3). See United States v. Thompson/Ctr. Arms Co., 504 U.S. 505, 507 (1992). Relevant here is the NFA's definition of "rifle" which is a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily

restored to fire a fixed cartridge." 26 U.S.C. § 5845(c).[1] It is therefore widely accepted that the NFA regulates "short-barreled rifles"[2] ("SBRs") and "short-barreled shotguns" ("SBSG") also known as "sawed-off shotguns."[3]

The NFA requires registration of SBSGs and SBRs in the National Firearms Registration and Transfer record. See 26 U.S.C. § 5841. The NFA imposes a $200 making tax for each NFA firearm made, 26 U.S.C. § 5821, and a $200 transfer tax for each NFA firearm transferred that is not within the "any other weapon" category. 26 U.S.C. § 5811. Importers, manufacturers, and dealers who deal in NFA firearms must pay a "special (occupational) tax" annually. § 5801. Any person who violates the NFA may be "fined not more than $10,000, or be imprisoned not more than ten years, or both." § 5871.

The Gun Control Act of 1968 ("GCA"), as amended 18 U.S.C. § 921 et seq., was enacted to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence[.]" Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213. The GCA defines "firearm" as "(A) any weapon (including a starter

---

[1] "The NFA defines a "rifle" and a 'shotgun' as a 'weapon designed or redesigned, made or remade, and intended to be fired from the shoulder.'" (Dkt. 1 at ¶ 21)

[2] When the NFA references "a rifle having a barrel or barrels of less than 16 inches in length" or "weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[,]" this means short-barreled rifle. See Thompson/Ctr., 504 U.S. at 507.

[3] When the NFA references "a shotgun having a barrel or barrels of less than 18 inches in length" or "weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length [,]" this means short-barreled shotgun or sawed-off shotgun. See United States v. McGill, 618 F.3d 1273, 1275 (11th Cir. 2010) ("[T]he National Firearms Act ("NFA"), regulates a narrow class of weapons, termed "firearms," that includes short-barreled shotguns, machine guns, grenades, bombs, and explosives."); see also United States v. Owens, 447 F.3d 1345, 1347 (11th Cir. 2006) (referring to the term "sawed-off shotguns" as used in opinions from the Fourth and Seventh Circuit courts of appeal).

gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). The GCA also defines the terms "rifle" and "short-barreled rifle" expressly. Under the GCA, a "rifle" is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." § 921(a)(7). Under the GCA, an "SBR" is "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." § 921(a)(8).

The GCA defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and any combination of parts from which a firearm described in subparagraph (A) can be assembled." § 921(a)(30). Neither the NFA nor the GCA defines the term "pistol." Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regulations however define "pistol" as a:

> weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having (a) a chamber(s) as an integral part(s) of, or permanently aligned with, the bore(s); and (b) a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore(s).

See 27 C.F.R. § 479.11.

"ATF permits—but does not require—gun makers to seek classification letters from ATF prior to manufacturing a gun."[4] See Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 599 (1st Cir. 2016); see also 27 C.F.R. § 479.102(c) ("The Director may issue a determination (classification) to a person whether an item, including a kit, is a firearm"). On November 8, 2012, ATF received its first request for a classification letter related to a brace-equipped pistol.[5] On November 26, 2012, ATF through its Firearms Technology Branch ("FTB") concluded the "submitted forearm brace, when attached to a firearm does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm."[6] From 2014 to 2017, ATF issued various open letters that contradict private classification letters concerning the appropriate classification of braced pistols (hereinafter, "brace-equipped pistols"). (Dkt. 22)

## 1. The Proposed Rule

Concerned with the inconsistent guidance that had been provided, ATF determined to undertake a formal review of its regulations.[7] Thus, on June 10, 2021, ATF issued a notice of proposed rulemaking ("NPRM") to seek notice and comment

---

[4] The Court takes judicial notice of ATF's National Firearms Act Handbook, which can be accessed at https://perma.cc/P3NL-G35G. See e.g., Am. Fed'n of Gov't Emp., Local 1858 v. Callaway, 398 F. Supp. 176, 195 (N.D. Ala. 1975) (taking judicial notice of facts when evaluating a motion for preliminary injunction).
[5] See Factoring Criteria for Firearms With Attached "Stabilizing Braces", 86 Fed. Reg. 30,826-01, at *30,827, 2021 WL 2352274 (June 10, 2021) [hereinafter, cited as "NPRM"].
[6] See Letter from John R. Spencer, Chief, Firearms Technology Branch to Alex Bosco (Nov. 26, 2012), available at https://www.atf.gov/resource-center/docs/foia/impact-laws-footnote-11-2015-atf-open-letter/download.
[7] ATF also expressed concerns with the proliferation of these weapons and their alleged use in shootings, including mass shootings. Plaintiffs counter that assertion by highlighting that ATF identified only two instances in which brace-equipped pistols were used in mass shootings.

on factors that ATF planned to consider "when evaluating firearms equipped with a purported 'stabilizing brace'" to determine whether those firearms are "subject to regulation under the . . . NFA." See NPRM, 86 Fed. Reg. 30,826-01, 2021 WL 2352274 (June 10, 2021). The factors were combined into what the NPRM identified as ATF Worksheet 4999. See id. ATF Worksheet 4999 proposed a point system in which ATF would assign a weighted value "to various characteristics of the fully assembled firearm as configured when submitted for classification." Id. at *30,829. ATF Worksheet 4999 featured three sections with varying characteristics to evaluate firearms, those sections are Section I – Prerequisites (assessment of weight and length), Section II – Accessory Characteristics, and Section III – Weapon Configuration. Id.

The NPRM explained that a firearm would be assigned 0 to 4 points in Sections II and III.[8] Id. Firearms that accumulated fewer than 4 points in both sections, Section II and Section III, would be determined not generally "designed to be fired from the shoulder"; therefore, those firearms would not constitute SBSGs or SBRs, "unless there [was] evidence that the manufacturer or maker expressly intended to design the weapon to be fired from the shoulder." Id. Firearms that accumulated "4 points or

---

[8] The NPRM explained that 0-4 point were to be assigned as follows:
    • 1 point: Minor Indicator (the weapon could be fired from the shoulder)
    • 2 points: Moderate Indicator (the weapon may be designed and intended to be fired from the shoulder)
    • 3 points: Strong Indicator (the weapon is likely designed and intended to be fired from the shoulder)
    • 4 points: Decisive Indicator (the weapon is designed and intended to be fired from the shoulder)
See 86 Fed. Reg. 30,826-01, at *30,829.

more in Section II or Section III [would] be determined to be designed and intended to be fired from the shoulder" and any such firearm would therefore be classified as an SBSG or SBR regulated by the NFA. Id.

In the NPRM, ATF evaluated three firearms using the worksheet. Id. at *30,835-43. One of the firearms evaluated was, "an AR-type firearm J with the SBA3 accessory" and a picture of that firearm is included below:



Id. at *30,839. ATF determined the firearm pictured above would constitute an "SBR" according to ATF Worksheet 4999 for two reasons:  (1) the firearm is a suitable host for a "stabilizing brace" because it weighs "89 ounces and have an overall length of 25⅛ inches" and (2) the firearm scored 8 points in Section II based on the shoulder stock (1 point), rearward attachment (3 points), adjustable design (2 points), and flaps on the "Cuff-type" design (2 points). Id. at *30,840.

## 2. The Final Rule

On January 31, 2023, ATF published its Final Rule that abandoned the worksheet and point system, explaining that its decision was made, "[a]fter careful consideration of the comments received regarding the complexity in understanding the proposed Worksheet 4999 and the methodology used in the Worksheet to evaluate firearms equipped with a 'brace' device." See Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 Fed Reg. 6,478-01, 2023 WL 1102552 (Jan. 31, 2023) [hereinafter, "Final Rule"]. The Final Rule did not adopt some key aspects of the approach proposed in the NPRM, specifically the Worksheet 4999 and its point system. Id. The Final Rule specifically provided:

> [ATF] amends the definition of "rifle" . . . to expressly state that the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" includes a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations and described in this preamble, indicate that the weapon is designed, made, and intended to be fired from the shoulder. The other factors are:
>
> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
>
> (3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

Final Rule, 88 Fed Reg. 6,478-01, at *6,480.

ATF explained that the Final Rule's definition of "rifle" was "the best interpretation of the statute, and it [was] immediately effective." Id.   ATF also explained that "because prior ATF classifications of firearms equipped with a 'brace' device did not all employ this correct understanding of the statutory terms, all such prior classifications are no longer valid as of January 31, 2023."[9] Id. As a result, the Final Rule offered unlicensed possessors five (5) options for compliance by May 31, 2023:[10]

1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm, thus removing it from the scope of the NFA.

2. Submit through the eForms system an Application to Make and Register a Firearm, ATF Form 1 ("E-Form 1") by May 31, 2023.[FN174] The possessor may adopt the markings on the firearm for purposes of the E-Form 1 if the firearm is marked in accordance with 27 CFR 478.92 and 479.102. If the firearm does not have the markings under 27 CFR 478.92 and 479.102, then the individual must mark the firearm as required. Proof of submission of the E-Form 1 should be maintained by all possessors. To transfer an affected firearm to another individual after the

---

[9] January 31, 2023, where used in this Order refers to the Effective date of the Final Rule.
[10] May 31, 2023, where used in this Order refers to the Compliance date of the Final Rule.

date this rule is published, it must be registered in the NFRTR, and the individual must submit and receive approval on an Application for Tax Paid Transfer and Registration of Firearm, ATF Form 4; otherwise, the transfer is a violation of the NFA. See 26 U.S.C. 5861(e).

3. Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA. The Department recognizes that the removal of a "stabilizing brace" from a firearm that was originally received as a "short-barreled rifle" results in the production of a "weapon made from a rifle," as defined by the NFA. However, the Department in its enforcement discretion will allow persons to reconfigure the firearm to a pistol by May 31, 2023 and will not require the registration of these firearms as a "weapon made from a rifle."

4. Turn the firearm into your local ATF office.

5. Destroy the firearm. ATF will publish information regarding proper destruction on its website, www.atf.gov.

Federal Firearms Licensed ("FFL") Manufacturers and Importers were given the same five options. Id.

### B. Procedural History

Plaintiffs Josiah Colon, Brandon Kling, Eric David Mele, Ted William Martin, and 2nd Amendment Armory (collectively, "Plaintiffs") commenced this action on February 1, 2023, against the United States Department of Justice, Merrick Garland as Attorney General of the United States, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and Steven Dettelbach as Director of the ATF (collectively, "Defendants"). (Dkt. 1) Plaintiffs' Complaint asserts three claims against the Defendants for alleged violations of the Second Amendment (Count I), Taxing and

Spending Clause (Count II), and Administrative Procedure Act (Count III). (Id.) On May 24, 2023, Plaintiffs moved for a preliminary injunction. (Dkt. 24)

On June 8, 2023, the Court held a status conference to determine the Parties' positions on Plaintiffs' motion. (Dkt. 27) The Court set the preliminary injunction hearing for July 13, 2023, and it ordered Plaintiffs to file attestations detailing their efforts at compliance with the Final Rule. (Dkt. 28) On July 13, 2023, this Court heard arguments from the Parties on the motion for preliminary injunction. (Dkt. 37) At the preliminary injunction hearing, the Court directed Plaintiff Ted Martin to file an affidavit stating his membership status vis-à-vis the Second Amendment Foundation. On July 27, 2023, the Court ordered supplemental briefing as to Plaintiff 2nd Amendment Armory's standing to assert a Second Amendment claim. (Dkt. 39). This matter is now ripe for consideration.

