UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE №: 8:23-cv-223

JOSIAH COLON, *et al.*,

*Plaintiffs,*

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

*Defendants.*

_____/

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

All Plaintiffs respectfully move this honorable Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment on Count I of the complaint. Specifically, that the National Firearms Act's attachment of felony consequences for the simple possession of a firearm by reference to barrel length violates the Second Amendment. U.S. Const. Amend. II.

The constitutionality of these provisions with respect to the Second Amendment is a pure question of law. There are no material factual questions to be disputed, and thus no discovery is necessary to resolve this question. Accordingly, Plaintiffs request an order granting summary judgment as to Count I, declaring the underlying provisions unconstitutional, and enjoining Defendants from enforcing them. In support thereof, Plaintiffs state:

1

I. **26 U.S.C. §§ 5861(b)-(d) ARE FACIALLY UNCONSTITUTIONAL BY WAY OF 26 U.S.C. § 5845(a)(1)-(4)**

The Supreme Court recently explored a facial Second Amendment challenge in *Rahimi*, where 18 U.S.C. §922(g)(8) survived a facial challenge. *United States v. Rahimi*, 144 S.Ct. 1889, 1902. *Rahimi* provides valuable guidance and counsels towards finding Acts here at issue facially unconstitutional. A facial challenge is appropriate because §5861's attachment of felony consequences for the peaceable possession of firearms by reference to barrel length has no constitutionally "legitimate sweep." *Washington v. Glucksberg*, 521 U.S. 702, 740, n. 7 (1997) (Stevens, J., concurring in judgment).

a. **HISTORICAL & TECHNICAL BACKGROUND OF THE ACTS**

The National Firearms Act of 1934 ("NFA"), Pub.L. 73-474, 48 Stat. 1236 imposed an intentionally prohibitory tax on the making and transfer of "firearms," as defined in the NFA, as well as imposing a burdensome tax—stylized as a "special (occupational) tax"—on persons and entities engaged in the business of importing, manufacturing, and dealing in firearms covered by the NFA. *See* ATF, *National Firearms Act*, https://www.atf.gov/rules-and-regulations/national-firearms-act (In ATF's own words, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms."). The

NFA requires that all firearms defined by §5845 be registered with the Secretary of the Treasury.

The NFA was designed to prohibit the transfer and possession of all handguns by way of a prohibitory tax of $200 on the making or transfer of a handgun.[1] Short barreled rifles and shotguns (hereinafter "SBR"s and "SBS"s) were added to the Act in order to prevent individuals from circumventing the handgun tax by simply cutting down long guns into what would be the effective equivalent of a handgun. Prior to passage, the handgun regulations were removed from the NFA, but the restrictions on SBRs and SBSs remained, a vestige of the handgun regulations.

If one wishes to take hold of an NFA firearm, it is not an easy process. In addition to the $200 tax, the transferor and transferee together must prepare and file Form 5320.4.[2] 26 U.S.C. § 5812(a); 27 C.F.R. § 479.84(a). The application demands a vast amount of information, including all personal identifying information about both transferor and transferee, complete

---

[1] Given a cumulative rate of inflation of 2244.6% between 1934 and 2024, 200 1934 dollars would have equivalent purchasing power of $4,689 in 2024. This is equal to approximately 12.5% of the average U.S. annual salary for Q4 of 2023, and $200 would have been approximately 14% of the average white man's salary in 1939. (31% for an African-American man's). U.S. Bur. Labor. Stat, *Quarterly Census of Employment and Wages*; Prices and Wages by Decade: 1930-1939, *Libraries of the University of Missouri*, https://libraryguides.missouri.edu/pricesandwages/1930-1939.

[2] "Application for Tax Paid Transfer and Registration of Firearm," https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204

identifying information regarding the firearm, a passport-style photograph, and two sets of fingerprints from the transferee. 26 U.S.C. § 5812(a)(3); 27 C.F.R. § 479.85(a). Additionally, if the registrant wants to possess an SBR, the application must include a sworn statement from the transferee providing "[t]he reasons why there is a reasonable necessity for [the transferee] to purchase or otherwise acquire the device or weapon," and to state that the transferee's "receipt or possession of the device or weapon would be consistent with public safety." 27 C.F.R. § 478.98. Just to ensure that wasn't too little a burden, the would-be transferee must also send a completed copy of the application to the chief law enforcement officer of their locality. 27 C.F.R. § 478.98.

In 1968, Congress passed the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213. The GCA revised the NFA through Title II, which regulated machineguns, SBSs, and SBRs. Rifles and pistols not subject to the NFA were regulated under Title I of the GCA. § 18 U.S.C. § 921 *et seq*.

