UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE №: 8:23-cv-223

JOSIAH COLON, *et al.*,

                  *Plaintiffs,*

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

                  *Defendants.*

_____/

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND <u>MEMORANDUM IN SUPPORT THEREOF</u>

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................... 3

**I.   A JUDGMENT ON SECOND AMENDMENT GROUNDS IS NECESSARY FOR COMPLETE RELEIF** .................................................... 4

**II.   26 U.S.C. §§ 5861(b)-(d) ARE FACIALLY UNCONSTITUTIONAL BY WAY OF 26 U.S.C. § 5845(a)(1)-(4)** .......................................... 5

   a.   HISTORICAL & TECHNICAL BACKGROUND OF THE ACTS.... 6

**III.   THE BARREL LENGTH REGIME CANNOT SURVIVE SECOND AMENDMENT SCRUTINY** ................................................................ 10

**IV.   UNDERSTANDING *MILLER*** ................................................... 11

**V.   THE MILITIA, DEFENSIVE UTILITY, AND COMMONALITY OF SHORT-BARRELED RIFLES** ........................................................ 13

**VI.   THERE IS NO LEGITIMATE SWEEP TO THE BARREL LENGTH RESTRICTIONS** .................................................................. 16

**VII.   26 U.S.C. §§ 5861(b)-(d) ARE UNCONSTITUTIONAL AS APPLIED TO PLAINTIFFS BY WAY OF 26 U.S.C. § 5845(a)(1)-(4)** ..... 19

   a.   **With Respect to Eric David Mele** ..................................... 20

   b.   **With Respect to Josiah Colon** .......................................... 22

   c.   **With Respect to Brandon Kling** ....................................... 22

   d.   **With Respect to William Martin** ...................................... 23

   e.   **With Respect to 2nd Amendment Armory** ...................... 23

**CONCLUSION** ............................................................................. 24

## <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

The National Firearms Act's barrel-length provisions impose felony liability based solely on the length of a rifle's barrel or the presence of a stabilizing component—be it a stock or a brace. Under *Bruen*, the Second Amendment's plain text covers plaintiffs' possession and use of these arms, which are in common use for lawful purposes. The government cannot meet its burden to show a historical analogue, because no tradition exists of criminalizing arms of medium size, penalizing the use of stabilizing accessories, or requiring federal permission before traveling with them, leaving nearly infinite hooks in addition to simple possession for future prosecution.

Absent relief, the government's position guarantees that plaintiffs remain under the constant threat of felony prosecution for the peaceable possession of common arms. The barrel-length provisions chill core Second Amendment conduct. Because these restrictions cannot be reconciled with *Bruen*, the Court should declare them unconstitutional in their entirety. At a minimum, it should hold them invalid as applied to these plaintiffs, whose daily reliance on the affected firearms, and who are presently denied the effective use of a firearm, places them in the heartland of the Amendment's protection. Only declaratory and injunctive relief can secure their rights and end the chilling effect of the statute and the government's enforcement stance.

## ARGUMENT

All Plaintiffs respectfully move this honorable Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment on Count I of the complaint. Specifically, that the National Firearms Act's attachment of felony consequences for the simple possession of a firearm by reference to barrel length violates the Second Amendment. U.S. Const. Amend. II, both facially and as applied to Plaintiffs. Mele's injury alone establishes standing. He is presently unable to use his firearm and cannot repair it without incurring felony liability. (Ex. A).

Accordingly, Plaintiffs request an order granting summary judgment as to Count I, declaring the underlying provisions unconstitutional, and enjoining Defendants from enforcing them. In support thereof, Plaintiffs state:

## I.    A JUDGMENT ON SECOND AMENDMENT GROUNDS IS NECESSARY FOR COMPLETE RELEIF

Even before the Final Rule, Defendants repeatedly asserted that pistols equipped with stabilizing braces could be classified as short-barreled rifles under 26 U.S.C. § 5845(c). In litigation surrounding the Rule, the Department of Justice represented that the Rule merely "clarified" existing law and that brace-equipped firearms were always subject to the NFA. See, e.g., (Doc. 40 p. 38 lines 4-15); *Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023) (noting Government's position that "the stabilizing braces were always unlawful").