## C. Factual Background

Plaintiff Josiah Colon is a resident of the State of Florida, and he owns a Palmetto State Armory AK-P GF3 with an attached stabilizing brace. (Dkt. 1 at ¶ 4) Plaintiff Brandon Kling is a resident of the State of Florida, and he owns two AR-style pistols with attached, stabilizing braces that he built. (Id. at ¶ 5) Plaintiff Eric Mele is a resident of the State of Florida, and he owns an AR-type pistol with an attached stabilizing brace. (Id. at ¶ 6) Plaintiff Ted Martin is a resident of the State of Florida, and he owns firearms with attached stabilizing braces. (Id. at ¶ 7) Plaintiff Ted Martin is the owner of Plaintiff 2nd Amendment Armory, a Florida business entity engaged in the business of selling firearms parts and accessories. (Id. at ¶¶ 7 and 8) The

Individual Plaintiffs allege that they depend on their firearms for defense, and they allege the Final Rule impedes their ability to possess, to alienate, and to travel with their firearms. (Id. at ¶ 4-7) Individual Plaintiffs Colon and Mele are members of Second Amendment Foundation. (Dkt. 30) Plaintiff Kling refuses to identify the gun rights group that he is a member of, but he claims protection under an existing injunction. [11] (Id.) Plaintiffs Colon, Kling, and Mele have made no modifications to their firearms since this action began. (Dkts. 30 and 33)

Plaintiff 2nd Amendment Armory is an LLC organized under the laws of Florida. Plaintiff Martin alleges that he owns 2nd Amendment Armory. Plaintiff Martin is not a member of Second Amendment Foundation. (Dkt. 38) Plaintiff 2nd Amendment Armory also owned pistols with attached stabilizing braces in its inventory. (Id.) Plaintiff Martin owns stabilizing braces, but he alleges he has removed the braces from firearms in his and 2nd Amendment Armory's possession. (Dkt. 32) Plaintiff 2nd Amendment Armory alleges its inventory is affected by the Final Rule. (Dkt. 1 at ¶ 8)

## II.     LEGAL STANDARD

Movants are entitled to entry of a preliminary injunction if they can establish "(1) [that they] have a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened

---

[11] On June 16, 2023, the Court directed Plaintiff Kling to file a copy of the injunction that he believed protected him against enforcement of the Final Rule. Plaintiff Kling filed copies of the injunctions entered in three separate cases. (Dkt. 33)

injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 (11th Cir. 2014) (citation omitted). A preliminary injunction is "an extraordinary remedy, [so] its grant is the exception rather than the rule[.]" United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983) (citing Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975)).

A "federal district court may issue a nationwide, or 'universal,' injunction 'in appropriate circumstances." Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281 (11th Cir. 2021). Such an order is not required where a more narrow order would afford relief to the litigants before the Court. See, e.g., AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1549 (11th Cir. 1986) (reversing and remanding to the district court to tailor a narrower order). In considering a request to enjoin a national rule or policy, a court may consider a host of factors specific to the case that include: (1) the extent "necessary to provide complete relief to the plaintiffs"; (2) the extent necessary "to protect similarly situated nonparties"; (3) the avoidance of "'chaos and confusion' [caused by] a patchwork of injunctions"; (4) the geographic dispersion of the plaintiffs; (5) the extent to which immigration law is implicated; and (6) "when certain types of unconstitutionality are found." Id. at 1282 (citations omitted). The "district court should thoroughly analyze the extent of relief necessary to protect the plaintiffs from harm, taking care that the remedy issued is not 'more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" Georgia v. President of the United States, 46 F.4th 1283, 1306 (11th Cir. 2022) (citation omitted).

The central focus is "whether a nationwide injunction is necessary to offer full relief to the plaintiffs." Id. Ultimately, the scope of injunctive relief is dictated by the extent of the violation established and is guided by the Court's discretion. Id.

## III. DISCUSSION

### A. Standing

To demonstrate standing, a party must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998). While a complaint may set "forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements, [a court] should not speculate concerning the existence of standing, nor should [a court] imagine or piece together an injury sufficient to give [a] plaintiff standing when it has demonstrated none." Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1229-30 (11th Cir. 2000).

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982). Relevant here, is the prudential principle that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights

or interests of third parties." CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1270 (11th Cir. 2006). The doctrine of *jus tertii* serves as one of the many exceptions to the prudential prohibition against third-party standing. "In a *jus tertii* case, a litigant is permitted to challenge the enforcement of a statute against himself and also assert that the legal duties imposed on the litigant operate to violate third parties' rights." Mata Chorwadi, Inc. v. City of Boynton Beach, 66 F.4th 1259, 1265 (11th Cir. 2023).

In considering a motion for a preliminary injunction, a district court should assess standing according to the sufficiency of the allegations within the pleadings. Church v. City of Huntsville, 30 F.3d 1332, 1336 (11th Cir. 1994) ("It might well be unfair, however, to impose a standing burden beyond the sufficiency of the allegations of the pleadings on a plaintiff seeking a preliminary injunction, unless the defendant puts the plaintiff on notice that standing is contested."). When a district court considers facts that were not alleged in the complaint, the Eleventh Circuit has recognized that the complaint is then treated as having been amended to conform to the evidence. See id. ("plaintiffs' standing should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint."); Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1206 n.50 (11th Cir. 1991) ("If [the district court] considers facts not disclosed in the complaint, the court, in effect, treats the complaint as having been amended to conform to the evidence.") (citation omitted). If standing is raised by a court *sua sponte*, the court must give the parties a chance to provide evidence to

support standing to comply with "elementary principles of procedural fairness." See Alabama Legis. Black Caucus v. Alabama, 575 U.S. 254, 271 (2015); City of Miami Gardens v. Wells Fargo & Co., 956 F.3d 1319, 1320 (11th Cir. 2020).

### 1. Individual Plaintiffs

The Court finds the Individual Plaintiffs have sufficiently alleged standing to assert their claims at this time. The Individual Plaintiffs allege they "own firearms that ATF contends are regulable as SBRs." (Dkt. 1 at ¶ ¶ 4-7 and 35) The Individual Plaintiffs allege they "depend on their affected firearms for lawful purposes" such as self-defense, target shooting, and other activities. (Id. at ¶ 37) The Individual Plaintiffs also allege the Final Rule harms them in four ways. First, the Final Rule impedes the Individual Plaintiffs' ability to travel with their affected firearms without permission from the federal government. (Id. at ¶ 38) Second, the Final Rule impedes the Individual Plaintiffs' ability to use their affected firearms because these Plaintiffs would now be subject to the NFA and the GCA's registration and reporting provisions for SBRs and SBSGs. (Id. at ¶ 39) Third, the Final Rule impedes the Individual Plaintiffs' ability to keep their affected firearms without facing criminal consequences. (Id. at ¶ 40) Fourth, the Final Rule impedes the Individual Plaintiffs' ability to dispose of their affected firearms. (Id. at ¶ 42)

Because the Final Rule imposed a compliance date of May 31, 2023, the Court finds the Individual Plaintiffs have alleged standing because there is a "real and immediate threat of future injury." See, e.g., Eternal Word Television Network, Inc. v. Sebelius, 935 F. Supp. 2d 1196, 1214 (N.D. Ala. 2013). The Final Rule was

promulgated by and will be enforced by the Defendants, so the Individual Plaintiffs' injuries are directly traceable to the Defendants' conduct. <u>See West Virginia v. Treasury</u>, <u>59 F.4th 1124, 1138</u> (11th Cir. 2023) (finding the traceability element was satisfied when the plaintiffs challenged a tax offset provision in the American Rescue Plan Act). Finally, this Court finds that the Individual Plaintiffs' injuries are likely to be redressed if they are successful on their motion. <u>See</u>, <u>e.g.</u>, <u>Harrell v. The Fla. Bar</u>, <u>608 F.3d 1241, 1257</u> (11th Cir. 2010) ("As for the redressability prong, if the challenged rules are stricken as unconstitutional, [plaintiff] simply need not contend with them any longer."). The Individual Plaintiffs have therefore shown standing to pursue their claims.

### 2. 2nd Amendment Armory

The Court likewise finds 2nd Amendment Armory has alleged standing to assert a Second Amendment claim at this time. Defendants contend Plaintiff 2nd Amendment Armory has failed to allege standing in its corporate form, citing <u>Teixeira v. County of Alameda</u>, <u>873 F.3d 670, 682</u> (9th Cir. 2017). Defendants also argue that 2nd Amendment Armory failed to allege third-party standing because the Complaint does not mention "customer" or otherwise satisfy the third-party standing rules. Plaintiffs respond, contending that the Complaint contains sufficient allegations to invoke 2nd Amendment Armory's individual and third-party standing under <u>Maryland Shall Issue, Inc. v. Hogan</u>, <u>971 F.3d 199, 214</u> (4th Cir. 2020).

Here, 2nd Amendment Armory has alleged it will suffer an economic injury. (<u>Dkt. 1 at</u> ¶ 41) 2nd Amendment Armory's injury may ultimately be sufficient to confer

standing in its own right; however, it is uncertain whether an economic injury is a sufficient basis for 2nd Amendment Armory to assert a constitutional claim under Article III. On this record, however, 2nd Amendment Armory purports to represent the interest of its customers not members of the LLC. Thus, the Court need not tread into uncharted waters to decide whether a corporation has standing to assert its own Second Amendment claim because a more easily discernible rubric for standing, *jus tertii* standing, is available to 2nd Amendment Armory.

### a. Jus Tertii Standing

A corporation may be conferred *jus tertii* standing "when (1) the plaintiff seeking to assert [a] third party's rights has otherwise suffered an injury-in-fact, (2) the relationship between the plaintiff and the third party is such that the plaintiff is nearly as effective a proponent of the third party's right as the third party itself, and (3) there is some obstacle to the third party asserting the right." Region 8, 993 F.2d at 809. The Supreme Court observed in Craig v. Boren, that a vendor suffers a concrete injury sufficient for *jus tertii* standing where the vendor is "obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of [their] buyer's market, or to disobey the statutory command and suffer ... sanctions." 429 U.S. 190, 193-95 (1976).[12]

---

[12] See Williams v. Pryor, 220 F. Supp. 2d 1257, 1267-73 (N.D. Ala. 2002) (finding the "vendor plaintiffs . . . have demonstrated that they have standing to pursue their constitutional challenge against defendant—both independently and on behalf of third party purchasers of sexual devices."), rev'd on other grounds sub. nom. Williams v. Att'y Gen. of Ala., 378 F.3d 1232, 1234 n.3 (11th Cir. 2004) ("The district court properly concluded that vendors and users have shown a high probability of suffering a legally cognizable injury as [a] result of the statute and thus have demonstrated standing, and we adopt its analysis in this regard").

The second prong for *jus tertii* standing is a "causal connection between the litigant's injury and the violation of the third parties' constitutional rights." See Mata Chorwadi, Inc., 66 F.4th at 1266. The Supreme Court explained that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." Craig, 429 U.S. at 195; Young Apartments, Inc. v. Town of Jupiter, FL, 529 F.3d 1027, 1041 (11th Cir. 2008) ("One exception to [the prudential] rule [that forbids third-party standing], however, allows businesses to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with that business relationship."). The last prong requires either (1) an allegation of difficulty if not impossibility for affected persons to present their grievance before any court, See Young, 529 F.3d at 1043, or (2) dilution or infringement of a third party's rights if the surrogate litigant is not allowed to proceed. See Harris v. Evans, 20 F.3d 1118, 1124 (11th Cir. 1994).

Here, this Court is presented with the scenario anticipated by Justice Thomas in his dissent in June Med. Servs. L. L. C. v. Russo, 140 S. Ct. 2103, 2142 n.1 (2020) ("But it is fair to wonder whether gun vendors could expect to receive the same privilege if they seek to vindicate the Second Amendment rights of their customers."). Concerning the first prong, the Court finds Plaintiffs have sufficiently alleged injury-in-fact on behalf of 2nd Amendment Armory. Plaintiffs claim in their supplemental briefing on standing that 2nd Amendment Armory has "sold, and wishes to continue selling the affected products" – brace-equipped firearms. (Dkt. 43 at 4) This allegation

shows that 2nd Amendment Armory's harm is imminent and is not merely hypothetical. Cf. Aaron Priv. Clinic Mgmt. LLC v. Berry, 912 F.3d 1330, 1337–38 (11th Cir. 2019) ("Although the complaint alleges that Aaron aspired to open a methadone clinic someday, it offers no facts suggesting that the "someday" was imminent or that Aaron had any concrete plan in place for bringing its clinic into operation."). Also, the Complaint and Plaintiffs' moving papers allege that 2nd Amendment Armory's inventory is considered regulable under the Final Rule. (Dkt. 1 at ¶ 36 and Dkt. 21 at 13) At this stage, these allegations are sufficient to plausibly suggest that 2nd Amendment Armory faces direct economic injury through the constriction of its buyer's market, injury amounting to loss of inventory if it complies with the Final Rule, and sanctions for disobeying the Final Rule. See Craig, 429 U.S. at 195; Williams, 220 F. Supp. 2d at 1267-73.