Pertinent to this matter, the NFA defines a "rifle" and a "shotgun" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder" 26 U.S.C. §§ 5845(c), (d). Short-barreled rifles and shotguns subject to the NFA are defined as those "having a barrel or barrels of less than

16 inches in length" with respect to rifles and 18 inches in length with respect to shotguns. *Id*. at § 5845(a).

Firearms subject to the NFA are subject to burdensome restrictions unlike other common firearms, including the need to request permission from the federal government to travel interstate with the firearm, permission for which the government may take months to grant—if it ever grants it at all.

Firearms registered pursuant to the NFA require the payment of a $200 transfer tax and the submission of an ATF Form 4, either by the previous owner—if in the same state—or through a licensed special occupational taxpayer. The transfer of an NFA firearm from an unlicensed individual to another unlicensed individual out-of-state requires the item first be transferred on a Form 4 to a special occupational taxpayer, then another Form 4 from the special occupational taxpayer to the end user. Each Form 4 transfer can take a year or more and requires the payment of a $200 tax. Meaning for a Floridian to alienate a shoulder-fired rifle with a 15.999" barrel, rather than a simple transfer between eligible owners as would be the case for a firearm with a 16.001" barrel, such transfer can attend years of waiting and hundreds of dollars spent for the privilege of transferring and possessing a firearm less concealable than a pistol, but slightly shorter than a non-NFA rifle.

Anyone who violates any of the litany of restrictions on the possession, transportation, and alienation of SBRs is subject to substantial monetary fines and up to ten years imprisonment. 26 U.S.C. § 5871.

## II.   THE BARREL LENGTH REGIME CANNOT SURVIVE SECOND AMENDMENT SCRUTINY

The NFA sought to regulate handguns, SBRs, SBSs, as well as other weapons due to concealability. The handgun—the most concealable firearm of all—has since been recognized as "the quintessential self-defense weapon" and closest to the core of Second Amendment protection. *District of Colombia v. Heller*, 554 U.S. 570 at 629 (2008). Further, 59. *Bruen*           held           as unconstitutional New York's 1911 Sullivan Act, requiring a license and demonstration of "proper cause" for the possession and carrying of a concealable firearm. Bruen, 597 U.S. __ at *2.

As this honorable Court observed, *Bruen* stands for the proposition that any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. Const., Amend. II, can only be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. Bruen, 597 U.S. at *29. The government cannot contest that no federal regulation of firearms existed before the 1934 enactment of the NFA.

There is simply no historical basis, and no historical law analogous to the attachment of felony treatment to firearms by reference to barrel length alone. In so far as attachments such as shoulder stocks, there is no historical basis, and no historical law analogous to the attachment of felony treatment to firearms by the presence of an accessory to facilitate easier, more accurate use of the firearm. There is no historical basis, and no historical law analogous to the attachment of felony consequences for traveling interstate with a firearm without bureaucratic permission, either.

### III.   UNDERSTANDING *MILLER*

The government will no doubt, as it has previously in this litigation, attempt to hang its hat on *U.S. v. Miller*, 307 U.S. 174 (1939). This is unavailing for several reasons. First, Plaintiffs here do not necessarily challenge the regulation of a sawn-off shotgun. Rather, all of the firearms at issue are either pistols or rifles. Second, *Miller*'s analysis, properly applied, supports the grant of summary judgment.

The core of *Miller* was a unanimous conclusion that the Second Amendment did not apply to the possession of a firearm that did not have "some reasonable relationship to the preservation or efficiency of a well regulated militia." 307 U.S., at 178. This was the 1939 Court sidestepping the question of whether the NFA's registration and taxation provisions constitute

an "infringement" of the right to keep and bear arms by ruling that it could not take judicial notice of whether a short-barreled shotgun was "ordinary military equipment." *Id*. Just as the *Heller* Court observed, if the *Miller* Court actually believed prohibitive taxation and registration were consistent with the Second Amendment, it would have made no sense to examine whether the particular weapons were useful in militia service rather than simply approve the regime. *Heller*, 554 U.S. at 622 ("Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen.").

Defendants will no doubt next turn to *Heller* dicta for support, quoting that the *Heller* court "therefore read *Miller* only to say that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 625. But the *Heller* case was not about short-barreled firearms—it was about an effective ban on operable handguns in the home. There were no facts before the Court on the actual lawful use of these firearms, and thus the shotgun dicta has no bearing to the case at bar. Even if it did, the Eleventh Circuit has "pointed out many times that regardless of what a court says in its opinion, the

decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).

Reading *Bruen*, *Heller*, and *Miller* for what they say, each decision supports the grant of summary judgment here.