4

Thus, vacating the Final Rule does not eliminate the Government's claimed authority to prosecute owners of brace-equipped pistols under the NFA.

As a threshold matter, this suit's Count I is not predicated on the rulemaking at all. (Doc. 1 pp. 15-17). It unambiguously challenges the underlying statute's constitutionality, along with the fact that nothing would prevent the government from engaging in the same rulemaking process—or worse, pursuing criminal enforcement absent rulemaking, as the government asserts its position is and always was the correct reading of the law. *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces", 2021R-08F; *see also* (Doc. 22 at 15-21) (arguing that brace-equipped firearms were always regulable as SBRs). Further, Plaintiffs, such as Eric Mele, whose affidavit is attached hereto as Exhibit A, are presently denied the effective use of their lawfully owned firearms by the statute, the conduct of Defendants in their present and threatened future enforcement actions. Only declaratory relief and a permanent injunction can grant Plaintiffs complete relief to the violations of right presently suffered.

## II. 26 U.S.C. §§ 5861(b)-(d) ARE FACIALLY UNCONSTITUTIONAL BY WAY OF 26 U.S.C. § 5845(a)(1)-(4)

The Supreme Court recently explored a facial Second Amendment challenge in *Rahimi*, where 18 U.S.C. §922(g)(8) survived a facial challenge. *United States v. Rahimi*, 144 S.Ct. 1889, 1902. *Rahimi* provides valuable

guidance and counsels towards finding Acts here at issue facially unconstitutional. A facial challenge is appropriate because §5861's attachment of felony consequences for the peaceable possession of firearms by reference to barrel length has no constitutionally "legitimate sweep." *Washington v. Glucksberg*, 521 U.S. 702, 740, n. 7 (1997) (Stevens, J., concurring in judgment).

### a. HISTORICAL & TECHNICAL BACKGROUND OF THE ACTS

The National Firearms Act of 1934 ("NFA"), Pub.L. 73-474, 48 Stat. 1236 imposed an intentionally prohibitory tax on the making and transfer of "firearms," as defined in the NFA, as well as imposing a burdensome tax— stylized as a "special (occupational) tax"—on persons and entities engaged in the business of importing, manufacturing, and dealing in firearms covered by the NFA. *See* ATF, *National Firearms Act*, https://www.atf.gov/rules-and-regulations/national-firearms-act (In ATF's own words, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms."). The NFA requires that all firearms defined by §5845 be registered with the Secretary of the Treasury.

The NFA was designed to prohibit the transfer and possession of all handguns by way of a prohibitory tax of $200 on the making or transfer of a

handgun.[1] Short barreled rifles and shotguns (hereinafter "SBR"s and "SBS"s) were added to the Act in order to prevent individuals from circumventing the handgun tax by simply cutting down long guns into what would be the effective equivalent of a handgun. Prior to passage, the handgun regulations were removed from the NFA, but the restrictions on SBRs and SBSs remained, a vestige of the handgun regulations.

If one wishes to take hold of an NFA firearm, it is not an easy process. In addition to the $200 tax,[2] the transferor and transferee together must prepare and file Form 5320.4.[3] 26 U.S.C. § 5812(a); 27 C.F.R. § 479.84(a). The application demands a vast amount of information, including all personal identifying information about both transferor and transferee, complete identifying information regarding the firearm, a passport-style photograph, and two sets of fingerprints from the transferee. 26 U.S.C. § 5812(a)(3); 27 C.F.R. § 479.85(a). Additionally, if the registrant wants to possess an SBR, the

---

[1] Given a cumulative rate of inflation of 2244.6% between 1934 and 2024, 200 1934 dollars would have equivalent purchasing power of $4,689 in 2024. This is equal to approximately 12.5% of the average U.S. annual salary for Q4 of 2023, and $200 would have been approximately 14% of the average white man's salary in 1939. (31% for an African-American man's). U.S. Bur. Labor. Stat, *Quarterly Census of Employment and Wages*; Prices and Wages by Decade: 1930-1939, *Libraries of the University of Missouri*, https://libraryguides.missouri.edu/pricesandwages/1930-1939.