Concerning the second prong, the Court finds Plaintiffs have sufficiently alleged a causal connection between 2nd Amendment Armory's injury and its customers' constitutional rights. The Complaint alleges firearms sellers are targeted by ATF's promulgation of a Final Rule that reclassifies all brace-equipped firearms irrespective of who owns them. (Dkt. 1 at ¶ 53) Plaintiffs' supplemental briefing on standing argues 2nd Amendment Armory "has a close relationship" with its customers because a customer's right to keep and acquire firearms affected by the Final Rule is inextricably bound up with Plaintiffs' right to sell and support them. (Dkt. 43 at 8-9) For example, after the Compliance Date, 2nd Amendment Armory's past customers are prevented from returning unregistered brace-equipped firearms to 2nd Amendment Armory or

getting unregistered brace-equipped firearms serviced by 2nd Amendment Armory. (Id. at 7)

The Eleventh Circuit has repeatedly recognized a vendor's "ability to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with that business relationship." See Young, 529 F.3d at 1041 (citing Craig, 429 U.S. at 195, 197); see also Mata, 66 F.4th at 1265 (same). The Final Rule in this case is an interesting provision because it targets both the possession of brace-equipped firearms and the sale of such, which is distinguishable from most *jus tertii* cases. Thus, it could provide an avenue for a direct challenge by vendors. That said, the Final Rule nonetheless imposes a duty on 2nd Amendment Armory, and 2nd Amendment Armory's compliance with the Final Rule would directly affect its customers' Second Amendment rights. Therefore, Plaintiffs have sufficiently alleged a causal connection that satisfies the rule from Craig and the Eleventh Circuit's interpretation of Craig as stated in Mata.

Concerning the third and final prong, the Court finds Plaintiffs have sufficiently alleged hindrance to a third party asserting its rights. Plaintiffs' supplemental briefing on standing argues 2nd Amendment Armory's customers have privacy concerns surrounding firearm ownership and they have a justifiable fear of Defendants' retribution, both of which hinder customers from bringing suit. (Dkt. 43 at 9-10) Plaintiffs also explain that an "individual's status as a firearms owner is a sensitive issue of personal privacy, and especially concerning where the government threatens severe consequences for possessing an affected firearm." (Id. at 10)

Courts have regularly found privacy to be a legitimate hindrance sufficient to confer *jus tertii* standing in cases involving citizenship concerns, medical procedures, and contraceptives. For example, in <u>Young</u>, the Eleventh Circuit found *jus tertii* standing without a single allegation in the complaint that specifically named a resident because "some of the immigrants living in Jupiter may fear drawing attention to the immigration status of themselves or their neighbors." <u>529 F.3d at 1044</u>. The Supreme Court has also conferred *jus tertii* standing to a physicians in abortion rights challenges. <u>Singleton v. Wulff</u>, <u>428 U.S. 106, 117-18</u> (1976); <u>Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller</u>, <u>934 F.2d 1462, 1465</u> (11th Cir. 1991). The Supreme Court later extended its reasoning in those cases to contraceptive vendors because "potential purchasers may be chilled from . . . assertion (of their own rights) by a desire to protect the very privacy (they seek to vindicate) from the publicity of a court suit." <u>Carey v. Population Servs., Int'l</u>, <u>431 U.S. 678, 684</u> n.4 (1977). The Supreme Court has been forgiving with the hindrance element where "it is credibly alleged that the statute at issue here may materially impair the ability of third persons [(criminal defendants with nonforfeitable assets)] to exercise their constitutional rights." <u>Caplin & Drysdale, Chartered v. United States</u>, <u>491 U.S. 617, 624</u> n.3 (1989).

Here, 2nd Amendment Armory's past customers face new registration requirements under the Final Rule that, if not adhered to, will result in criminal and or monetary penalties. (<u>Dkt. 1 at</u> ¶ 2) Plaintiffs also claim in their supplemental briefing on standing that 2nd Amendment Armory's future customers face a credible threat of prosecution for being on either side of a transaction involving a newly made or

unregistered brace-equipped firearm. (Dkt. 43 at 3) At this preliminary stage, the Court finds that 2nd Amendment Armory is uniquely positioned to litigate these claims to prevent threatened sanctions from the ATF against future customers and to afford privacy to past and future customers from the publicity of a court suit. See Carey, 431 U.S. at 684 n.4; Young, 529 F.3d at 1044; Caplin, 491 U.S. at 624 n.3.

## B. Preliminary Injunction

Plaintiffs are also able to satisfy the prerequisites for the entry of a preliminary injunction. First, when a plaintiff brings multiple claims, reviewing courts regularly evaluate the preliminary injunction factors for each claim asserted. See, e.g., Gen. Motors Corp. v. Phat Cat Carts, Inc., 504 F. Supp. 2d 1278, 1280 (M.D. Fla. 2006) (adopting the report and recommendations that evaluated three claims); accord Freedom Med., Inc. v. Sewpersaud, 469 F. Supp. 3d 1269 (M.D. Fla. 2020); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 (11th Cir. 2008). Here, Plaintiffs assert one statutory and two constitutional claims for which preliminary injunctive relief is sought. (Dkt. 21) The Court begins its analysis with Plaintiffs' APA claim because Plaintiffs have alleged the Final Rule "impermissibly" classifies certain weapons as "rifles" which may result in those weapons falling either within ATF's regulatory authority or within the plain text of the Second Amendment.

### 1. Likelihood of Success on the Merits

The first factor, a substantial likelihood of success on the merits, is considered the most critical factor in the merits analysis of this motion. Barber v. Governor of Alabama, 73 F.4th 1306, 1318 (11th Cir. 2023) (citation omitted). A court need not

consider the remaining preliminary injunction factors, where the first factor fails. Id. (citing Grayson v. Warden, Comm'r, Alabama Doc, 869 F.3d 1204, 1239 n.89 (11th Cir. 2017) (evaluating a prisoner's motion for stay of execution and concluding that "it was unnecessary for the Court to determine whether Brooks satisfied the second, third or fourth factors in the four-part test for granting a stay.")); see, e.g., Alabama Libertarian Party v. Alabama Pub. Television, 227 F. Supp. 2d 1213, 1220 (M.D. Ala. 2002). "Although the initial burden of persuasion [in a preliminary injunction hearing] is on the moving party, the ultimate burden is on the party who would have the burden at trial." FF Cosms. FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017). Here, the ultimate burden lies with the Defendants.

### a. Administrative Procedure Act Claim

The Administrative Procedure Act ("APA") permits judicial review of agency decisions. Sierra Club v. Van Antwerp, 526 F.3d 1353, 1359 (11th Cir. 2008). A reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be:

> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> **(B)** contrary to constitutional right, power, privilege, or immunity;
> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> **(D)** without observance of procedure required by law;
> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

Plaintiffs contend that the Final Rule violates the APA because the Final Rule is: (1) inconsistent with the relevant statutes; (2) not the result of Defendants following procedure, (3) arbitrary, capricious, and contrary to law; (4) contrary to the rights of Americans; and (5) not a logical outgrowth of the initial proposed rule. (Dkt. 21) Plaintiffs' papers and their representations at the hearing center on the fifth argument. Thus, the Court begins its inquiry with Plaintiffs' fifth point.

### i.   Violation of Statutory Procedure

Plaintiffs argue the Final Rule should be set aside because the Final Rule is not a logical outgrowth of the NPRM. (Dkt. 21 at 11-13) Put another way, Plaintiffs contend the Final Rule violates the APA's statutory notice requirement, rendering the Final Rule itself unlawful. Defendants argue the Final Rule does not violate the APA's notice requirements for two reasons. (Dkt. 22 at 24) First, Defendants argue the Final Rule is exempt from notice and comment because it is an interpretive rule. (Id. at 25) Second, Defendants contend even if the Final Rule required notice and comment, the Final Rule is a reasonable outgrowth of the NPRM for which there was sufficient notice and a reasonable opportunity for comment. (Id. at 26-28)

"The APA requires that agencies publish notice of their proposed rulemaking and afford the public an opportunity to comment." Miami-Dade Cnty. v. EPA, 529 F.3d 1049, 1058 (11th Cir. 2008) (citing 5 U.S.C. § 553(b)-(c). To show this requirement has been met as to the final iteration of the rule, the final rule must be "a 'logical outgrowth' of the rule it originally proposed." See id. "[N]otice and comment

rulemaking is not required when an agency issues an 'interpretive rule.'" Warshauer v. Solis, 577 F.3d 1330, 1337 (11th Cir. 2009). Substantive rules have the "force and effect of law," while interpretive rules are those that merely advise the public of the agency's construction of the statutes and rules that it administers. See Azar v. Allina Health Servs., 139 S. Ct. 1804, 1811 (2019). The Eleventh Circuit adopted the D.C. Circuit's test for "interpretive rules" which states:

> First, although not dispositive, the agency's characterization of the rule is relevant to the determination. *Id.* Second, "[a]n interpretative rule simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.' On the other hand, if by its action the agency intends to create new *law, rights or duties*, the rule is properly considered to be a legislative rule.

Warshauer, 577 F.3d at 1337 (emphasis added). The Eleventh Circuit has stated the difference between a legislative rule and a general policy statement depends on whether "the agency action establishes a binding norm." Ryder Truck Lines, Inc. v. United States, 716 F.2d 1369, 1377 (11th Cir. 1983). A binding norm is one "affecting individual rights and obligations." Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).

In this case, Defendants have characterized the Final Rule as interpretive in their moving papers and the Final Rule itself. See 88 Fed. Reg. 6,478-01, at *6,478. Defendants contend that ATF promulgated the Final Rule to give its "best *interpretation* of the relevant statutory provisions" and any obligations flowing from ATF's new interpretation are preexisting obligations under the NFA and the GCA. (Dkt. 22 at 25) (emphasis added) At this preliminary stage, the record does not support a finding that the Final Rule is interpretive for the reasons stated below, but

specifically, Defendants' argument fails at the second step of the assessment outlined in <u>Warshauer</u>.

Before the Effective Date and the Enforcement Date, brace-equipped pistol owners were unencumbered by the NFA or GCA, and they had no duty or legal obligation to register, transfer, surrender, alter, or destroy their firearms. After the Enforcement date, brace-equipped pistol owners and retailers of such modified weapons now have legal duties to comply with or risk criminal and monetary penalties. <u>See</u> Final Rule, <u>88 Fed. Reg. 6,478</u>-01, at *6,480 ("While firearms equipped with 'stabilizing braces' or other rearward attachments may be submitted to ATF for a new classification determination, a majority of the existing firearms equipped with a 'stabilizing brace' are likely to be classified as 'rifles' because they are configured for shoulder fire based on the factors described in this rule."). The Final Rule imposes associated duties: it expressly commands owners or possessors of "short-barreled rifles equipped with a "stabilizing brace device" to comply with preexisting NFA registration requirements by May 31, 2023. It imposes punishment and penalties flowing directly from the Final Rule, i.e., a brace-equipped pistol owner's failure to register his or her firearm as a "rifle" will result in criminal and monetary penalties. This is far from a reminder because these owners or possessors previously had no NFA-related obligations.[13]

---

[13] Defense Counsel acknowledged at the hearing on Plaintiffs' motion that the Final Rule "sets forth clear means of compliance[.]" <u>See</u> Tr<u>. 35:4-6</u>.

The Final Rule also supersedes all prior "ATF classifications involving 'stabilizing brace' attachments for firearms" as of the Effective Date. See 88 Fed. Reg. 6,478-01, at *6,569. Based on this statement of supremacy, the Final Rule, in its application, imposes future burdens on possession of a "brace-equipped pistol" because possession of these pistols virtually always constitutes possession of a "rifle." As a result, the Final Rule criminalizes possession of brace-equipped pistols purchased or owned before the Final Rule was promulgated if they are possessed after the Enforcement date. Therefore, the future effect and the nature of the Final Rule support a finding that the Final Rule is legislative rather than interpretive.

The Final Rule further commands obedience by the Compliance Date and offers a tax shield to those who comply. These provisions in the Final Rule, without evidence to contradict their meaning, support Plaintiffs' position that the Final Rule will likely be found to be "force or effect of law" because the deadlines imposed therein are not tentative recommendations or suggested guidelines. See e.g., State v. Becerra, 544 F. Supp. 3d 1241, 1289 (M.D. Fla. 2021) (finding the "conditional sailing order serves as neither a tentative recommendation nor a suggested guideline nor a declaratory "final disposition"; the conditional sailing order carries the force of law and bears all of the qualities of a legislative rule."). This preliminary finding is bolstered by Defense Counsel's representations at the hearing that, after the Enforcement date, no one can own these weapons as previously configured without registration. (See Tr. 47:13-15; 48:10-20) While the text of the Final Rule states it did not intend to create any new

obligations or duties, Plaintiffs have shown that the Final Rule creates new obligations and duties, thus the Final Rule is likely legislative based on the present record.