## IV.  THE MILITIA, DEFENSIVE UTILITY, AND COMMONALITY OF SHORT-BARRELED RIFLES

Relevant to *Miller*, *Heller*, and *Bruen*, a firearm's martial utility is material to the firearm's lawful uses, such as militia service, in addition to self-defense. Unlike the situation in *Miller*, where it was "not within judicial notice that [a short barreled shotgun] is any part of the ordinary military equipment or that its use could contribute to the common defense[,]" *Miller* 607 U.S. at 178, the militia and self-defense utility of SBRs is manifest. In fact, they are the weapon of choice for our Nation's infantry, and widely favored by law enforcement.

For example, one of the standard-issue firearms of the U.S. armed forces and police departments for decades now has been the 14.5-inch barreled M4A1 carbine. *See*, *e.g.* Andrew Feickert, Cong. Res. Serv. "The Army's M-4 Carbine: Background and Issues for Congress," (Jun. 8, 2010). In the years since the M4's adoption, the consensus among the military and law enforcement for defensive carbines has inched towards *even shorter* firearms. *See id.* at 4 (contemplating a 10-inch barreled carbine); "Daniel Defense Mk18: A

9

Comprehensive Guide to the Elite AR-15 Variant," Top Defense Systems (Jun. 23, 2024) (Referring to the 10.3-inch Mk18 as having "gained immense popularity among law enforcement, military personnel, and civilian enthusiasts alike.").

Indeed, the utilitarian martial firearms employed by the military, law enforcement, and militia have universally moved in one direction: shorter barrels. In the case of the U.S. Army, for example, barrel length has been a one-way ratchet since at least 1903. 1936 saw the 26-and-24-inch barreled M1903 and M1917 replaced with the 24-inch-barreled M1 Garand. 1957 saw the Garand replaced with the 22-inch-barreled M14. 1964 saw the M14 replaced with the 20-inch-barreled M16. 1994 saw the M16 replaced with the 14.5-inch-barreled M4—crossing the Rubicon into SBR territory. Now, the Army has officially adopted the 13-inch-barreled XM7 rifle as the M4's replacement. *See*, *e.g.*, Joe Engesser, "250 Years of the American Infantry Rifle," Rock Island Auctions (Jul. 1, 2024) https://www.rockislandauction.com/riac-blog/american-infantry-rifle-history. As has been the case for the entire history of this nation, individuals and law enforcement look to the military for choosing defensive weapons, often utilizing

semiautomatic-only versions of the same.[3] The AR-15 exemplifies this. *See, e.g.*, C. McWhirter, Z. Elinson, "American Gun – The True Story of the AR-15," Farrar, Straus and Giroux (2023).

In addition to the three-to-seven million SBRs Defendants estimate to be in circulation, the government's own data supports that short barreled rifles are in common use for lawful purposes, with 532,725 registered examples nationwide in 2021, and almost 10% of those in the Great State of Florida alone. ATF, "Firearms Commerce in the United States – Annual Statistical Update 2021" at 16-17 https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download. The 2021 number is certainly underinclusive, as the ATF is estimated to have registered an additional quarter-million SBRs under the rulemaking precipitating this action. Gutowski, S. "ATF Says a Quarter Million Guns Registered Under Pistol-Brace Ban," *The Reload* (Jun 2, 2023) https://thereload.com/atf-says-a-quarter-million-guns-registered-under-pistol-brace-rule/. These estimates drastically understate the number of short-barrel rifles in circulation, according to the government's official position that all braced pistols are properly classified as

---

[3] The U.S. Government even charted the Civilian Marksmanship Program ("CMP") for the express purpose of providing standard-issue military rifles to American civilians, to encourage their proficiency and use. The firearms provided by the CMP were wildly popular, and are still highly sought after today. *See*, "Civilian Marksmanship Program," Gov't Accountability Office GAO-19-287 (Feb. 2019) (Since 1996, the Army has transferred more than 700,000 surplus rifles and handguns to CMP.).

short-barrel rifles. *See, e.g., Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023). Taking Defendants at their word, there are **between three and seven million SBRs in circulation**. *Id.* at 581–82. So the actual number of short-barrel rifles in use is around 750,000, plus three to seven million. Finding these firearms to be in common use does not require drawing a jurisprudential line at a specific number of firearms that must be in circulation for them to be so, their numbering in the millions is enough. *Cf. Caetano v. Massachusetts*, 577 U.S. 411 (2016) (some 200,000 stun gun owners showing "common use" of stun guns).

The government's inevitable counter that only the registered short-barreled firearms can be considered in lawful use must be ignored, as the only source of illegality would be the conduct of Defendants and the challenged provision itself. *See Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.").