[2] The tax is scheduled to be reduced to $0 in 2026, but that does nothing for the present injury, and does nothing to alleviate the multitude unconstitutional restrictions described *infra*.

[3] "Application for Tax Paid Transfer and Registration of Firearm," https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204

application must include a sworn statement from the transferee providing "[t]he reasons why there is a reasonable necessity for [the transferee] to purchase or otherwise acquire the device or weapon," and to state that the transferee's "receipt or possession of the device or weapon would be consistent with public safety." 27 C.F.R. § 478.98. Just to ensure that wasn't too little a burden, the would-be transferee must also send a completed copy of the application to the chief law enforcement officer of their locality. 27 C.F.R. § 478.98.

In 1968, Congress passed the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213. The GCA revised the NFA through Title II, which regulated machineguns, SBSs, and SBRs. Rifles and pistols not subject to the NFA were regulated under Title I of the GCA. § 18 U.S.C. § 921 *et seq*.

Pertinent to this matter, the NFA defines a "rifle" and a "shotgun" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder" 26 U.S.C. §§ 5845(c), (d). Short-barreled rifles and shotguns subject to the NFA are defined as those "having a barrel or barrels of less than 16 inches in length" with respect to rifles and 18 inches in length with respect to shotguns. *Id*. at § 5845(a).

Firearms subject to the NFA are subject to burdensome restrictions unlike other common firearms, including the need to request permission from

8

the federal government to travel interstate with the firearm, permission for which the government may take months to grant—if it ever grants it at all.

Firearms registered pursuant to the NFA require the payment of a $200 transfer tax and the submission of an ATF Form 4, either by the previous owner—if in the same state—or through a licensed special occupational taxpayer. The transfer of an NFA firearm from an unlicensed individual to another unlicensed individual out-of-state requires the item first be transferred on a Form 4 to a special occupational taxpayer, then another Form 4 from the special occupational taxpayer to the end user. Each Form 4 transfer can take a year or more and requires the payment of a $200 tax. Meaning for a Floridian to alienate a shoulder-fired rifle with a 15.999" barrel, rather than a simple transfer between eligible owners as would be the case for a firearm with a 16.001" barrel, such transfer can attend years of waiting and hundreds of dollars spent for the privilege of transferring and possessing a firearm less concealable than a pistol, but slightly shorter than a non-NFA rifle.

Anyone who violates any of the litany of restrictions on the possession, transportation, and alienation of SBRs is subject to substantial monetary fines and up to ten years imprisonment. 26 U.S.C. § 5871.

### III. THE BARREL LENGTH REGIME CANNOT SURVIVE SECOND AMENDMENT SCRUTINY

The NFA sought to regulate handguns, SBRs, SBSs, as well as other weapons due to concealability. The handgun—the most concealable firearm of all—has since been recognized as "the quintessential self-defense weapon" and closest to the core of Second Amendment protection. *District of Colombia v. Heller*, 554 U.S. 570 at 629 (2008). Further, 59. *Bruen*        held        as unconstitutional New York's 1911 Sullivan Act, requiring a license and demonstration of "proper cause" for the possession and carrying of a concealable firearm. Bruen, 597 U.S. 1 at 2 (2022).

As this honorable Court observed, *Bruen* stands for the proposition that any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. Const., Amend. II, can only be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. *Bruen*, 597 U.S. at 29. The government cannot contest that no federal regulation of firearms existed before the 1934 enactment of the NFA.

There is simply no historical basis, and no historical law analogous to the attachment of felony treatment to firearms by reference to barrel length alone. In so far as attachments such as shoulder stocks, there is no historical

10

basis, and no historical law analogous to the attachment of felony treatment to firearms by the presence of an accessory to facilitate easier, more accurate use of the firearm. There is no historical basis, and no historical law analogous to the attachment of felony consequences for traveling interstate with a firearm without bureaucratic permission, either.