The Parties also dispute whether the Final Rule is the logical outgrowth of the NPRM.[14] Statutory notice requirements can ensure: (1) "agency regulations are tested via exposure to diverse public comment, (2) [ ] fairness to affected parties, and (3) affected parties [have] an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Miami-Dade, 529 F.3d at 1058. "A rule is deemed a logical outgrowth if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." Ne. Maryland Waste Disposal Auth. v. E.P.A., 358 F.3d 936, 952 (D.C. Cir. 2004). "Agency notice must describe the range of alternatives being considered with reasonable specificity." Georgia v. Wheeler, 418 F. Supp. 3d 1336, 1373 (S.D. Ga. 2019) (quoting Small Refiner Lead Phase-Down Task Force v. E.P.A., 705 F.2d 506, 549 (D.C. Cir. 1983)). "Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision making." Id.

The Court has created a chart to best illustrate its consideration of the NPRM against the Final Rule.

| NPRM | FINAL RULE |
|---|---|
| **Description**: ATF is proposing to amend the definition of "rifle" in 27 CFR 478.11 and 479.11, respectively, by adding a | **Description**: The rule provides an amendment to the definition of "rifle" in §§ 478.11 and 479.11. In issuing this final |

---

[14] The Parties concede that a notice and comment period occurred for the promulgation of the Final Rule, so the Court directs its analysis to the logical outgrowth arguments only.

| | |
|---|---|
| sentence at the end of each definition. The new sentence would clarify that the term "rifle" includes any weapon with a rifled barrel and equipped with [FN15] an attached "stabilizing brace" that has objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder, as indicated on ATF Worksheet 4999. | rule, the Department has revised the proposed regulatory text in the NPRM to account for the comments received. The rule does not adopt the Worksheet 4999 as proposed in the NPRM. The rule does, however, adopt from the NPRM and proposed Worksheet 4999 several of the objective design features that indicate a firearm is designed, made, and intended to be fired from the shoulder and incorporates those features into the definition of "rifle." The final regulatory text for the definition of "rifle" reflects the best interpretation of the relevant statutory provisions. All previous ATF classifications involving "stabilizing brace" attachments for firearms are superseded as of May 31, 2023. As such, they are no longer valid or authoritative, and cannot be relied upon. However, firearms with such attachments may be submitted to ATF for re-classification. |
| **Determination Procedure**: ATF proposes to use ATF Worksheet 4999 to determine if a firearm is designed and intended to be fired from the shoulder. ATF will use a four-point system, in which it will assign anywhere from 1 to 4 points in three sections to determine if the firearm is regulatable. One point is a minor indicator the weapon could be fired from the shoulder. Two points is a moderate indicator the weapon may be designed and intended to be fired from the shoulder. Three points is a strong indicator the weapon is likely designed and intended to be fired from the shoulder. Four points is a decisive indicator the weapon is designed and intended to be fired from the shoulder. If the total point value of the firearm submitted is equal to or greater than 4— in either Section II or III—then the | **Determination Procedure**: ATF will examine six factors to determine whether a weapon is designed, made, and intended to be fired from the shoulder. Those factors are:<br><br>(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;<br><br>(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component, or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles; |

firearm, with the attached "stabilizing brace," will be determined to be "designed or redesigned, made or remade, and intended to be fired from the shoulder," or a "rifle" under the GCA and NFA.

(1): **Prerequisites**. FATD will first examine the submitted sample's weapon weight and overall length.

(2) **Accessory Characteristics**. If the submitted firearm sample meets the prerequisites of weighing at least 64 ounces and having an overall length between 12 and 26 inches, FATD will analyze the accessory's design, rear surface area, adjustability, and stabilizing support.

(3) **Weapon Configuration**. FATD will evaluate the entire weapon including how the "stabilizing brace" is mounted to the firearm as well as the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder by considering: length of pull, attachment method, stabilizing brace modifications and configuration, and peripheral accessories.

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

| **Prerequisites – Weight and Length**. | **Factor 1 – Weight and Length**. |
|---|---|
| (a) *Weapon Weight*. Weapon weight is a key prerequisite in determining whether a "stabilizing brace" is appropriately used on a weapon. Firearms weighing less than 64 ounces/4 pounds (weighed with unloaded magazine and accessories removed) are not considered weapons suitable for use with a "stabilizing brace" accessory because they are more easily held and fired with one hand without the need for a "stabilizing brace."<br><br>(b) *Overall Length*. The overall length of a weapon is relevant in classifying it as a | ATF will measure the weight and length of the firearm while it is equipped with the "stabilizing brace" affixed to it. If the weight or length of the firearm in question is consistent with the weight or length of similarly designed rifles, then this would be an indicator that shoulder firing the weapon provides stabilization and is beneficial in firing the weapon, and thus that the firearm is designed, made, and intended to be used this way. |

| | |
|---|---|
| "rifle" or a "pistol" because, as a firearm becomes excessive in length, it is increasingly difficult to fire with one hand. Firearms possessing an overall length between 12 and 26 inches may be considered pistols for which a "stabilizing brace" could reasonably be attached to support one-handed fire. Firearms with an overall length of less than 12 inches are considered too short to indicate any need for a "stabilizing brace." Conversely, firearms exceeding 26 inches in overall length are impractical and inaccurate to fire one-handed, even with a "stabilizing brace," due to imbalance of the weapon. | |
| **Accessory Characteristics – 4 Prongs**. If the submitted firearm sample meets the prerequisites of weighing at least 64 ounces and having an overall length between 12 and 26 inches, FATD will analyze various attachment characteristics, including:<br><br>*Accessory Design*. The design of the accessory when attached is a factor in determining whether the item is actually a "stabilizing brace" or is intended to be utilized as a stock, making the firearm designed to be fired from the shoulder. the more features a purported "stabilizing brace" has in common with known shoulder stock designs, the more points it will accumulate. "Stabilizing braces" that are not based on any known shoulder stock design will accrue zero points. "Stabilizing braces" that incorporate one or more shoulder stock design features (e.g., adjustment levers or features that allow for the length of the device to be varied in a manner similar to an adjustable shoulder stock, sling mounts, or hardened surfaces) will | **Factor 2 – Length of Pull**. ATF will examine the firearm for characteristics (e.g., length of pull) consistent with whether a firearm is designed, made, and intended to be fired from the shoulder. Whether there is an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method is considered when examining a firearm's length of pull to determine if the firearm is designed, made, and intended to be fired from the shoulder. First, for devices with fixed material or a device in a fixed position on the rear of the firearm, the length of pull of a firearm would be measured from the device's fixed position to the center of the trigger. This is the position by which an individual may shoulder the firearm. Second, for devices that are not fixed and instead have a mechanism to lock into place in various locations along a buffer tube or receiver extension, ATF would measure length of pull with the device in the rearmost locked position. Finally, for a |

accrue 1 point. Lastly, "stabilizing braces" that are modified versions of known shoulder stock designs will accrue 2 points.

*Rear Surface Area*. Rear surface area is a design characteristic referring to the area on the rear of the purported "stabilizing brace." Clearly, larger, more substantial "stabilizing braces" may have more surface area in which to shoulder a firearm. However, while smaller, less substantial "stabilizing brace" designs may have reduced surface area, this shouldering area may still be similar to known shoulder stock designs upon which they are based. A "stabilizing brace" accessory that is designed with only a minimal rear surface area (e.g., a "fin-type") with which a weapon could possibly be shouldered will accrue 1 point. A "stabilizing brace" accessory that is designed with a rear surface area sufficient to shoulder the firearm, or approximating the rear surface of known shoulder stocks, which allows shouldering the firearm, will accrue 2 points. Finally, a "stabilizing brace" accessory that features material clearly designed to increase rear surface area to facilitate shoulder firing will accrue 3 points.

*Adjustability*. While adjustability, in and of itself, is not determinative of a "stabilizing brace's" design function on a firearm, it remains a significant indicator that the device is designed and intended to be shouldered. Weapons that do not incorporate an adjustable "stabilizing brace" will accrue zero points, while "stabilizing brace" designs that are adjustable will accrue 2 points.

firearm that includes a device that is movable but cannot be affixed into various positions along the buffer tube or receiver extension, length of pull would be measured with the device collapsed.

*Stabilizing Support*. Stabilizing support is a vital characteristic because it provides evidence to evaluate the purported purpose of the attached device, which is to provide shooters with forearm support for firing large, heavy handguns. It is therefore important for ATF to consider the various "stabilizing brace" designs and the forearm support they provide. ATF has categorized these different "stabilizing brace" designs into three broad categories: Counterbalance, "Fin-type", and "Cuff-type."

(a) **Counterbalance** designs utilize the weight of the weapon as a lever to push the "stabilizing brace" into the forearm and provide stability for firing. This feature presents some evidence that a firearm equipped with a Counterbalance "stabilizing brace" is intended to be fired from the shoulder and therefore will accrue 1 point.

(b) "Fin-type" designs incorporate a thin "blade" designed to rest against the shooter's arm, and feature a minimal, thin rear surface area. "Fin-type" accessories that do not incorporate an arm strap of suitable length or functionality will accrue 2 points, while those that incorporate an arm strap long enough to secure a person's forearm consistent with the purported intent will not accrue any points (zero).

(c) "Cuff-type" designs are by far the most prevalent of all "stabilizing

braces," consisting of over two dozen different unique designs. Therefore, a "cuff-type" "stabilizing brace" that fully wraps around the shooter's forearm (e.g., SB15/SBX-K) will not accrue any points (zero). "Cuff-type" "stabilizing braces" that partially wrap around the shooter's forearm (e.g., SOB/SB-Mini) will accrue 1 point. Finally, those "stabilizing braces" incorporating arm flaps that do not wrap around the shooter's forearm (e.g., SBA3/SB-PDW), thereby providing no arm support, will accrue 2 points. Any "stabilizing brace" that is configured as a "split-stock" (e.g., SBT/FS1913) will accrue 3 points.

| | |
|---|---|
| **Weapon Configuration** – ATF will evaluate the entire weapon including how the "stabilizing brace" is mounted to the firearm as well as the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder. This will involve a consideration of:<br><br>*Length of Pull*. Length of pull is a common measurement of firearms that describes the distance between the trigger and the center of the shoulder stock. Firearms with "stabilizing braces" that incorporate a length of pull of less than 10 inches will not accrue any points (zero). However, a length of pull that is between 10 but under 11 inches will accrue 1 point, 11 but under 12 inches will accrue 2 points, 12 but under 13 inches will accrue 3 points, and a length of pull of 13 inches or more will accrue 4 points as this is a | **Factor 3 – Sights and Scopes**<br>ATF intends to examine the sights or scope on a submitted firearm sample as compared to those sights or scopes featured on a rifle to determine whether the sights or scope on the firearm being evaluated must be shouldered to use the sights or scope as designed. The alignment of sights and optics is an important feature of a weapon designed, made, and intended to be fired from the shoulder. Back-up or flip-up sights that can only be effectively used when the firearm is shouldered are an indicator that a firearm is designed, made, and intended to be fired from the shoulder. Similarly, the presence of a reflex sight with flip-to-the-side magnifier that has limited eye relief (i.e., the sight is unusable unless aimed and fired from the shoulder) is a design incorporated on |

standard length of pull for rifles and is a decisive indicator that the firearm is intended to be fired from the shoulder. P. 10

*Attachment Method*. A "stabilizing brace's" attachment method often provides critical insight as to how a firearm is intended to be used. Use of an AR-type pistol buffer tube with adjustment notches, an adjustable rifle buffer tube, or an adjustable PDW-type guide rail, will accrue 1 point as each indicates the ability to adjust the "stabilizing brace." An extended AR-type pistol buffer tube (greater than 6½ inches), folding adaptors, and the use of "spacers" will accrue 2 points. Additionally, a shoulder stock that has been modified to incorporate a "stabilizing brace," or any attachment method that results in an unusable aimpoint when the "stabilizing brace" is attached is also a strong indicator the weapon is actually intended to be shoulder-fired and will accrue 3 points.

*Brace Modifications/Configuration*. "Stabilizing brace" accessories that have been modified from their original configuration will accrue additional points. Any "cuff-type" or "fin-type" accessory, which incorporates an arm strap too short to wrap around the shooter's arm or is manufactured from an elastic material (eliminating stabilizing support), will accrue 2 points, as will a "fin-type" accessory lacking an arm strap. Further, if these modifications reconfigure the device into a shoulder stock, 4 points will be accrued.

Peripheral Accessories.

firearms designed, made, and intended to be fired from the shoulder.

The relevant inquiry for this objective design feature is whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed. Sights or scopes that cannot be used without shouldering the weapon indicate that the firearm is designed, made, and intended to be fired from the shoulder.

(a) **Hand-stop Attachments.** The presence of a hand-stop will result in 2 points being accrued. Further, the presence of any secondary grip on a weapon with a "stabilizing brace" accessory change the classification from a one-handed to a two-handed weapon, thereby disqualifying it from being classified as a "braced pistol," and resulting in the subject firearm accruing 4 points.