## V. THERE IS NO LEGITIMATE SWEEP TO THE BARREL LENGTH RESTRICTIONS

As discussed above, the purpose for the barrel length restrictions underlying this action was to prohibit concealable firearms. *Heller*'s

affirmation that the most concealable firearms of all—handguns—cannot be prohibited moots the fundamental purposes of the law. Additionally, the commonality of firearms affected by the barrel length restrictions obviates any assertion that the firearms are not in common use for lawful purposes.

The unconstitutionality of the barrel length restrictions here is best exemplified by its absurd timeline: Congress, in 1934, sought to ban handguns with the idea that they were useful in crime. It ultimately gave up on the handgun ban, leaving a vestigial remnant, restricting shotguns *and* rifles with barrels under 18 inches. In 1960, the government sold a large quantity of 16-inch-barreled rifles to civilians, and rushed to amend the law, rather than criminally prosecute or seize the firearms.[4] The law now restricts shotguns under 18 inches, but rifles under 16 inches. Over the years, larger pistols and shorter rifles came more *en vogue*. Relying on guidance from Defendants in interpreting the underlying restrictions, the line between a large pistol and a short rifle came to blur with the braced pistol.

---

[4] In early 1960, the government acknowledged that a substantial number of U.S. M1 carbines were acquired by civilians before 1960, without realizing that they violated the NFA's restrictions on possession of a rifle with a barrel 18 inches or shorter, and thus the NFA's definition of a restricted short barreled rifle was changed to 16 inches, but remained at 18 for shotguns. Hearing, 86th Cong., 2d. Sess., on H.R. 4029, an Act to Amend the Internal Revenue Code of 1954 (April 26, 1960); *cf.* 26 U.S.C. § 5845(a). Note that no great fuss was made over the dangerousness of these sixteen-inch rifles the government inadvertently put into circulation. Rather, the hearings reflect a sober understanding of the inutility and arbitrariness of the barrel-length restrictions.

The result is the present situation: the government seems to accept that it cannot touch small, extremely concealable handguns, and that it cannot touch long guns, but asserts—for some reason—possession of medium-sized guns (be they short rifles or large pistols) ought attend felonious consequences[5] on a hair-trigger due to their terrifyingly middling concealability and dangerously medium size?

This is precisely as absurd as it sounds. There is simply "no set of circumstances…under which [the restrictions on firearms by reference to barrel length under §§ 5861(b)-(d); 5845(a)(1)-(4)] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## VI.   A JUDGMENT ON SECOND AMENDMENT GROUNDS IS NECESSARY FOR COMPLETE RELEIF

While this honorable Court found Plaintiffs likely to succeed on the merits of the APA claim, an APA judgment would not grant complete relief for several reasons. First, nothing would prevent the government from engaging in the same rulemaking process—or worse, pursuing criminal enforcement absent rulemaking, as the government asserts its position is and always was the correct reading of the law. *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces", 2021R-08F. Additionally, Plaintiffs, such as

---

[5] Unless the government accidentally sells them to us, of course. In which case—no big deal. *Supra* note 4.

Eric Mele, whose affidavit is attached hereto as Exhibit A, are presently denied the effective use of their lawfully owned firearms by the conduct of Defendants in their present and threatened future enforcement actions. Only declaratory relief and a permanent injunction can grant Plaintiffs complete relief to the violations of right presently suffered.

## CONCLUSION

For the reasons stated *supra*, this honorable Court should grant the motion for summary judgment.

Respectfully submitted,

DATED:  November 23, 2024

/s/Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 23, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Matthew Larosiere
Matthew Larosiere

**EXHIBIT A – AFFIDAVIT OF ERIC DAVID MELE**

## <u>AFFIDAVIT OF ERIC DAVID MELE</u>

August 9, 2024

I am Eric Mele, a natural person. I have in my own possession, the AR-style pistol described in the complaint. I also have in my own possession, several lawfully acquired AR-pattern rifles, as well as upper and lower receivers for those rifles.

In my time depending on the AR-style pistol described in the complaint for lawful purposes such as target shooting and self-defense, it has begun to show signs of wear. To ensure it stays in good order, I would like to install the buttstock and receiver from one of my AR-15 rifles. However, if I did so, I fear that I would face prosecution for having an unregistered short barreled rifle. Alternatively, if I registered it, I fear my ability to depend on it when traveling interstate, to allow my friends and family members to use it, and to otherwise dispose of it would be hindered by the expense and rigors of NFA compliance.

But for the above, I would configure the firearm described in the complaint with a short barrel and buttstock.

Under penalty of perjury, I affirm the foregoing statement to be true.

ERIC DAVID MELE