## IV.    UNDERSTANDING *MILLER*

The government will no doubt, as it has previously in this litigation, attempt to hang its hat on *U.S. v. Miller*, 307 U.S. 174 (1939). This is unavailing for several reasons. First, Plaintiffs here do not necessarily challenge the regulation of a sawn-off shotgun. Rather, all of the firearms at issue are either pistols or rifles. Second, *Miller*'s analysis, properly applied, supports the grant of summary judgment.

The core of *Miller* was a unanimous conclusion that the Second Amendment did not apply to the possession of a firearm that did not have "some reasonable relationship to the preservation or efficiency of a well regulated militia." 307 U.S., at 178. This was the 1939 Court sidestepping the question of whether the NFA's registration and taxation provisions constitute an "infringement" of the right to keep and bear arms by ruling that it could not take judicial notice of whether a short-barreled shotgun was "ordinary military equipment." *Id*. Just as the *Heller* Court observed, if the *Miller* Court actually

believed prohibitive taxation and registration were consistent with the Second Amendment, it would have made no sense to examine whether the particular weapons were useful in militia service rather than simply approve the regime. *Heller*, 554 U.S. at 622 ("Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen.").

Defendants will no doubt next turn to *Heller* dicta for support, quoting that the *Heller* court "therefore read *Miller* only to say that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. But the *Heller* case was not about short-barreled firearms—it was about an effective ban on operable handguns in the home. There were no facts before the Court on the actual lawful use of these firearms, and thus the shotgun dicta has no bearing to the case at bar. Even if it did, the Eleventh Circuit has "pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).

Reading *Bruen*, *Heller*, and *Miller* for what they say, each decision supports the grant of summary judgment here.

## V.    THE MILITIA, DEFENSIVE UTILITY, AND COMMONALITY OF SHORT-BARRELED RIFLES

Relevant to *Miller*, *Heller*, and *Bruen*, a firearm's martial utility is material to the firearm's lawful uses, such as militia service, in addition to self-defense. Unlike the situation in *Miller*, where it was "not within judicial notice that [a short barreled shotgun] is any part of the ordinary military equipment or that its use could contribute to the common defense[,]" *Miller* 607 U.S. at 178, the militia and self-defense utility of SBRs is manifest. In fact, they are the weapon of choice for our Nation's infantry, and widely favored by law enforcement.

For example, one of the standard-issue firearms of the U.S. armed forces and police departments for decades now has been the 14.5-inch barreled M4A1 carbine. *See*, *e.g.* Andrew Feickert, Cong. Res. Serv. "The Army's M-4 Carbine: Background and Issues for Congress," (Jun. 8, 2010). For over a hundred years, the consensus among the military, law enforcement, and other civilian users of defensive carbines has inched towards *even shorter* firearms. *See id.* at 4 (contemplating a 10-inch barreled carbine); "Daniel Defense Mk18: A Comprehensive Guide to the Elite AR-15 Variant," Top Defense Systems (Jun. 23, 2024) (Referring to the 10.3-inch Mk18 as having "gained immense popularity among law enforcement, military personnel, and civilian enthusiasts alike.").

Indeed, the utilitarian martial firearms employed by the military, law enforcement, and militia have universally moved in one direction: shorter barrels. In the case of the U.S. Army, for example, barrel length has been a one-way ratchet since at least 1903. 1936 saw the 26-and-24-inch barreled M1917 and M1903 replaced with the 24-inch-barreled M1 Garand. 1957 saw the Garand replaced with the 22-inch-barreled M14. 1964 saw the M14 replaced with the 20-inch-barreled M16. 1994 saw the M16 replaced with the 14.5-inch-barreled M4—crossing the Rubicon into SBR territory. Now, the Army has officially adopted the 13-inch-barreled XM7 rifle as the M4's replacement. *See*, *e.g.*, Joe Engesser, "250 Years of the American Infantry Rifle," Rock Island Auctions (Jul. 1, 2024) https://www.rockislandauction.com/riac-blog/american-infantry-rifle-history. As has been the case for the entire history of this nation, individuals and law enforcement look to the military for choosing defensive weapons, often utilizing semiautomatic-only versions of the same.[4] The AR-15 exemplifies this. *See, e.g.*, C. McWhirter, Z. Elinson, "American Gun – The True Story of the AR-15," Farrar, Straus and Giroux (2023).