(b) **Sights.** The presence of rifle-type flip-up, back-up iron sights ("BUIS") or lack of any sight will accrue 1 point. Further, firearms that incorporate a reflex sight (e.g., Red Dot) in conjunction with a flip-to-the-side ("FTS") magnifier with limited eye relief (distance between the shooter's eye and rear of sight/scope) will accrue 2 points. Finally, any weapon incorporating a sight or scope that possesses an eye relief (distance between the shooter's eye and rear of sight/scope) incompatible with one-handed firing will accrue 4 points, as this is a decisive indicator that the "stabilizing brace" is being utilized as a shouldering device.

(c) **Bipod/monopod.** Attachment of a bipod/monopod will accrue 2 points, regardless of the type of "stabilizing brace" attached.

(a) **Weight.** Any complete firearm with an installed "stabilizing brace" that weighs more than 120 ounces (7½ pounds), incorporating end-user accessories, will be considered too heavy to be fired with one hand,

| | |
|---|---|
| and will accrue 4 points. The firearm will be weighed as configured, with an unloaded magazine.<br><br>*Catchall Provision*. Efforts to advertise, sell, or otherwise distribute "short-barreled rifles" as such will result in a classification as a "rifle" regardless of the points accrued on the ATF Worksheet 4999 because there is no longer any question that the intent is for the weapon to be fired from the shoulder. | |
| | **Factor 4 – Surface Area**<br>　　An assessment of whether a weapon that is equipped with an accessory or rearward attachment provides a surface area that allows the weapon to be fired from the shoulder shall be the first step in determining that a weapon is rifle designed, made, and intended to be fired from the shoulder. In making the determination of whether surface area "allows" for shoulder firing, ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area. Instead, ATF will consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon. If the firearm includes a surface area that can be used for shoulder firing the weapon, the weapon potentially qualifies as a "rifle." ATF will then need to consider whether the accessory, component, or other rearward attachment is necessary for the cycle of operations to aid in the determination of whether a firearm is designed, made, and intended to be fired from the shoulder. In contrast, if the |

| | weapon does not include such surface area, then it does not qualify as a "rifle." |
|---|---|
| | **Factor 5 – Marketing & Promotional Materials**<br>ATF plans to consider the marketing of the attachment (e.g., indirect marketing through persons that manufacture or sell "stabilizing braces" but not firearms) and the direct marketing from the firearm manufacturer regarding the firearm to which the attachment or "brace" is assembled. By considering direct or indirect marketing or promotional materials available through videos, advertisements, or other sources, ATF can verify the manufacturer's purported intent regarding the use of the weapon. Indirect marketing materials can include statements from accessories manufacturers for the accessories that a firearms manufacturer attaches or incorporates into its firearm, such as a "brace" manufacturer that advertises that a "stabilizing brace" is a method to circumvent the NFA. |
| | **Factor 6 – Likely Use Information**<br>ATF plans to consider "information demonstrating the likely use of the weapon by the general community, including both the manufacturer's stated intent when submitting its item for classification and use by members of the firearms industry, firearms writers, and in the general community." These sources provide insight into the ways that manufacturers market their products and whether the firearm equipped with a "stabilizing brace" as configured is designed, made, and intended to be shoulder-fired. ATF would also consider information such as the firearms magazines that similarly exhibited the |

|  | use of this "stabilizing brace" as a shoulder stock. |

By this comparison, the Court finds Plaintiffs have shown a likelihood of success on their claim that the Final Rule is not a logical outgrowth of the NPRM. First, the NPRM focuses almost entirely on Sections II and III of Worksheet 4999 to determine whether a brace-equipped firearm is a rifle. However, the Final Rule focuses on six factors with minimal overlap from the NPRM and no certainty or predictability as to scoring criteria in ATF's analysis. The Final Rule also clarifies that "surface area" is the threshold, and most important, factor because "[a] firearm that does not have [a] surface area that allows for the weapon to be fired from the shoulder cannot qualify as a rifle." See 88 Fed. Reg. at 6,478-01, at *6,511. Upsetting the order, certainty, and predictability afforded by the NPRM's Worksheet 4999, the Final Rule's ATF-subjective factors amount to a total shift in the "rifle" analysis that interested parties would never have been able to predict. See e.g., Georgia v. Wheeler, 418 F. Supp. 3d at 1376 (finding no logical outgrowth where the final rule "created an entire distance-based scheme without giving any indication of a range of alternatives to interested parties"). This preliminary observation is bolstered by and mirrors the Fifth Circuit's finding that "the Worksheet allowed an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." See Mock v. Garland, 75 F.4th 563, 584 (5th Cir. 2023).

Second, the current record does not reflect factors 5 and 6 were adequately presented for notice and comment. Defendants have offered no evidence at this time to suggest that the NPRM notified citizens that ATF would consider videos, advertisements, or other sources to determine whether a firearm/pistol would be reclassified as a "rifle" under the Final Rule. Also, Defendants have not offered evidence to suggest citizens were otherwise on notice that ATF would consider a weapon's "use by members of the firearms industry, firearms writers, and in the general community" under the Final Rule. Nor is there any indication that interested parties would, could, or should have anticipated the Final Rule's complete extraction of the NPRM's prerequisites and accessory characteristic sections of Worksheet 4999 into separate and subjective categories for consideration by ATF only. For this reason alone, Defendants have not yet shown the Final Rule is the logical outgrowth of the NPRM. Cf. Miami-Dade, 529 F.3d at 1060.

Third, the Court is satisfied Plaintiffs would likely have been able to mount a credible challenge to the Final Rule if the subjective test and factors 5 and 6 had properly been presented for notice and comment. (Dkt. 21 at 11-13); Cf Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms & Explosives, No. 3:21-cv-0116, 2023 WL 7490149, at *1, --- F.Supp.3d ---- (N.D. Tex. Nov. 14, 2023) (denying injunctive relief on the logical outgrowth claim because plaintiffs failed to delineat[e] any reasons why their notice interests were harmed when the ATF did not conduct a second notice and comment process ). Therefore, for the reasons independently stated above and for the well-reasoned points explained in Mock, the Court finds Plaintiffs

have shown a likelihood of success on the merits regarding their APA-logical outgrowth claim at this time. See 75 F.4th at 586.

**b.  Second Amendment Claim**

Plaintiffs also mount a Second Amendment challenge to the regulation. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; District of Columbia v. Heller, 554 U.S. 570, 576 (2008). The bar for overcoming constitutional challenges to infringement of the Second Amendment has recently been raised--significantly. In fact, the Supreme Court articulated a rigorous two-step inquiry for Second Amendment claims. New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022). Under its standard, a plaintiff must show the plain text of the Second Amendment covers the proposed restricted conduct. Id. at 18. If so, the government must "justify its regulation by demonstrating that [the challenged regulation] is consistent with the Nation's historical tradition of firearm regulation." Id. at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"[15] Id. To satisfy their burden under the strictures of Bruen, Defendants must, at the preliminary injunction stage, show they are likely to prevail on Plaintiffs' challenge

---

[15] History will ultimately judge whether the Bruen standard will stand the test of time in an era in which the proliferation of weapons and the associated, necessary regulation of them could not possibly find an historical analogue dating to the days of muskets and pump loaded shotguns and six-shot percussion pistols. Compare, for example, laser equipped, semi-automatic and automatic rifles, single use 3-D Glocks and hypersonic rifle and ammunition to any historical analogue, and any modern regulation would likely come up lacking. But, for now, Bruen is the law of the land and constrains any other analysis of the matter.

that these strictures find analogs in the Nation's historical tradition of firearm regulation. To be sure, <u>Bruen</u> makes clear that Defendants' choice of analog need not be an historic twin, even so, finding a close archival comparator is no small feat, especially in the infancy of litigation. <u>See</u> <u>597 U.S. at 30</u>.

So, with little time to mine the annals of history, Defendants offer that the Final Rule's pertinent support rests on centuries of taxation and registration requirements that reflect what they describe as an "unbroken historical tradition of firearm regulation 'relevantly similar' to that required by the NFA." (<u>Dkt. 22 at 36-39</u>)

Specifically, Defendants cite a litany of state regulations dating to 1631 to show that many "states" required registration, inspection, or surveying of citizens' firearms. (<u>Id.</u> at 37-39) The cited regulations, ordinances, and practices, however, concerned civilian readiness for combat, adequacy of stock, and taxation of firearms and ammunition to raise revenue for the general welfare. That is to say—at this stage in the litigation, all the Defendants have produced are historical inspection analogs that were undertaken to ensure that the citizenry was well-armed, not to ensure that weapons were removed for non-compliance with regulatory limitations.

Plaintiffs counter that there is "no historical basis for the regulation, and no historical law [is] analogous to the attachment of felonious consequences to firearms by barrel length." (<u>Dkt. 21 at 6</u>) As Plaintiffs point out, the historic analogs offered by Defendants have nothing to do with the inspection or registration of firearms for crime control or to prevent shoulder fire, as is the case with the Final Rule. Just by way of example, Defendants cite Professor Robert Churchill's article for his discussion of the

colonial militia practice of surveying firearms. Robert H. Churchill, <u>Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment</u>, 25 LAW & HIST. REV. 139 (2007). To the contrary, Professor Churchill notes: In New Jersey, for example, the legislature ordered that every militiaman should "*be provided*" with arms and ammunition "in his house or place of abode" and imposed a fine whenever "*said persons shall be deficient in keeping the arms* and stores aforesaid." <u>See</u> Churchill, 25 LAW & HIST. REV. at 148 (emphasis added). Likewise, South Carolina and Georgia ordered that "*every person* liable to appear and bear arms … *shall constantly keep one gun or musket fit for service*" as well as ammunition.") <u>Id.</u> (emphasis added). Professor Church's article does not speak at all to the regulation of firearms for the purpose of removing offending types of weapons or ensuring certain limitations related to the weapon's firing capabilities or otherwise limiting or controlling of citizens' rights to bear certain types of arms.

The Supreme Court has made it clear that a district court's analogical inquiry should consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." <u>Bruen</u>, <u>597 U.S. at 29</u>.

Because the Court concludes Plaintiffs have demonstrated a likelihood of success on their claim that the Final Rule violates the APA and finds that an injunction should issue for that reason alone, the Court declines to address the adequacy of the offered historically analogous laws as they relate to the constitutional claim.

**Irreparable Harm**

As to the statutory claim, Plaintiffs contend that they are suffering irreparable harm because they face the threat of criminal prosecution, felony arrest, and imprisonment. (Dkt. 21 at 13) Defendants contend that Plaintiff Second Amendment Armory has failed to show irreparable injury because it has not articulated how or why the Final Rule creates a risk of criminal consequences or loss of its license. (Dkt. 26 at 11) Defendants also argue the Individual Plaintiffs have failed to show irreparable harm because they "cannot plausibly [establish] that their decision making as to compliance with the [Final] Rule is so subjectively difficult that it creates" an irreparable injury. (Id. at 13) Defendants add that all Plaintiffs have failed to identify a legal interest that would be injured by their compliance with the NFA's registration procedures. (Id. at 12)

A party seeking a preliminary injunction must demonstrate irreparable harm. See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990). An injury is irreparable if it is "neither remote nor speculative, but actual and imminent." See id. (citation omitted). A violation of any constitutional right does not always constitute irreparable harm. See Siegel v. LePore, 234 F.3d 1163, 1177 (11th Cir. 2000). The relevant inquiry is whether there is "direct penalization, as opposed to incidental inhibition" of the constitutional right alleged. Cate v. Oldham, 707 F.2d 1176, 1188-89 (11th Cir. 1983).

Here, the claims as asserted by Plaintiffs Colon, Kling, and Mele present a wrinkle in the irreparable harm analysis because Plaintiffs Colon, Kling, and Mele are

presumably protected by the injunctions entered in other federal cases. All acknowledge they are members of Second Amendment Foundation or are otherwise protected because of their membership in a gun rights group. The Fifth Circuit Court of Appeals is now considering three cases consolidated on appeal that involve the gun rights groups in which Plaintiffs claim membership. See Mock v. Garland, No. 4:23-cv-00095, 2023 WL 6457920, at *18, --- F. Supp. 3d ---- (N.D. Tex. Oct. 2, 2023) (granting preliminary relief); Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives, No. 6:23-cv-00013, 2023 WL 7116844, at *12, --- F. Supp. 3d ---- (S.D. Tex. Oct. 27, 2023) (partially granting preliminary relief); but see Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms & Explosives, No. 3:21-cv-0116, 2023 WL 7490149, at *20, --- F. Supp. 3d ---- (N.D. Tex. Nov. 13, 2023) (denying preliminary relief). Assuming injunctive relief continues to enjoin the enforcement of the Final Rule for Plaintiffs Colon, Kling, and Mele, an injunction in this case would be overlapping protection.