---

[4] The U.S. Government even charted the Civilian Marksmanship Program ("CMP") for the express purpose of providing standard-issue military rifles to American civilians, to encourage their proficiency and use. The firearms provided by the CMP were wildly popular, and are still highly sought after today. *See*, "Civilian Marksmanship Program," Gov't Accountability Office GAO-19-287 (Feb. 2019) (Since 1996, the Army has transferred more than 700,000 surplus rifles and handguns to CMP.).

In addition to the three-to-seven million SBRs Defendants estimate to be in circulation, the government's own data supports that short barreled rifles are in common use for lawful purposes, with 870,286 registered examples nationwide in 2024, and almost 10% of those in the Great State of Florida alone. ATF, "Firearms Commerce in the United States – Annual Statistical Update 2024" at 16-17 https://www.atf.gov/resource-center/docs/report/2024firearmscommercereportpdf/download. The 2024 number is likely underinclusive, as the ATF is estimated to have registered an additional quarter-million SBRs under the rulemaking precipitating this action. Gutowski, S. "ATF Says a Quarter Million Guns Registered Under Pistol-Brace Ban," *The Reload* (Jun 2, 2023) https://thereload.com/atf-says-a-quarter-million-guns-registered-under-pistol-brace-rule/. These estimates certainly understate the number of short-barrel rifles in circulation, according to the government's official position that all braced pistols are properly classified as short-barrel rifles. *See, e.g.*, *Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023). Taking Defendants at their word, there are **between three and seven million SBRs in circulation**. *Id.* at 581–82. So the actual number of short-barrel rifles in use is around 1 million, plus three to seven million, plus however many 15.999" or shorter rifles which have to date gone unregistered. Finding these firearms to be in common use does not require drawing a jurisprudential line at a specific number of firearms that must be in circulation

for them to be so, their numbering in the many hundreds of thousands to millions is enough. *Cf. Caetano v. Massachusetts*, 577 U.S. 411 (2016) (some 200,000 stun gun owners showing "common use" of stun guns).

The government's inevitable counter that only the registered short-barreled firearms can be considered in lawful use must be ignored, as the only source of illegality would be the conduct of Defendants and the challenged provision itself. *See Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.").

## VI. THERE IS NO LEGITIMATE SWEEP TO THE BARREL LENGTH RESTRICTIONS

As discussed above, the purpose for the barrel length restrictions underlying this action was to prohibit concealable firearms. *Heller*'s affirmation that the most concealable firearms of all—handguns—cannot be prohibited moots the fundamental purposes of the law. Additionally, the commonality of firearms affected by the barrel length restrictions obviates any assertion that the firearms are not in common use for lawful purposes.

The unconstitutionality of the barrel length restrictions here is best exemplified by its absurd timeline: Congress, in 1934, sought to ban handguns

with the idea that they were useful in crime. It ultimately gave up on the handgun ban, leaving a vestigial remnant, restricting shotguns *and* rifles with barrels under 18 inches. In 1960, the government sold a large quantity of 16-inch-barreled rifles to civilians, and rushed to amend the law, rather than criminally prosecute their owners or seizing the firearms.[5] The law now restricts shotguns under 18 inches, but rifles under 16 inches. Over the years, larger pistols and shorter rifles came more *en vogue*.[6] Relying on guidance from Defendants in interpreting the underlying restrictions, the line between a large pistol and a short rifle came to blur with the braced pistol.

The result is the present situation: the government seems to accept that it cannot touch small, extremely concealable handguns, and that it cannot touch long guns, but asserts—for some reason—possession of medium-sized guns (be they short rifles or large pistols) ought attend felonious consequences[7]

---

[5] In early 1960, the government acknowledged that a substantial number of U.S. M1 carbines were acquired by civilians before 1960, without realizing that they violated the NFA's restrictions on possession of a rifle with a barrel 18 inches or shorter, and thus the NFA's definition of a restricted short barreled rifle was changed to 16 inches, but remained at 18 for shotguns. Hearing, 86th Cong., 2d. Sess., on H.R. 4029, an Act to Amend the Internal Revenue Code of 1954 (April 26, 1960); *cf.* 26 U.S.C. § 5845(a). Note that no great fuss was made over the dangerousness of these sixteen-inch rifles the government inadvertently put into circulation. Rather, the hearings reflect a sober understanding of the inutility and arbitrariness of the barrel-length restrictions.