Whether irreparable harm can be proven in this scenario was addressed in Florida v. Department of Health & Human Services, 19 F.4th 1271 (11th Cir. 2021). There, the Eleventh Circuit applied the capable-of-repetition-yet-evading-review exception to the mootness doctrine to decide whether the Western District of Louisiana's nationwide injunction that enjoined the Omnibus COVID-19 Health Care Staff Vaccination interim rule rendered moot the State of Florida's claim for preliminary injunction of the same interim rule. See 19 F.4th at 1280. The Eleventh Circuit found there was a "reasonable expectation that th[e] situation would recur"

because the Fifth Circuit could eliminate the nationwide reach of the Louisiana district court's injunction. Id. at 1284. If the Fifth Circuit eliminated the nationwide reach of the injunction, then Florida would certainly lose its shield, and there likely would be too short a window between the interim rule's effective date and the date on which Florida would again be susceptible to the United States' enforcement of the interim rule. Id. at 1284. Therefore, the Eleventh Circuit concluded it had jurisdiction, the capable-of-repetition-yet-evading-review exception applied, and prudential concerns militated in favor of reviewing the Northern District of Florida's order denying the State of Florida's motion for preliminary injunction. Id. at 1285.

The Court likewise finds the risk of irreparable harm to Plaintiffs Colon, Kling, and Mele is not eliminated by the existing injunctions in Mock and Texas. Given the inconsistent decisions in the Texas cases that are being addressed in the consolidated appeal, Plaintiffs Colon, Kling, and Mele may face the same exposure and short window before enforcement that the State of Florida faced in Florida v. Department of Health & Human Services if the Fifth Circuit determines preliminary relief is unwarranted or that nationwide relief is too broad.

Without injunctive relief, the Individual Plaintiffs face direct penalization of their right to own, possess, or sell brace-equipped pistols. The deprivation of Plaintiffs' due process rights under the APA is sufficient to support this Court's conclusion that

the irreparable harm element is met. See e.g., Minard Run Oil Co. v. U.S. Forest Serv.,
670 F.3d 236, 256 (3d Cir. 2011), as amended (Mar. 7, 2012).[16]

### C. Balancing of Harms

The remaining two requirements to grant a preliminary injunction "involve a
balancing of the equities between the parties and the public." Florida v. Dep't of Health
& Human Servs., 19 F.4th 1271, 1293 (11th Cir. 2021). "[W]here the government is
the party opposing the preliminary injunction, its interest and harm merge with the
public interest." Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020).

The Court, having balanced the equities, finds this factor favors granting
preliminary relief because Plaintiffs have shown a likelihood of success on their claim,
and the Government suffers no countervailing harm from being prevented from
violating their rights. The Court also finds the public suffers minimal harm from non-
enforcement of the Final Rule. Cf. Florida, 19 F.4th at 1293. As a result, equity
demands the issuance of an injunction until this Court can evaluate this case on a more
developed record.

### D. Scope

Plaintiffs seek a nationwide injunction because of "complications and pitfalls"
associated with local injunctions, the "acute nature of the potential harms posed by

---

[16] Defendants' timeliness argument is unpersuasive because the Final Rule stated, "the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register." See 88 Fed. Reg. 6,478-01, at *6,481. The Final Rule also explained that "affected firearms have until 120 days after this rule is published to take the necessary actions . . . to comply with Federal law [and] to avoid civil and criminal penalties." Id. at *6,553. Thus, the Court finds Plaintiffs acted timely by moving for injunctive relief before the expiration of the 120-day compliance period.

Defendants, the implication of Plaintiffs' interstate travel rights, and the interstate nature of Plaintiffs' business." (Dkt. 21 at 17) Defendants argue nationwide relief is unwarranted because the Final Rule is subject to litigation in at least five other federal district courts, so judicial restraint counsels in favor of letting each court independently assess the Final Rule's legality. (Dkt. 26 (citing Trump v. Hawaii, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); DHS v. New York, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring)). The Court, being cognizant of this Circuit's reluctance to affirm nationwide injunctions gratuitously entered, has carefully considered many of the factors suggested in Florida, including what is necessary to provide complete relief to the Plaintiffs, and finds that limiting its relief to the parties before it is sufficient to afford the relief that is sought.

First, the named Plaintiffs in this case are all located within the State of Florida, so the geographic dispersion factor counsels against a nationwide injunction. See Florida, 19 F.4th at 1282 ("this case raises no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief because the plaintiffs were not dispersed among the United States or 'myriad jurisdictions' like in a nationwide class action."). The fact that all named Plaintiffs are located in the State of Florida suggests that statewide relief may be appropriate, See Garcia v. Stillman, No. 1:22-cv-24156, 2023 WL 3478450, at *3 (S.D. Fla. May 16, 2023), especially in light of one named Plaintiff having demonstrated *jus tertii* standing for its customers.

Second, the Eleventh Circuit has recognized that "injunctive relief operates on specific parties, not geographic territories" to the extent that "identifying the [parties]

. . . is possible." <u>Georgia</u>, <u>46 F.4th at 1307</u>. All of the parties are capable of being identified. The Plaintiffs are named in the complaint and the customers of 2nd Amendment Armory can identify themselves if approached by the Defendants and threatened with enforcement.

Third, these challenges are being raised in several actions, and are being resolved under the precedents of several circuits. Should the resolutions not align, the matter can be addressed at the highest level of appeals. Thus, upon careful consideration of the foregoing, the Court finds that the Final Rule should be enjoined as to the named Plaintiffs and 2nd Amendment Armory's past and future customers. This carefully tailored injunction will eliminate the identification concerns mentioned in <u>Health Freedom Def. Fund, Inc. v. Biden</u>. See <u>599 F. Supp. 3d 1144, 1177</u> (M.D. Fla. 2022). Moreover, the Court's limited injunction will allow the Final Rule's legality to be independently litigated in district and circuit courts outside the State of Florida. See <u>Florida</u>, <u>19 F.4th at 1281</u>.

## IV.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (<u>Dkt. 21</u>), is **GRANTED in PART** and **DENIED in PART**. It is hereby **ORDERED** that Defendants Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, United States Department of Justice, and Merrick B. Garland, their agents, servants, employees, officers, and all other persons who have notice of this Order and are in active concert or participation with

Defendants, be and are, without prior written or oral notice, preliminarily restrained and enjoined from, in any way, either directly or indirectly, enforcing the Final Rule against the named Plaintiffs and 2nd Amendment Armory's past and future customers (collectively, "Covered Persons") who reside in the State of Florida. For purposes of this injunction, the term "customer" includes any Florida resident who has purchased or subsequently purchases a brace-equipped firearm from 2nd Amendment Armory before final resolution of this action. The injunctive relief authorized by this Order expressly does not grant Covered Persons any additional privileges during interstate travel. Covered Persons engaging in interstate travel are required to comply with any requirements pertinent to traveling with their respective firearms in existence before the Final Rule became effective.

It is further **ORDERED** that Plaintiffs have shown there is a minimal risk of monetary loss to be suffered by Defendants if an injunction is imposed and the Defendants have not countered that assertion. Therefore, the Court waives the security requirement outlined in Rule 65(c) of the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** in Tampa, Florida, this 26th day of January 2024.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any pro se party

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| JOSIAH COLON, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 8:23-cv-223-MSS-NHA |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *et al.*, | |
| *Defendants*. | |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that all defendants hereby appeal to the United States Court of Appeals for the Eleventh Circuit from this Court's opinion and order dated January 26, 2024, ECF No. 47, granting in part plaintiffs' motion for a preliminary injunction, ECF No. 21.

Dated: March 22, 2024          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ (CA Bar No. 332080)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys

1

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-5200
Email: taylor.n.pitz@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On March 22, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Middle District of Florida, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Taylor Pitz
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice

| | |
|---|---|
| braces," consisting of over two dozen different unique designs. Therefore, a "cuff-type" "stabilizing brace" that fully wraps around the shooter's forearm (e.g., SB15/SBX-K) will not accrue any points (zero). "Cuff-type" "stabilizing braces" that partially wrap around the shooter's forearm (e.g., SOB/SB-Mini) will accrue 1 point. Finally, those "stabilizing braces" incorporating arm flaps that do not wrap around the shooter's forearm (e.g., SBA3/SB-PDW), thereby providing no arm support, will accrue 2 points. Any "stabilizing brace" that is configured as a "split-stock" (e.g., SBT/FS1913) will accrue 3 points. | |
| **Weapon Configuration** – ATF will evaluate the entire weapon including how the "stabilizing brace" is mounted to the firearm as well as the effectiveness of the brace in single-handed firing as opposed to firing from the shoulder. This will involve a consideration of:<br><br>*Length of Pull*. Length of pull is a common measurement of firearms that describes the distance between the trigger and the center of the shoulder stock. Firearms with "stabilizing braces" that incorporate a length of pull of less than 10 inches will not accrue any points (zero). However, a length of pull that is between 10 but under 11 inches will accrue 1 point, while 11 but under 12 inches will accrue 2 points, 12 but under 13 inches will accrue 3 points, and a length of pull of 13 inches or more will accrue 4 points as this is a | **Factor 3 – Sights and Scopes** ATF intends to examine the sights or scope on a submitted firearm sample as compared to those sights or scopes featured on a rifle to determine whether the sights or scope on the firearm being evaluated must be shouldered to use the sights or scope as designed. The alignment of sights and optics is an important feature of a weapon designed, made, and intended to be fired from the shoulder. Back-up or flip-up sights that can only be effectively used when the firearm is shouldered are an indicator that a firearm is designed, made, and intended to be fired from the shoulder. Similarly, the presence of a reflex sight with flip-to-the-side magnifier that has limited eye relief (i.e., the sight is unusable unless aimed and fired from the shoulder) is a design incorporated on |

standard length of pull for rifles and is a decisive indicator that the firearm is intended to be fired from the shoulder. P. 10

*Attachment Method*. A "stabilizing brace's" attachment method often provides critical insight as to how a firearm is intended to be used. Use of an AR-type pistol buffer tube with adjustment notches, an adjustable rifle buffer tube, or an adjustable PDW-type guide rail, will accrue 1 point as each indicates the ability to adjust the "stabilizing brace." An extended AR-type pistol buffer tube (greater than 6½ inches), folding adaptors, and the use of "spacers" will accrue 2 points. Additionally, a shoulder stock that has been modified to incorporate a "stabilizing brace," or any attachment method that results in an unusable aimpoint when the "stabilizing brace" is attached is also a strong indicator the weapon is actually intended to be shoulder-fired and will accrue 3 points.

*Brace Modifications/Configuration*.
"Stabilizing brace" accessories that have been modified from their original configuration will accrue additional points. Any "cuff-type" or "fin-type" accessory, which incorporates an arm strap too short to wrap around the shooter's arm or is manufactured from an elastic material (eliminating stabilizing support), will accrue 2 points, as will a "fin-type" accessory lacking an arm strap. Further, if these modifications reconfigure the device into a shoulder stock, 4 points will be accrued.

Peripheral Accessories.

firearms designed, made, and intended to be fired from the shoulder.

The relevant inquiry for this objective design feature is whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed. Sights or scopes that cannot be used without shouldering the weapon indicate that the firearm is designed, made, and intended to be fired from the shoulder.

(a) **Hand-stop Attachments.** The presence of a hand-stop will result in 2 points being accrued. Further, the presence of any secondary grip on a weapon with a "stabilizing brace" accessory change the classification from a one-handed to a two-handed weapon, thereby disqualifying it from being classified as a "braced pistol," and resulting in the subject firearm accruing 4 points.

(b) **Sights.** The presence of rifle-type flip-up, back-up iron sights ("BUIS") or lack of any sight will accrue 1 point. Further, firearms that incorporate a reflex sight (e.g., Red Dot) in conjunction with a flip-to-the-side ("FTS") magnifier with limited eye relief (distance between the shooter's eye and rear of sight/scope) will accrue 2 points. Finally, any weapon incorporating a sight or scope that possesses an eye relief (distance between the shooter's eye and rear of sight/scope) incompatible with one-handed firing will accrue 4 points, as this is a decisive indicator that the "stabilizing brace" is being utilized as a shouldering device.

(c) **Bipod/monopod.** Attachment of a bipod/monopod will accrue 2 points, regardless of the type of "stabilizing brace" attached.