[6] *See* discussion *supra* Part V.

[7] Unless the government accidentally sells them to us, of course. In which case—no big deal. *Supra* note 4.

17

on a hair-trigger due to their terrifyingly middling concealability and dangerously medium size?

Another point is evident in the curio and relics list, where the government identifies specific firearms as exempt from the NFA's barrel length rigors for various reasons. Bureau of Alcohol, Tobacco, Firearms, and Explosives, "Curio or Relics List – January 1972 through April 2025" https://www.atf.gov/file/203006/download. The list identifies some, but not all, models of Hamilton rifle, which were single-shot rifles designed for young boys at the turn of the century whose barrels almost never reached 16".[8]



---

[8] "The Quintessential Boy's Rifle: Hamilton's Model 27," The Standard Catalog of Firearms, https://www.nrvoutdoors.com/HAMILTON/HAMILTON%2027.htm.

Despite the fact that many thousands of these boys' rifles remain in circulation, and are not of the 11 models exempted on the Curio & Relic list, the ATF has not attempted to recover these firearms or prevent their sale. The enforcement of the NFA against these non-exempt ancient boys' rifles would be absurd, and yet the statute as written commands it.

This is precisely as absurd as it sounds. There is simply "no set of circumstances…under which [the restrictions on firearms by reference to barrel length under §§ 5861(b)-(d); 5845(a)(1)-(4)] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## VII. 26 U.S.C. §§ 5861(b)-(d) ARE UNCONSTITUTIONAL AS APPLIED TO PLAINTIFFS BY WAY OF 26 U.S.C. § 5845(a)(1)-(4)

Even if this Court declines to find the NFA's barrel-length restrictions facially unconstitutional, it must hold them invalid as applied to these Plaintiffs. The government has consistently asserted that brace-equipped pistols are, and always have been, short-barreled rifles within the scope of the NFA, regardless of the 2023 Rule. See, e.g., Mock v. Garland, 75 F.4th 563, 574 (5th Cir. 2023). That litigation position creates a reasonable and continuing fear of criminal prosecution, even after vacatur of the Rule.

Each Plaintiff is a law-abiding citizen whose possession and use of brace-equipped pistols or short-barreled rifles is for core Second Amendment

purposes—self-defense, training, travel, and lawful commerce. The government's enforcement position under 26 U.S.C. §§ 5861(b)–(d) and § 5845(a)(1)–(4) denies Plaintiffs their rights, burdens their lawful conduct, chills protected activity, and lacks any grounding in this nation's historical tradition of firearms regulation.

Nothing prevents the government from bringing enforcement actions tomorrow against Plaintiffs for their brace-equipped firearms. Declaratory and injunctive relief is therefore necessary to cease the unconstitutional chilling of protected Second Amendment conduct.

   a. **With Respect to Eric David Mele**

Mele suffers present and ongoing injury: he is presently denied the functional use of his firearm. (Ex. A); (Doc. 1 at ¶6). As he previously feared (Doc. 51 at 17), the firearm has become unusable. He could simply install a replacement rifle receiver, but the government's enforcement position forces him to choose between felony exposure or abandoning the functional utility of his firearm in a configuration well within the Second Amendment's protective scope.

On this, the challenged acts are unconstitutional as applied to him, an individual who has a firearm which the government has repeatedly argued violates the NFA in its brace-equipped configuration, that could be repaired

with equipment in his possession—namely a lower receiver from an AR-15 rifle.

The distinction between an AR-15 rifle lower receiver and an AR-15 pistol lower receiver is exclusively legal, not functional, and wholly caused by the challenged statutes.[9] The government has consistently been of the position that the AR-15 lower receiver is the only part of the AR-15 that constitutes a legal "firearm." The statute's text and the government's enforcement position even forbid him from installing the AR-15 rifle receiver, which is in all material respects identical, even without a stock. 26 U.S.C. § 5845(a)(4) (prohibiting a "weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel…of less than 16 inches in length").