(a) **Weight.** Any complete firearm with an installed "stabilizing brace" that weighs more than 120 ounces (7½ pounds), incorporating end-user accessories, will be considered too heavy to be fired with one hand,

| | |
|---|---|
| and will accrue 4 points. The firearm will be weighed as configured, with an unloaded magazine.<br><br>_Catchall Provision_. Efforts to advertise, sell, or otherwise distribute "short-barreled rifles" as such will result in a classification as a "rifle" regardless of the points accrued on the ATF Worksheet 4999 because there is no longer any question that the intent is for the weapon to be fired from the shoulder. | |
| | **Factor 4 – Surface Area**<br>     An assessment of whether a weapon that is equipped with an accessory or rearward attachment provides a surface area that allows the weapon to be fired from the shoulder shall be the first step in determining that a weapon is rifle designed, made, and intended to be fired from the shoulder. In making the determination of whether surface area "allows" for shoulder firing, ATF will not attempt to precisely measure the surface area or make the determination based on the existence of any minimum surface area. Instead, ATF will consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon. If the firearm includes a surface area that can be used for shoulder firing the weapon, the weapon potentially qualifies as a "rifle." ATF will then need to consider whether the accessory, component, or other rearward attachment is necessary for the cycle of operations to aid in the determination of whether a firearm is designed, made, and intended to be fired from the shoulder. In contrast, if the |

| | |
|---|---|
| | weapon does not include such surface area, then it does not qualify as a "rifle." |
| | **Factor 5 – Marketing & Promotional Materials**<br>ATF plans to consider the marketing of the attachment (e.g., indirect marketing through persons that manufacture or sell "stabilizing braces" but not firearms) and the direct marketing from the firearm manufacturer regarding the firearm to which the attachment or "brace" is assembled. By considering direct or indirect marketing or promotional materials available through videos, advertisements, or other sources, ATF can verify the manufacturer's purported intent regarding the use of the weapon. Indirect marketing materials can include statements from accessories manufacturers for the accessories that a firearms manufacturer attaches or incorporates into its firearm, such as a "brace" manufacturer that advertises that a "stabilizing brace" is a method to circumvent the NFA. |
| | **Factor 6 – Likely Use Information**<br>ATF plans to consider "information demonstrating the likely use of the weapon by the general community, including both the manufacturer's stated intent when submitting its item for classification and use by members of the firearms industry, firearms writers, and in the general community." These sources provide insight into the ways that manufacturers market their products and whether the firearm equipped with a "stabilizing brace" as configured is designed, made, and intended to be shoulder-fired. ATF would also consider information such as the firearms magazines that similarly exhibited the |

| | use of this "stabilizing brace" as a shoulder stock. |
|---|---|

By this comparison, the Court finds Plaintiffs have shown a likelihood of success on their claim that the Final Rule is not a logical outgrowth of the NPRM. First, the NPRM focuses almost entirely on Sections II and III of Worksheet 4999 to determine whether a brace-equipped firearm is a rifle. However, the Final Rule focuses on six factors with minimal overlap from the NPRM and no certainty or predictability as to scoring criteria in ATF's analysis. The Final Rule also clarifies that "surface area" is the threshold, and most important, factor because "[a] firearm that does not have [a] surface area that allows for the weapon to be fired from the shoulder cannot qualify as a rifle." See 88 Fed. Reg. at 6,478-01, at *6,511. Upsetting the order, certainty, and predictability afforded by the NPRM's Worksheet 4999, the Final Rule's ATF-subjective factors amount to a total shift in the "rifle" analysis that interested parties would never have been able to predict. See e.g., Georgia v. Wheeler, 418 F. Supp. 3d at 1376 (finding no logical outgrowth where the final rule "created an entire distance-based scheme without giving any indication of a range of alternatives to interested parties"). This preliminary observation is bolstered by and mirrors the Fifth Circuit's finding that "the Worksheet allowed an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." See Mock v. Garland, 75 F.4th 563, 584 (5th Cir. 2023).

Second, the current record does not reflect factors 5 and 6 were adequately presented for notice and comment. Defendants have offered no evidence at this time to suggest that the NPRM notified citizens that ATF would consider videos, advertisements, or other sources to determine whether a firearm/pistol would be reclassified as a "rifle" under the Final Rule. Also, Defendants have not offered evidence to suggest citizens were otherwise on notice that ATF would consider a weapon's "use by members of the firearms industry, firearms writers, and in the general community" under the Final Rule. Nor is there any indication that interested parties would, could, or should have anticipated the Final Rule's complete extraction of the NPRM's prerequisites and accessory characteristic sections of Worksheet 4999 into separate and subjective categories for consideration by ATF only. For this reason alone, Defendants have not yet shown the Final Rule is the logical outgrowth of the NPRM. Cf. Miami-Dade, 529 F.3d at 1060.

Third, the Court is satisfied Plaintiffs would likely have been able to mount a credible challenge to the Final Rule if the subjective test and factors 5 and 6 had properly been presented for notice and comment. (Dkt. 21 at 11-13); Cf Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms & Explosives, No. 3:21-cv-0116, 2023 WL 7490149, at *1, --- F.Supp.3d ---- (N.D. Tex. Nov. 14, 2023) (denying injunctive relief on the logical outgrowth claim because plaintiffs failed to delineat[e] any reasons why their notice interests were harmed when the ATF did not conduct a second notice and comment process ). Therefore, for the reasons independently stated above and for the well-reasoned points explained in Mock, the Court finds Plaintiffs

Case 8:23-cv-00223-MSS-NHA   Document 47   Filed 01/26/24   Page 42 of 51   PageID 384

have shown a likelihood of success on the merits regarding their APA-logical outgrowth claim at this time. See 75 F.4th at 586.

### b. Second Amendment Claim

Plaintiffs also mount a Second Amendment challenge to the regulation. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; District of Columbia v. Heller, 554 U.S. 570, 576 (2008). The bar for overcoming constitutional challenges to infringement of the Second Amendment has recently been raised--significantly. In fact, the Supreme Court articulated a rigorous two-step inquiry for Second Amendment claims. New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022). Under its standard, a plaintiff must show the plain text of the Second Amendment covers the proposed restricted conduct. Id. at 18. If so, the government must "justify its regulation by demonstrating that [the challenged regulation] is consistent with the Nation's historical tradition of firearm regulation." Id. at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"[15] Id. To satisfy their burden under the strictures of Bruen, Defendants must, at the preliminary injunction stage, show they are likely to prevail on Plaintiffs' challenge

---

[15] History will ultimately judge whether the Bruen standard will stand the test of time in an era in which the proliferation of weapons and the associated, necessary regulation of them could not possibly find an historical analogue dating to the days of muskets and pump loaded shotguns and six-shot percussion pistols. Compare, for example, laser equipped, semi-automatic and automatic rifles, single use 3-D Glocks and hypersonic rifle and ammunition to any historical analogue, and any modern regulation would likely come up lacking. But, for now, Bruen is the law of the land and constrains any other analysis of the matter.

that these strictures find analogs in the Nation's historical tradition of firearm regulation. To be sure, <u>Bruen</u> makes clear that Defendants' choice of analog need not be an historic twin, even so, finding a close archival comparator is no small feat, especially in the infancy of litigation. <u>See</u> <u>597 U.S. at 30</u>.

So, with little time to mine the annals of history, Defendants offer that the Final Rule's pertinent support rests on centuries of taxation and registration requirements that reflect what they describe as an "unbroken historical tradition of firearm regulation 'relevantly similar' to that required by the NFA." (<u>Dkt. 22 at 36-39</u>)

Specifically, Defendants cite a litany of state regulations dating to 1631 to show that many "states" required registration, inspection, or surveying of citizens' firearms. (<u>Id.</u> at 37-39) The cited regulations, ordinances, and practices, however, concerned civilian readiness for combat, adequacy of stock, and taxation of firearms and ammunition to raise revenue for the general welfare. That is to say—at this stage in the litigation, all the Defendants have produced are historical inspection analogs that were undertaken to ensure that the citizenry was well-armed, not to ensure that weapons were removed for non-compliance with regulatory limitations.

Plaintiffs counter that there is "no historical basis for the regulation, and no historical law [is] analogous to the attachment of felonious consequences to firearms by barrel length." (<u>Dkt. 21 at 6</u>) As Plaintiffs point out, the historic analogs offered by Defendants have nothing to do with the inspection or registration of firearms for crime control or to prevent shoulder fire, as is the case with the Final Rule. Just by way of example, Defendants cite Professor Robert Churchill's article for his discussion of the

colonial militia practice of surveying firearms. Robert H. Churchill, <u>Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment</u>, 25 LAW & HIST. REV. 139 (2007). To the contrary, Professor Churchill notes: In New Jersey, for example, the legislature ordered that every militiaman should "*be provided*" with arms and ammunition "in his house or place of abode" and imposed a fine whenever "said *persons shall be deficient in keeping the arms* and stores aforesaid." <u>See</u> Churchill, 25 LAW & HIST. REV. at 148 (emphasis added). Likewise, South Carolina and Georgia ordered that "*every person* liable to appear and bear arms … *shall constantly keep one gun or musket fit for service*" as well as ammunition.") <u>Id.</u> (emphasis added). Professor Church's article does not speak at all to the regulation of firearms for the purpose of removing offending types of weapons or ensuring certain limitations related to the weapon's firing capabilities or otherwise limiting or controlling of citizens' rights to bear certain types of arms.

The Supreme Court has made it clear that a district court's analogical inquiry should consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." <u>Bruen, 597 U.S. at 29</u>.

Because the Court concludes Plaintiffs have demonstrated a likelihood of success on their claim that the Final Rule violates the APA and finds that an injunction should issue for that reason alone, the Court declines to address the adequacy of the offered historically analogous laws as they relate to the constitutional claim.

**Irreparable Harm**

As to the statutory claim, Plaintiffs contend that they are suffering irreparable harm because they face the threat of criminal prosecution, felony arrest, and imprisonment. (Dkt. 21 at 13) Defendants contend that Plaintiff Second Amendment Armory has failed to show irreparable injury because it has not articulated how or why the Final Rule creates a risk of criminal consequences or loss of its license. (Dkt. 26 at 11) Defendants also argue the Individual Plaintiffs have failed to show irreparable harm because they "cannot plausibly [establish] that their decision making as to compliance with the [Final] Rule is so subjectively difficult that it creates" an irreparable injury. (Id. at 13) Defendants add that all Plaintiffs have failed to identify a legal interest that would be injured by their compliance with the NFA's registration procedures. (Id. at 12)

A party seeking a preliminary injunction must demonstrate irreparable harm. See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990). An injury is irreparable if it is "neither remote nor speculative, but actual and imminent." See id. (citation omitted). A violation of any constitutional right does not always constitute irreparable harm. See Siegel v. LePore, 234 F.3d 1163, 1177 (11th Cir. 2000). The relevant inquiry is whether there is "direct penalization, as opposed to incidental inhibition" of the constitutional right alleged. Cate v. Oldham, 707 F.2d 1176, 1188-89 (11th Cir. 1983).

Here, the claims as asserted by Plaintiffs Colon, Kling, and Mele present a wrinkle in the irreparable harm analysis because Plaintiffs Colon, Kling, and Mele are

- 45 -

presumably protected by the injunctions entered in other federal cases. All acknowledge they are members of Second Amendment Foundation or are otherwise protected because of their membership in a gun rights group. The Fifth Circuit Court of Appeals is now considering three cases consolidated on appeal that involve the gun rights groups in which Plaintiffs claim membership. See Mock v. Garland, No. 4:23-cv-00095, 2023 WL 6457920, at *18, --- F. Supp. 3d ---- (N.D. Tex. Oct. 2, 2023) (granting preliminary relief); Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives, No. 6:23-cv-00013, 2023 WL 7116844, at *12, --- F. Supp. 3d ---- (S.D. Tex. Oct. 27, 2023) (partially granting preliminary relief); but see Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms & Explosives, No. 3:21-cv-0116, 2023 WL 7490149, at *20, --- F. Supp. 3d ---- (N.D. Tex. Nov. 13, 2023) (denying preliminary relief). Assuming injunctive relief continues to enjoin the enforcement of the Final Rule for Plaintiffs Colon, Kling, and Mele, an injunction in this case would be overlapping protection.