The government cannot identify a historical basis for prohibiting Mr. Mele from installing a replacement AR-15 rifle receiver on his AR-15 pistol just because that AR-15 receiver was originally installed on a rifle. Nor can the government identify a historical basis for prohibiting Mr. mele from installing a replacement AR-15 rifle receiver on his AR-15 pistol complete with a

---

[9] *See* Horman, Gil "Building AR-15 Pistols at Home", American Rifleman (July 14, 2016) https://www.americanrifleman.org/content/building-ar-15-pistols-at-home/ (reflecting the common reading of the NFA that "A factory fresh AR lower receiver that has never been part of a firearm can be used to build a pistol, carbine or rifle. If a lower receiver is built into and registered as a pistol first, it can be stripped down and converted into a rifle in the future. If the receiver built into a carbine or rifle first, it must always remain part of a rifle and cannot ever be used to build a pistol.").

buttstock. However, that is what the statute dictates. On this much, the National Firearms Act's restrictions on arms as they relate to barrel length are unconstitutional as applied to Mr. Mele.

### b.  **With Respect to Josiah Colon**

Colon owns and relies upon a Palmetto State Armory AK-P pistol with a stabilizing brace for defense of hearth and home and for interstate travel. (Doc. 1 at ¶4). The government has repeatedly insisted that such brace-equipped firearms are subject to the NFA. Colon therefore reasonably fears prosecution if he continues to keep or transport his firearm. (*Id.*) The threat forces him either to abandon his preferred defensive weapon or to submit to the burdens of registration, taxation, and interstate travel permission. There is no historical analogue for criminalizing a common defensive arm on this basis. As applied to Colon, the NFA's restrictions as they relate to barrel length are unconstitutional.

### c.  **With Respect to Brandon Kling**

Kling owns brace-equipped AR pistols, one built from a lawfully machined receiver, and regularly travels out of state for family visits and to instruct at Project Appleseed events. (Doc. 1 at ¶5). The government's position threatens felony consequences for Kling to transport his firearms across state lines without federal approval, chilling his right to armed self-defense during travel and his ability to use his arms for instructional purposes. Citizens at the

Founding were never required to seek bureaucratic permission to travel with common arms. As applied to Kling, the statute unconstitutionally burdens protected conduct.

### d. **With Respect to William Martin**

Martin, a veteran and the owner of 2nd Amendment Armory, personally owns brace-equipped firearms for defense of home and business. (Doc. 1 at ¶7). Because the government asserts that these firearms are inherently NFA weapons, Martin must either register and surrender their practical use, or face felony liability for continued possession. Criminalizing a veteran's ordinary possession of common defensive firearms has no analogue in this nation's history or tradition. As applied to Martin, the statute is unconstitutional.

### e. **With Respect to 2nd Amendment Armory**

2nd Amendment Armory maintains brace-equipped pistols in its inventory for sale. (Doc. 1 at ¶8). The government's position that all such firearms are or may be NFA weapons strips them of marketability: transfer requires years of delay, duplicative taxes, and complex NFA paperwork. That destroys their commercial value and prevents citizens from acquiring arms in common use. There is no historical tradition of forcing licensed merchants to destroy or withhold otherwise common arms from the market. Additionally, the government's threat to one day enforce the NFA against brace-equipped firearms again means it risks its business license—its owners livelihood—on

the government's opinion tomorrow about its conduct today. As applied to 2nd Amendment Armory, the statute unconstitutionally burdens both the company's property rights and the Second Amendment rights of its customers.

## CONCLUSION

For the reasons stated *supra*, this honorable Court should grant the motion for summary judgment, and enter an order declaring the challenged statutes facially unconstitutional and enjoining their enforcement, or, in the alternative, unconstitutional as applied to Plaintiffs.

Respectfully submitted,

DATED:  October 3, 2025

/s/Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Lead Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 3, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Matthew Larosiere
Matthew Larosiere

24