Whether irreparable harm can be proven in this scenario was addressed in Florida v. Department of Health & Human Services, 19 F.4th 1271 (11th Cir. 2021). There, the Eleventh Circuit applied the capable-of-repetition-yet-evading-review exception to the mootness doctrine to decide whether the Western District of Louisiana's nationwide injunction that enjoined the Omnibus COVID-19 Health Care Staff Vaccination interim rule rendered moot the State of Florida's claim for preliminary injunction of the same interim rule. See 19 F.4th at 1280. The Eleventh Circuit found there was a "reasonable expectation that th[e] situation would recur"

because the Fifth Circuit could eliminate the nationwide reach of the Louisiana district court's injunction. Id. at 1284. If the Fifth Circuit eliminated the nationwide reach of the injunction, then Florida would certainly lose its shield, and there likely would be too short a window between the interim rule's effective date and the date on which Florida would again be susceptible to the United States' enforcement of the interim rule. Id. at 1284. Therefore, the Eleventh Circuit concluded it had jurisdiction, the capable-of-repetition-yet-evading-review exception applied, and prudential concerns militated in favor of reviewing the Northern District of Florida's order denying the State of Florida's motion for preliminary injunction. Id. at 1285.

The Court likewise finds the risk of irreparable harm to Plaintiffs Colon, Kling, and Mele is not eliminated by the existing injunctions in Mock and Texas. Given the inconsistent decisions in the Texas cases that are being addressed in the consolidated appeal, Plaintiffs Colon, Kling, and Mele may face the same exposure and short window before enforcement that the State of Florida faced in Florida v. Department of Health & Human Services if the Fifth Circuit determines preliminary relief is unwarranted or that nationwide relief is too broad.

Without injunctive relief, the Individual Plaintiffs face direct penalization of their right to own, possess, or sell brace-equipped pistols. The deprivation of Plaintiffs' due process rights under the APA is sufficient to support this Court's conclusion that

the irreparable harm element is met. See e.g., Minard Run Oil Co. v. U.S. Forest Serv., 670 F.3d 236, 256 (3d Cir. 2011), as amended (Mar. 7, 2012).[16]

## C. Balancing of Harms

The remaining two requirements to grant a preliminary injunction "involve a balancing of the equities between the parties and the public." Florida v. Dep't of Health & Human Servs., 19 F.4th 1271, 1293 (11th Cir. 2021). "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020).

The Court, having balanced the equities, finds this factor favors granting preliminary relief because Plaintiffs have shown a likelihood of success on their claim, and the Government suffers no countervailing harm from being prevented from violating their rights. The Court also finds the public suffers minimal harm from non-enforcement of the Final Rule. Cf. Florida, 19 F.4th at 1293. As a result, equity demands the issuance of an injunction until this Court can evaluate this case on a more developed record.

## D. Scope

Plaintiffs seek a nationwide injunction because of "complications and pitfalls" associated with local injunctions, the "acute nature of the potential harms posed by

---

[16] Defendants' timeliness argument is unpersuasive because the Final Rule stated, "the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register." See 88 Fed. Reg. 6,478-01, at *6,481. The Final Rule also explained that "affected firearms have until 120 days after this rule is published to take the necessary actions . . . to comply with Federal law [and] to avoid civil and criminal penalties." Id. at *6,553. Thus, the Court finds Plaintiffs acted timely by moving for injunctive relief before the expiration of the 120-day compliance period.

Defendants, the implication of Plaintiffs' interstate travel rights, and the interstate nature of Plaintiffs' business." (Dkt. 21 at 17) Defendants argue nationwide relief is unwarranted because the Final Rule is subject to litigation in at least five other federal district courts, so judicial restraint counsels in favor of letting each court independently assess the Final Rule's legality. (Dkt. 26 (citing Trump v. Hawaii, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); DHS v. New York, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring)). The Court, being cognizant of this Circuit's reluctance to affirm nationwide injunctions gratuitously entered, has carefully considered many of the factors suggested in Florida, including what is necessary to provide complete relief to the Plaintiffs, and finds that limiting its relief to the parties before it is sufficient to afford the relief that is sought.

First, the named Plaintiffs in this case are all located within the State of Florida, so the geographic dispersion factor counsels against a nationwide injunction. See Florida, 19 F.4th at 1282 ("this case raises no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief because the plaintiffs were not dispersed among the United States or 'myriad jurisdictions' like in a nationwide class action."). The fact that all named Plaintiffs are located in the State of Florida suggests that statewide relief may be appropriate, See Garcia v. Stillman, No. 1:22-cv-24156, 2023 WL 3478450, at *3 (S.D. Fla. May 16, 2023), especially in light of one named Plaintiff having demonstrated *jus tertii* standing for its customers.

Second, the Eleventh Circuit has recognized that "injunctive relief operates on specific parties, not geographic territories" to the extent that "identifying the [parties]

. . . is possible." Georgia, 46 F.4th at 1307. All of the parties are capable of being identified. The Plaintiffs are named in the complaint and the customers of 2nd Amendment Armory can identify themselves if approached by the Defendants and threatened with enforcement.

Third, these challenges are being raised in several actions, and are being resolved under the precedents of several circuits. Should the resolutions not align, the matter can be addressed at the highest level of appeals. Thus, upon careful consideration of the foregoing, the Court finds that the Final Rule should be enjoined as to the named Plaintiffs and 2nd Amendment Armory's past and future customers. This carefully tailored injunction will eliminate the identification concerns mentioned in Health Freedom Def. Fund, Inc. v. Biden. See 599 F. Supp. 3d 1144, 1177 (M.D. Fla. 2022). Moreover, the Court's limited injunction will allow the Final Rule's legality to be independently litigated in district and circuit courts outside the State of Florida. See Florida, 19 F.4th at 1281.

## IV.  CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (Dkt. 21), is **GRANTED in PART** and **DENIED in PART**. It is hereby **ORDERED** that Defendants Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, United States Department of Justice, and Merrick B. Garland, their agents, servants, employees, officers, and all other persons who have notice of this Order and are in active concert or participation with

Defendants, be and are, without prior written or oral notice, preliminarily restrained and enjoined from, in any way, either directly or indirectly, enforcing the Final Rule against the named Plaintiffs and 2nd Amendment Armory's past and future customers (collectively, "Covered Persons") who reside in the State of Florida. For purposes of this injunction, the term "customer" includes any Florida resident who has purchased or subsequently purchases a brace-equipped firearm from 2nd Amendment Armory before final resolution of this action. The injunctive relief authorized by this Order expressly does not grant Covered Persons any additional privileges during interstate travel. Covered Persons engaging in interstate travel are required to comply with any requirements pertinent to traveling with their respective firearms in existence before the Final Rule became effective.

It is further **ORDERED** that Plaintiffs have shown there is a minimal risk of monetary loss to be suffered by Defendants if an injunction is imposed and the Defendants have not countered that assertion. Therefore, the Court waives the security requirement outlined in Rule 65(c) of the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** in Tampa, Florida, this 26th day of January 2024.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any pro se party

- 51 -

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSIAH COLON, *et al.*,

      *Plaintiffs,*

    v.

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES, *et al.*,

      *Defendants.*

Case No. 8:23-cv-223-MSS-NHA

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that all defendants hereby appeal to the United States Court of Appeals for the Eleventh Circuit from this Court's opinion and order dated January 26, 2024, ECF No. 47, granting in part plaintiffs' motion for a preliminary injunction, ECF No. 21.

Dated: March 22, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ (CA Bar No. 332080)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys

1

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-5200
Email: taylor.n.pitz@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On March 22, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Middle District of Florida, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Taylor Pitz
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice

2

03/26/2024                                                                                          1

## MIDDLE DISTRICT OF FLORIDA
## (Pro Se) Pleadings Report
Entered 03/25/2024 for Division 5
Nature of Suits: 463,510,530,535,540,550,555,560

| Case | Doc. | Filed | NOS | Title | Judge | Text | Case Flags |
|---|---|---|---|---|---|---|---|
| 5:20−cv−00530−JLB−PRL | 75 | 03/22/2024 | 550 | Diehl v. U.S. Department of Justice | JLB | MOTION to Appeal In Forma Pauperis by David A. Diehl. (Attachments: # (1) Mailing Envelope)(LAB) | FTMP−2, CLOSED, APPEAL |
| | 76 | 03/25/2024 | | | | **ORDER denying [75] Motion for Leave to Appeal In Forma Pauperis. The Clerk is DIRECTED to send a copy of this Order to the Clerk for the Eleventh Circuit. Signed by Judge John L. Badalamenti on 3/25/2024. (BGS)** | |
| 5:22−cv−00240−JLB−PRL | 12 | 03/25/2024 | 530 | Jackson v. Warden, FCC Coleman−USP 1 | JLB | **ORDER dismissing without prejudice for failure to comply with Court orders and failure to prosecute. The Clerk is directed to enter judgment, terminate any pending motions as moot, terminate any deadlines and close this case. Signed by Judge John L. Badalamenti on 3/25/2024. (KLS)** | HABEAS, OCAP−2 |
| 5:23−cv−00313−WWB−PRL | 19 | 03/25/2024 | 530 | Mosley v. Warden, FCC Coleman − Low | WWB | NOTICE OF APPEAL as to [18] Order on Motion for Discovery by Roy Mosley. Filing fee not paid. (Attachments: # (1) Mailing Envelope)(wrong case number on document)(EAM) | HABEAS, OCAP−1, APPEAL |
| | 20 | 03/25/2024 | | | | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re [19] Notice of Appeal. (EAM) | |

| Case | | Date | No. | Case Name | Judge | Description | Flags |
|------|---|------|-----|-----------|-------|-------------|-------|
| 5:23‑cv‑00487‑WFJ‑PRL | | 03/25/2024 | 550 | Wilkins v. Benton et al | WFJ | FEES Paid by Joseph John Wilkins (Filing fee $28.00, Receipt Number OCA‑13456). (LAB) | OCAP‑3, CLOSED |
| 5:23‑cv‑00639‑SDM‑PRL | 11 | 03/25/2024 | 550 | Molina v. United States of America et al | SDM | MOTION to Reopen Case and direct the defendants to respond to the second amended complaint titled, "Motion for Leave to Amend Complaint" by Miguel A. Molina. (LAB) | OCAP‑3, CLOSED |
| 5:23‑cv‑00650‑MSS‑PRL | 49 | 03/25/2024 | 555 | Cooper v. CoreCivic, Inc. et al | MSS | STIPULATION *to Extend Deadline to File Responsive Pleadings* by CoreCivic, Inc.. (Keene, Dana) | OCAP‑3 |
| 5:24‑cv‑00020‑SDM‑PRL | 7 | 03/25/2024 | 530 | Wooden v. Warden, FCC Coleman – Camp | SDM | MOTION for Appointment of Counsel by James Wooden. (Attachments: # (1) Mailing Envelope)(BGR) Motions referred to Magistrate Judge Philip R. Lammens. | HABEAS, OCAP‑3 |
| 5:24‑cv‑00021‑SPC‑PRL | | 03/25/2024 | 555 | Terry v. Federal Bureau of Prisons et al | SPC | FEES Paid by Jonathan Terry (Filing fee $43.95, Receipt Number OCA‑13457). (LAB) | OCAP‑2 |
| 5:24‑cv‑00044‑PGB‑PRL | 8 | 03/25/2024 | 550 | Jaber v. Rodriguez | PGB | JUDGMENT entered dismissing case without prejudice. (Signed by Deputy Clerk) (RLK) | OCAP‑2, CLOSED |
| 5:24‑cv‑00090‑CEM‑PRL | 6 | 03/25/2024 | 555 | Gill v. Broton et al | CEM | RESPONSE TO ORDER TO SHOW CAUSE re [5] Order to show cause, filed by Raymond Edward Gill. (Attachments: # (1) Mailing Envelope)(BGR) | OCAP‑3 |
| 5:24‑cv‑00098‑KKM‑PRL | 7 | 03/25/2024 | 550 | Floyd v. M.C.S.O. et al | KKM | AMENDED COMPLAINT against All Defendants filed by Larry Leroy Floyd. Related document: [1] Complaint filed by Larry Leroy Floyd. (Attachments: # (1) Mailing Envelope)(AJS) | OCAP‑4 |
| | 8 | 03/25/2024 | | | | PRISONER consent form and financial certificate by Larry Leroy Floyd. (Attachments: # (1) Mailing Envelope)(AJS) | |
| 5:24‑cv‑00149‑JSS‑PRL | 1 | 03/25/2024 | 530 | Villarroel v. Warden, FCC Coleman – Low | JSS | PETITION for Writ of Habeas Corpus - Federal filed by Anni Villarroel. (No fees paid. No service copy provided)(LAB) | HABEAS, FSACT‑2241, OCAP‑2 |

03/26/2024                    (Pro Se) Pleadings Report Entered 03/25/2024 for Div. 5                    3

                    2    03/25/2024                              **STANDING ORDER for all incarcerated**
                                                                **pro se litigants. Signed by Magistrate Judge**
                                                                **Philip R. Lammens on 3/25/2024. (LAB)**


**Total Pleadings Processed:**            16