## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSIAH COLON, *et al.*,

      *Plaintiffs*,

    v.

BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES, *et al.*,

      *Defendants.*

Case No. 8:23-cv-223

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

BACKGROUND ............................................................................................2

I.    The National Firearms Act ..................................................................2

II.   This Lawsuit.........................................................................................4

III.  The Rule's Vacatur & Other Recent Developments ....................................5

LEGAL STANDARDS....................................................................................6

I.    Rule 12(b)(1): Lack of Subject-Matter Jurisdiction ....................................6

II.   Rule 56: Summary Judgment ................................................................6

ARGUMENT ................................................................................................7

I.    Plaintiffs lack standing to assert their Second Amendment claim.................7

II.   The NFA does not violate the Second Amendment..................................10

      A.    Binding precedent precludes Plaintiffs' challenge. ...........................10

      B.    The NFA does not violate the Second Amendment........................15

      C.    Plaintiffs' as-applied arguments do not change that conclusion. ........25

III.  Plaintiffs' remaining claims challenging ATF's Rule should be
      dismissed as moot.................................................................................28

IV.   In all events, Plaintiffs are not entitled to injunctive relief..........................30

CONCLUSION ..............................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Banks v. Sec'y of Dep't of Health & Hum. Servs.*,
    38 F.4th 86 (11th Cir. 2022)................................................................8

*Burdick v. Kennedy*,
    700 F. App'x 984 (11th Cir. 2017) ................................................8

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
    451 F.3d 1257 (11th Cir. 2006)................................................. 8, 9

*Christian Coal. of Fla., Inc. v. United States*,
    662 F.3d 1182 (11th Cir. 2011)................................................... 28

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...................................................................8

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................. 8, 9

*Coal. of Clergy, Laws., & Professors v. Bush*,
    310 F.3d 1153 (9th Cir. 2002) ......................................................7

*Ctr. for Individual Freedom v. Carmouche*,
    449 F.3d 655 (5th Cir. 2006).........................................................6

*Dermer v. Miami-Dade Cty.*,
    599 F.3d 1217 (11th Cir. 2010)................................................... 10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .............................................. 11, 12, 15, 17

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .............................................................. 30

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................ 7, 8

*Fife v. State*,
    31 Ark. 455 (1876) ............................................................... 19

*Ga. Republican Party v. SEC*,
    888 F.3d 1198 (11th Cir. 2018)......................................................9

*HM-Florida-ORL, LLC v. Governor of Fla.*,
137 F.4th 1207 (11th Cir. 2025)................................................................ 28

*Johnson v. United States*,
576 U.S. 591 (2015) ................................................................................... 25

*Keohane v. Fla. Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020)................................................................ 29

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ..................................................................................... 6

*Lawrence v. Dunbar*,
919 F.2d 1525 (11th Cir. 1990).................................................................. 6

*Lomont v. O'Neill*,
285 F.3d 9 (D.C. Cir. 2002) ......................................................................... 3

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 7, 8, 9, 10

*McDonald v. Chicago*,
561 U.S. 742 (2010) ................................................................................... 15

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023)........................................................................ 4

*Mock v. Garland*,
2024 WL 2982056 (N.D. Tex. June 13, 2024) .................................... 5, 29

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ................................................................................... 30

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................................................ 11, 12

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025), *petition for cert. filed sub nom.*
*Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (U.S. May 20, 2025) ........... 17, 19

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)..............................................................................*passim*

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*,
55 F.4th 1312 (11th Cir. 2022) ................................................................. 28

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ................................................................................. 7

*State Farm Mut. Auto. Ins. Co. v. Spangler,*
64 F.4th 1173 (11th Cir. 2023) ................................................................. 6

*State v. Kerner,*
107 S.E. 222 (N.C. 1921) ....................................................................... 19

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ................................................................................... 7

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ................................................................................. 8

*Teixeira v. Cnty. of Alameda,*
873 F.3d 670 (9th Cir. 2017) ................................................................. 22

*TocMail, Inc. v. Microsoft Corp.,*
67 F.4th 1255 (11th Cir. 2023) ............................................................ 8, 9

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ............................................................................ 7, 8

*Trump v. CASA,*
606 U.S. 831 (2025) ............................................................................... 30

*United States v. Bradley,*
2023 WL 2621352 (S.D. W. Va. Mar. 23, 2023) ................................... 22

*United States v. Cox,*
906 F.3d 1170 (10th Cir. 2018) ............................................................. 14

*United States v. Dangleben,*
2023 WL 6441977 (D.V.I. Oct. 3, 2023) ............................................... 20

*United States v. Delauder,*
2023 WL 5658924 (N.D. W. Va. Aug. 31, 2023) ................................... 20

*United States v. Hatfield,*
376 F. App'x 706 (9th Cir. 2010) .......................................................... 14

*United States v. Holder,*
2024 WL 1599916 (N.D. Ga. Jan. 19, 2024),
*adopting report & recommendation*, 2024 WL 1012914 (N.D. Ga. Mar. 9, 2024) ..... 14

*United States v. Holton*,
639 F. Supp. 3d 704 (N.D. Tex. 2022) .................................................... 22, 23

*United States v. Jernigan*,
750 F. Supp. 3d 579 (E.D. Va. 2024) ........................................................... 14

*United States v. Libertad*,
681 F. Supp. 3d 102 (S.D.Y.Y. 2023), *aff'd sub nom.*
*United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025) ......................................... 22

*United States v. Miller*,
307 U.S. 174 (1939) .......................................................................... 2, 11, 20

*United States v. Miller*,
2023 WL 6300581 (N.D. Tex. Sep. 27, 2023) ................................................. 14

*United States v. Padgett*,
2023 WL 3483929 (D. Alaska Jan. 4, 2023) .................................................. 21

*United States v. Price*,
111 F.4th 392 (4th Cir. 2024) .................................................................. 14

*United States v. Rahimi*,
602 U.S. 680 (2024) .................................................................... *passim*

*United States v. Robinson*,
2025 WL 870981 (11th Cir. Mar. 20, 2025), *petition for cert. filed*,
No. 25-5150 (U.S. July 18, 2025) ...................................................... *passim*

*United States v. Royce*,
2023 WL 2163677 (D.N.D. Feb. 22, 2023) ............................................... 14, 17

*United States v. Rush*,
130 F.4th 633 (7th Cir. 2025), *petition for cert. filed*,
No. 24-1259 (U.S. June 10, 2025) .............................................................. 14

*United States v. Saleem*,
659 F. Supp. 3d 683 (W.D.N.C. 2023) ......................................................... 20

*United States v. Saleem*,
2024 WL 5084523 (4th Cir. Dec. 12, 2024) ................................................... 14

*United States v. Shepherd*,
2024 WL 71724 (S.D. Miss. Jan. 5, 2024) .................................................... 14

*United States v. Tagg,*
    572 F.3d 1320 (11th Cir. 2009) ................................................................ 13

*United States v. Thompson/Center Arms Co.,*
    504 U.S. 505 (1992) ............................................................................ 3, 25

*United States v. Wilson,*
    979 F.3d 889 (11th Cir. 2020) ........................................................... 13, 14

*Wood v. Raffensperger,*
    981 F.3d 1307 (11th Cir. 2020) ............................................................... 29

**STATUTES**

18 U.S.C. § 922 ........................................................................................... 27

26 U.S.C. §§ 5801–5872 ................................................................................. 2

26 U.S.C. § 5801 ........................................................................................... 4

26 U.S.C. § 5802 ........................................................................................... 4

26 U.S.C. § 5812 ........................................................................................... 4

26 U.S.C. § 5822 ........................................................................................... 4

26 U.S.C. § 5841 ........................................................................................... 4

26 U.S.C. § 5842 ........................................................................................... 4

26 U.S.C. § 5845 ........................................................................................ 3, 4

26 U.S.C. § 5861 ......................................................................................... 11

One Big Beautiful Bill Act,
    Pub. L. No. 119-21, 139 Stat. 72 (2025) ................................................. 27

**RULES**

Fed. R. Civ. P. 12 ..................................................................................... 6, 28

Fed. R. Civ. P. 56 .......................................................................................... 6

**REGULATIONS**

*Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
    88 Fed. Reg. 6478 (Jan. 31, 2023) ............................................................. 1

**UNITED STATES CONSTITUTION**

U.S. Const. amend. II .................................................................. 15

**Other Authorities**

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) .................. 18

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1716) ............................. 18

2 Edw. 3, c. 3 (1328) (Eng.) ............................................................... 17

2 Gen. Laws of Mass. from the Adoption of the Const. to Feb. 1822 (1823) .......... 22

4 W. Blackstone, *Commentaries on the Laws of England* (1769) .............................. 17

4 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) ............ 18

15 The Pub. Records of the Colony of Conn. (1890) ......................................... 22

Act of July 13, 1892, ch. 159, 27 Stat. 116 ....................................... 22

1775-1776 Mass. Acts 18 ............................................................... 21

1795 Mass. Acts 436 ................................................................... 24

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 .................................... 21

Act of Apr. 7, 1849, ch. 278, 1849 N.Y. Laws 403 ........................... 19

Act of Apr. 16, 1881, 1881 Ill. Laws 73 ......................................... 19

Act of Apr. 16, 1883, 80 Ohio Laws 129 .......................................... 24

Act of Dec. 7, 1866, No. 41, Ga. Laws 27 ....................................... 23

Act of Dec. 9, 1882, No. 18, 1882 Ga. Laws 34 ................................... 24

Act of Dec. 11, 1886, No. 4, sec. 5, 1886–87 Ala. Laws 31 ................... 24

Act of Dec. 12, 1888, No. 190, 1888–89 Ala. Laws 185 ..................... 24

Act of Dec. 20, 1820, 1820 Ala. Acts 10 ....................................... 23

Act of Dec. 21, 1771, ch. DXL, 1771 N.J. Laws 346 .......................... 19

Act of Dec. 22, 1884, No. 52, 1884–85 Ga. Laws 20 ........................ 24

Act of Dec. 25, 1837, 1837 Ga. Laws 90 ............................................................ 19

Act of Feb. 7, 1867, ch. 244, 1867 Miss. Laws 327 ............................................ 23

Act of Feb. 10, 1838, No. 24, 1838 Fla. Acts 36 ................................................. 23

Act of Feb. 10, 1852, No. 1, 1851–1852 Ala. Laws 3 ......................................... 23

Act of Feb. 16, 1875, 1874–1875 Ark. Acts 156 (1875) ...................................... 19

Act of Feb. 17, 1885, No. 337, 1884–85 Ala. Laws 601 ...................................... 24

Act of Feb. 19, 1867, No. 260, 1866–1867 Ala. Laws 259 .................................. 23

Act of Feb. 21, 1867, ch. 317, 1867 Miss. Laws 412 .......................................... 23

Act of Feb. 26, 1867, sec. 1, schedule A, class 3, 1866–67 N.C. Sess. Laws 95 ....... 23

Act of Feb. 28, 1887, No. 221, 1888–89 Ala. Laws 530 ...................................... 24

Act of Jan. 8, 1781, ch. XII, 1781 N.J. Laws 39 ................................................. 21

Act of Jan. 28, 1851, ch. 121, 1850–1851 N.C. Sess. Laws 241 .......................... 23

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175 ............................................... 21

Act of Mar. 9, 1891, ch. 327, 1891 N.C. Sess. Laws, Priv. Laws 1413 ................. 24

Act of Mar. 13, 1883, ch. 49, 1883 Cal. Stat. 93 ................................................ 24

Act of Mar. 27, 1879, ch. 186, 1879 Tenn. Pub. Acts 231 .................................. 19

Act of Mar. 28, 1889, 86 Ohio Laws 164 .......................................................... 24

Act of May 4, 1917, ch. 145, 1917 Cal. Stat. 221 .............................................. 19

Ala. Code § 494 (Wade Keyes, *et al.*, comps., Montgomery,
  Barrett & Brown 1877) ................................................................................ 24

Ala. Code § 629 (1887) .................................................................................... 24

Ala. Rev. Code § 434 (Joseph Abram Walker comp., Birmingham,
  Reid & Screws, State Printers 1867) ............................................................. 23

An Act Against Wearing Swords, &c., ch. 9, in Aaron Leaming & Jacob
  Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey*
  (2d ed. 1881) .............................................................................................. 18

vii

"An Act for the better regulating of the Militia of this Province," 1747,
  McCord, *Statutes at Large*, 9:647 ..................................................................... 21

ATF, *Current Processing Times*,
  https://www.atf.gov/resource-center/current-processing-times ....................... 27

Colonial Laws of Mass. Reprint. from the Ed. of 1672 (1890) ............................ 22

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* (2d ed. 1792) (N.H.) .... 18

Gen. Tax Act for 1887 and 1888, 1886 Ga. Laws 14 ......................................... 24

Gen. Tax Act for 1889 and 1890, No. 123, 1888 Ga. Laws 19 ............................ 24

H.R. Rep. No. 83-1337 (1954), 1954 U.S.C.C.A.N. 4017................................... 3

H.R. Rep. No. 73-1780 (1934) ........................................................................... 3

Ill. Stat. Ann. Crim. ch. 38 (1885) ...................................................................... 21

James Parker, *Conductor Generalis* (1764) (N.J.)................................................. 18

James Parker, *Conductor Generalis* (Robert Hodge printing 1788) (N.Y.)............... 18

James Parker, *Conductor Generalis* (Robert Campbell printing 1792) (Pa.) ............. 18

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*
  (1773) (Mass.) ................................................................................................. 18

Laws of the Commonwealth of Mass. from Nov. 28, 1780,
  to Feb. 28, 1807 (1807) .................................................................................. 21

Laws of the State of Maine (1830) ....................................................................... 21

Laws of the State of N.H; with the Consts. of the U.S. and of the State
  Prefixed (1830)................................................................................................ 22

Miss. Code ch. 8, art. 16 (1848) (effective Feb. 4, 1844) .................................... 23

*National Firearms Act: Hearings on H.R. 9066 before the House Comm. on
  Ways and Means*, 73d Cong., 2d Sess. (1934)..................................................... 3

*Records of the Colony of Rhode Island and Providence Plantations, In New England*,
  2:196 (Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857).. 21

Revenue, ch. 25, 1858–1859 N.C. Sess. Laws 28 .............................................. 23

Revenue, ch. 34, 1856–1857 N.C. Sess. Laws 28 ............................................... 23

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139 (2007) .................................................................... 21

Robert J. Spitzer, *Understanding Gun Law History after Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 58 (2023) ............................................... 19

S. Rep. No. 73-1444 (1934) ...................................................................................... 3

Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688-1868*, 83 Law & Contemp. Probs. 73 (2020) .......................................................... 24

S.C. Rev. Stat. § 490 (1894) ................................................................................... 24

St. Paul, Minn., Ordinances no. 895 (1889) ..................................................... 24

William Waller Hening, *The New Virginia Justice* (1795) (Va.) ........................... 18

**INTRODUCTION**

Plaintiffs are four individuals and one firearms retailer who allege that they possess firearms that may fall within the purview of the National Firearms Act of 1934 ("NFA"). Although this case previously focused on the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") final rule, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) ("Rule"), which set forth how ATF intended to apply the NFA to firearms with attached stabilizing braces, that Rule has been vacated, and now, Plaintiffs' summary judgment motion challenges the statute's regulation of short-barreled rifles and shotguns under the Second Amendment. While this Court previously indicated that ATF's Rule could potentially pose a Second Amendment issue, the question before the Court is a new one: whether the statute itself comports with the Second Amendment. Were the Court to agree with Plaintiffs' challenge, it would be the very first in the nation to do so. Even following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), courts have uniformly upheld the NFA's regulatory requirements as required by binding Supreme Court precedent. For a host of reasons, the Court should decline Plaintiffs' invitation to break new ground.

As an initial matter, Plaintiffs' claims should be dismissed for lack of jurisdiction, as they have failed to carry their burden to demonstrate that they have Article III standing to challenge the NFA. The single affidavit filed in support of the summary judgment motion is speculative and conclusory and does not establish that any Plaintiff stands to suffer an imminent, concrete injury as a result of the NFA's

1

regulatory requirements.

But even setting jurisdictional issues aside, Plaintiffs' Second Amendment claim fails on the merits. The NFA imposes regulatory requirements on eight categories of firearms—including short-barreled rifles and shotguns—that Congress deemed particularly dangerous and concealable, and thus, especially susceptible to criminal misuse. Shortly after the NFA was enacted, the Supreme Court upheld those requirements, holding that the Second Amendment does not guarantee the right to keep and bear short-barreled shotguns. *See United States v. Miller*, 307 U.S. 174, 178 (1939). The Eleventh Circuit recently reiterated that *Miller* remains binding precedent applicable to the regulation of both short-barreled rifles and shotguns, and that accordingly, the NFA's regulation of short-barreled rifles does not violate the Second Amendment. *United States v. Robinson*, 2025 WL 870981 (11th Cir. Mar. 20, 2025), *petition for cert. filed*, No. 25-5150 (U.S. July 18, 2025). And if more were needed, the historical record demonstrates that the NFA falls within this nation's tradition of regulating dangerous weapons susceptible to criminal misuse.

For all these reasons, the Court should deny Plaintiffs' motion and grant Defendants summary judgment on the Second Amendment claim, and dismiss as moot Plaintiffs' claims challenging the now-vacated ATF Rule.

## BACKGROUND

## I.    The National Firearms Act

The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, was Congress's first major attempt at regulating firearms in the United States, an effort

animated by the emergence of crime as a major national problem. *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002); *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess. at 4–5 (1934) (statement of Hon. Homer S. Cummings, Attorney General of the United States) (the NFA was the result of armed crime becoming a "serious national emergency"). Seeking to curtail the criminal misuse of firearms, the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals." H.R. Rep. No. 83-1337, at A395 (1954), 1954 U.S.C.C.A.N. 4017, 4542; H.R. Rep. No. 73-1780, at 1 (1934); S. Rep. No. 73-1444, at 1 (1934) (describing the NFA as a "remedy" to the "growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons"). To that end, the Act defined eight categories of "firearms" that are subject to regulation. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among these firearms are weapons commonly referred to as short-barreled rifles—*i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes."). Short-barreled shotguns—*i.e.*, "a shotgun having a barrel or barrels of less than 18 inches in length" or "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length"—are likewise covered. 26 U.S.C.

3

§ 5845(a)(1), (2); *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023) (the NFA targeted short-barreled shotguns because they were "particularly valued for their ability to be easily concealed and to unleash devastating damage at short range").

Short-barreled rifles and shotguns must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. 26 U.S.C. § 5841. They must bear a serial number and other requisite identifiers, *id.* § 5842, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General, *id.* § 5802, pay a special occupational tax, *id.* § 5801, and keep records regarding the making, sale, and importation of such firearms, *id.* § 5845.

## II.    This Lawsuit

In 2023, a group of individuals and a firearms retailer filed this lawsuit to challenge, *inter alia*, the Rule under the Administrative Procedure Act and Second Amendment as well as the NFA's regulation of short-barreled rifles and shotguns under the Second Amendment. *See* Compl. ¶¶ 54–68, 77–96. Defendants moved to dismiss the bulk of this case, *see* Defs.' Partial Mot. To Dismiss, ECF No. 22, and the Court partially granted and partially denied that motion, dismissing several of Plaintiffs' claims but allowing their APA and Second Amendment challenges to proceed. *See* Order, ECF No. 48.

Plaintiffs also moved to preliminarily enjoin ATF from enforcing the Rule. *See*

Pls.' Mot. for Prelim. Inj., ECF No. 21. The Court granted that motion, *see* Order, ECF No. 47, and Defendants promptly appealed that order to the Eleventh Circuit, *see Colon v. ATF*, No. 24-10897 (11th Cir.).

Months later, in late 2024, Plaintiffs moved for summary judgment on their Second Amendment challenge to the NFA and requested that the Court universally enjoin Defendants from enforcing the Act's regulations on short-barreled rifles and shotguns. *See* Pls.' Mot. for Partial Summ. J. & Memo. in Support Thereof, ECF No. 51. In response, the Court stayed proceedings pending the Eleventh Circuit's resolution of Defendants' interlocutory appeal. *See* Order, ECF No. 53.

### III.  The Rule's Vacatur & Other Recent Developments

Since then, the Rule has been universally vacated. *See Mock v. Garland*, 2024 WL 2982056 (N.D. Tex. June 13, 2024). After the Rule's vacatur became final,[1] the parties agreed to dismiss the pending interlocutory appeal in this matter, which the Eleventh Circuit granted in August 2025. *See* Order, *Colon v. ATF*, No. 24-10897 (11th Cir.), ECF No. 53. Shortly thereafter, this Court lifted the stay of proceedings, terminated all pending motions, and directed the parties to confer and advise the Court on whether any terminated motions should be reinstated without modification. Order, ECF No. 62. The parties proposed a schedule for cross-motions on summary judgment, ECF No. 63, and pursuant to that schedule, Plaintiffs filed a new motion for summary judgment. Pls.' Mot. for Summ. J. & Mem. in Supp. Thereof, ECF No. 64 ("Mot.").

---

[1] In July, the Fifth Circuit granted the parties' stipulated dismissal of the appeal in *Mock v. Bondi*, *see* Order, No. 24-10743 (5th Cir.), ECF No. 82, making the Rule's vacatur final.

## LEGAL STANDARDS

### I.   Rule 12(b)(1):  Lack of Subject-Matter Jurisdiction

A motion to dismiss under Rule 12(b)(1) may challenge the Court's subject-matter jurisdiction either "facially" or "factually." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). A "facial" attack under Rule 12(b)(1) accepts the truth of the plaintiff's well-pleaded allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. *Id.* at 1529. A "factual" attack, by contrast, contests the factual existence of subject-matter jurisdiction, typically based on evidence outside the pleadings, and the court may review extrinsic evidence without converting the motion into one for summary judgment. *Id.* In all cases, the party invoking a federal court's limited jurisdiction bears the burden of establishing that it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

### II.   Rule 56: Summary Judgment

Where, as here, a claim for relief presents only pure questions of law and no material facts are in dispute, summary judgment under Federal Rule of Civil Procedure 56(a) is the proper mechanism for resolving the claim. *State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023); *see also Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("[A] facial challenge to the constitutionality of a statute presents a pure question of law . . . .").

## ARGUMENT

### I.    Plaintiffs lack standing to assert their Second Amendment claim.

In seeking to upend the NFA's longstanding regulations on short-barreled rifles and shotguns, Plaintiffs overlook the issue of standing, citing no evidence that those regulations are causing them any ongoing or certainly impending harm—a burden they bear on summary judgment. Absent any such evidence, Plaintiffs lack standing to assert their Second Amendment claim.

Article III limits federal courts' jurisdiction to resolving actual "Cases" and "Controversies," not any dispute that happens to arise between two parties. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). For there to be a case or controversy, a plaintiff must have standing to sue. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). If standing is absent, a court cannot proceed at all to the merits of the dispute. *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1164 (9th Cir. 2002) ("[W]here litigants lack standing," any further ruling on the merits "is, by very definition, for a court to act ultra vires." (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998))).

To establish standing, a plaintiff must (i) have suffered or be likely to suffer an injury in fact (ii) that is fairly traceable to the defendant's challenged conduct and (iii) that a favorable ruling would redress. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact must be both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)

(citation omitted); *accord All. for Hippocratic Med.*, 602 U.S. at 381 (an injury in fact must be "real and not abstract," "actual or imminent, not speculative," and "personal," not "generalized"). And where, as here, the relief sought is prospective, the injury must be ongoing or "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The mere *possibility* of future injury does not suffice. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *Banks v. Sec'y of Dep't of Health & Hum. Servs.*, 38 F.4th 86, 95 (11th Cir. 2022). More still, plaintiffs must demonstrate standing "for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431.

At summary judgment, standing "cannot be inferred argumentatively" but "must affirmatively appear in the record." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1276 (11th Cir. 2006) (citation omitted). A plaintiff therefore cannot rest upon "mere allegations" but instead must put forth "specific facts" by "affidavit or other evidence" that demonstrate each element of standing. *Lujan*, 504 U.S. at 561. Vague or conclusory assertions of harm will not suffice. *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1264 (11th Cir. 2023); *Burdick v. Kennedy*, 700 F. App'x 984, 987 (11th Cir. 2017). Nor will speculation. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Measured by these principles, Plaintiffs have fallen well short of establishing Article III standing to assert their Second Amendment claim. Indeed, most Plaintiffs submitted no evidence whatsoever in support of their motion, and instead cited only to allegations from their complaint, *see* Mot. at 22–24, leaving any suggestion that they

are harmed by the challenged NFA provisions completely unsubstantiated. *See CAMP*, 451 F.3d at 1276 (finding no standing where "the record [did] not evidence an actual or imminent injury from [the challenged] provisions"). And the only other Plaintiff, Eric Mele, submitted a two-page affidavit containing only vague, conclusory, and speculative assertions of harm. *See TocMail*, 67 F.4th at 1263–67 (rejecting conclusory and speculative testimony regarding a plaintiff's standing at summary judgment). Specifically, Mele claims that he is avoiding assembling an "AR-style" weapon with a short barrel and buttstock because, if it were a short-barreled rifle, the NFA would obligate him to register it, which he fears would hinder his ability to travel with the weapon, allow family or friends to use it, and dispose of it. *See* Aff. of Eric David Mele, ECF No. 64-1. The problem is, even assuming that the weapon Mele wishes to assemble would in fact be a short-barreled rifle, the various activities he fears the NFA would hinder if he were to register the weapon are entirely hypothetical. Mele "cannot manufacture standing," however, "by inflicting harm on" himself—that is, by refusing to assemble the desired weapon and register it—based merely on "fears of hypothetical future harm." *See Clapper*, 568 U.S. at 416; *accord, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202–03 (11th Cir. 2018) (holding that an affidavit's "general assertion" that the plaintiff would "be 'significantly hinder[ed]'" by the challenged action was insufficient to "establish certainly impending injury" where "the affidavit offer[ed] no facts to show" that the plaintiff would "actually be harmed"). Nor can he establish an actual or imminent injury by suggesting, without elaboration, that at "some indefinite future time" he may wish to engage in potentially prohibited activities. *See Lujan*, 504

9

U.S. at 564 n.2; *id.* at 564 ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of . . . 'actual or imminent' injury . . . ."); *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220–21 (11th Cir. 2010) (holding that the plaintiff's "mere assertion" that he was chilled from engaging in certain activities, absent "elaboration" or "detail, such as when, where, or how" he intended to engage in those activities in the future, was "insufficient to demonstrate an injury in fact"). Mele's speculative assertions of harm thus cannot confer standing.

All told, Plaintiffs' motion for summary judgment is unsupported by any evidence upon which the Court could base a finding that any Plaintiff has Article III standing to challenge the NFA's regulation of short-barreled rifles or shotguns. Defendants are thus entitled to summary judgment on that claim for that reason alone.

## II.    The NFA does not violate the Second Amendment.

Plaintiffs' summary judgment motion challenges the NFA's regulation of short-barreled rifles and shotguns as violating the Second Amendment both on its face and as applied to Plaintiffs. Plaintiffs' arguments fail, however, because they are foreclosed by binding precedent and the NFA provisions at issue fit within this nation's historical tradition of firearms regulation.

### A. Binding precedent precludes Plaintiffs' challenge.

Plaintiffs are not the first to challenge the NFA, enacted in 1934, and this Court will not be the first to consider such a challenge even since the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Unsurprisingly

then, binding precedent precludes Plaintiffs' Second Amendment challenge to the NFA's regulation of these firearms.

As an initial matter, a facial challenge to a federal statute is the "most difficult challenge to mount successfully because it requires a [party] to establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (citation omitted); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (explaining the "decision" to bring a facial challenge "comes at a cost," as the Supreme Court has "made facial challenges hard to win"). The NFA provisions at issue have at least some valid applications. For example, because the Second Amendment protects the right to possess arms for "traditionally lawful purposes, such as self-defense within the home," *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008), the government may apply 26 U.S.C. § 5861(d)—at minimum—to individuals who instead pursue unlawful purposes, for instance, by sawing off rifle barrels to make their firearms more useful in criminal activity or to engage in unlawful firearms trafficking. That alone defeats the facial challenge.

But regardless, Supreme Court precedent forecloses both Plaintiffs' facial and as-applied challenges. In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Court upheld the application of the NFA to short-barreled shotguns, holding that the Second Amendment does not guarantee the right to possess such weapons. The decision specifically refers to the firearm by its barrel length. *See id.* (referring to a "shotgun having a barrel of less than eighteen inches in length"). The Court reaffirmed *Miller* more recently in its decision in *Heller*, explaining that "the Second Amendment does

11

not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," adding that this limitation is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 625, 627 (citation omitted). Accordingly, because the Supreme Court has already upheld the NFA's regulation of short-barreled shotguns, Plaintiffs can meet neither the "very high bar" that their facial challenge demands, *Moody*, 603 U.S. at 723, nor prevail on their as-applied challenge.

If more were needed, the Eleventh Circuit recently considered *Miller*'s application to the NFA's regulation of short-barreled rifles in *United States v. Robinson*, 2025 WL 870981 (11th Cir. Mar. 20, 2025) (per curiam), and held that "the NFA's regulation of short-barreled rifles does not violate the Second Amendment," *id.* at *2. In that case, the Eleventh Circuit considered a Second Amendment challenge to a criminal conviction under the NFA for the possession of an unregistered short-barreled rifle. *Id.* at *1–2. The defendant argued that under *Bruen*, the NFA violated the Second Amendment because short-barreled rifles are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes" because "there is a large number of them in circulation and they are rarely used to commit crimes." *Id.* at *2. He had also argued that *Miller* did not compel a different conclusion because it was unclear whether *Miller* was still binding precedent in light of the Supreme Court's decision in *Bruen*, and further, *Miller* involved a short-barreled shotgun, rather than a short-barreled rifle. *Id.*

12

The Eleventh Circuit rejected each of these arguments. The Court first considered whether *Miller* remained binding precedent. The Court walked through developments in the law since *Miller*, discussing the Supreme Court's decisions in *Heller*, *Bruen*, and *Rahimi*, as well as a number of Eleventh Circuit cases, including *United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) and *United States v. Wilson*, 979 F.3d 889, 903 (11th Cir. 2020). *Robinson*, 2025 WL 870981, at \*3–4. Weighing these cases, the Court concluded that "*Miller* remains binding as the Supreme Court has not overturned it," or even limited it, and "[a]s a lower federal court [the Eleventh Circuit] must leave it to the Supreme Court to overturn its own precedent and to limit its own precedent's applicability." *Id.* at \*5. And because *Miller* remained binding, the Court concluded that "the NFA's registration requirement for short-barreled shotguns is constitutional, and [its] precedent upholding the NFA against Second Amendment challenges and relying on *Miller* . . . remains binding." *Id.* (internal citation omitted).

The Court also concluded there was no basis to distinguish between short-barreled shotguns and short-barreled rifles, and accordingly, it was "[b]ound by the logic of *Miller*" as well as the Eleventh Circuit's decision in *Wilson*, 979 F.3d 889. *Id.*; *see also Wilson*, 979 F.3d at 903 ("[W]e cannot say that the Second Amendment guarantees the right to keep and bear an unregistered sawed-off shotgun having a barrel of less than eighteen inches in length." (citation omitted)). As the Court was bound by prior precedent, it did not consider the defendant's arguments that short-barreled rifles are in common use and are typically possessed for lawful purposes.

13

For all the reasons discussed in *Robinson*, *Miller* remains binding, and the NFA's regulation of short-barreled rifles and shotguns is constitutional. This conclusion is consistent with the many decisions of other courts rejecting Second Amendment challenges to the NFA's restrictions on short-barreled rifles and shotguns, both before and after *Bruen*. *See, e.g., Wilson*, 979 F.3d at 903; *United States v. Rush*, 130 F.4th 633, 640 (7th Cir. 2025), *petition for cert. filed*, No. 24-1259 (U.S. June 10, 2025); *United States v. Cox*, 906 F.3d 1170, 1184–88 (10th Cir. 2018); *United States v. Hatfield*, 376 Fed. App'x 706, 707 (9th Cir. 2010); *Robinson*, 2025 WL 870981, at *3–6; *United States v. Price*, 111 F.4th 392, 403 (4th Cir. 2024); *United States v. Saleem*, 2024 WL 5084523, at *1 (4th Cir. Dec. 12, 2024); *United States v. Holder*, 2024 WL 1599916, at *7 n.7 (N.D. Ga. Jan. 19, 2024), *adopting report & recommendation*, 2024 WL 1012914 (N.D. Ga. Mar. 9, 2024); *United States v. Shepherd*, 2024 WL 71724, at *5 (S.D. Miss. Jan. 5, 2024); *United States v. Jernigan*, 750 F. Supp. 3d 579, 587–88 (E.D. Va. 2024); *United States v. Royce*, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023); *United States v. Miller*, 2023 WL 6300581, at *3 (N.D. Tex. Sep. 27, 2023).

Plaintiffs' arguments do not change that conclusion. Though Plaintiffs purport to distinguish *Miller* because they "do not necessarily challenge the regulation of a sawn-off shogun," and rather, "all of the firearms at issue are either pistols or rifles," this distinction is irrelevant to their facial challenge to the NFA's regulation based on barrel length. Mot. at 11. Further, as was the case in *Robinson*, they "cite[] no cases treating these two types of short-barreled firearms . . . differently," nor "establish[] how

the distinctions between short-barreled rifles and short-barreled shotguns present a relevant and material difference that would make one regulation constitutional and the other not." 2025 WL 870981, at *5.

Plaintiffs' musings about what the Court was or was not doing in *Miller* are also beside the point, *see* Mot. at 11–12: as explained, the Eleventh Circuit has held *Miller* is binding precedent. That the Supreme Court more recently reaffirmed *Miller*'s rationale in dicta only reinforces that conclusion. *See Heller*, 554 U.S. at 625. Plaintiffs cannot avoid that this Court is bound by the Supreme Court's holding in *Miller*, and *Miller* precludes their Second Amendment challenge.

**B. The NFA does not violate the Second Amendment.**

Even if the Court were free to consider the matter in the first instance, the NFA's regulation of short-barreled rifles and shotguns does not violate the Second Amendment, either on its face or as applied to Plaintiffs in this case.

The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "protects an individual right to keep and bear arms for self-defense," *Bruen*, 597 U.S. at 17, and "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 602 U.S. at 690 (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)). "'Like most rights,' though, 'the right secured by the Second Amendment is not unlimited.'" *Id.* (quoting *Heller*, 554 U.S. at 626); *see also Bruen*, 597 U.S. at 21 (quoting same). "[T]he right was never thought to sweep

15

indiscriminately." *Rahimi*, 602 U.S. at 691.

In determining whether a firearm regulation is constitutional, the appropriate test is based on "the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. If the "plain text" of the Amendment "covers an individual's conduct the regulation must then be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791" and does not reflect "a law trapped in amber." *Rahimi*, 602 U.S. at 691-92. Instead, the modern law "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). "Why and how the regulation burdens the right are central to this inquiry." *Id.*

As explained, under *Miller*, *Heller*, and *Robinson*, the plain text of the Second Amendment does not guarantee the right to keep and bear short-barreled rifles and shotguns unencumbered by any regulatory burdens. *See supra* pp. 11–14. The Court's analysis can and should stop there.

But regardless, the NFA's regulation of short-barreled rifles and shotguns is "consistent with this Nation's historical tradition of firearms regulation." *Bruen*, 597 U.S. at 17. American legislatures have long imposed restrictions on arms that are especially susceptible to criminal misuse—in other words, there is historical precedent for "why" the NFA burdens the Second Amendment right. For instance, as the Supreme Court recently explained in *Rahimi*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a

16

right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Rahimi*, 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 626), and, historically, "[s]ome jurisdictions banned the carrying of 'dangerous and unusual weapons.'" *Id.* (citing 4 W. Blackstone, *Commentaries on the Laws of England* 148–49 (1769)); *see also Heller*, 554 U.S. at 627 (recognizing "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" (citation omitted)); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1114 (11th Cir. 2025) ("Since the Founding, American law has regulated arms-bearing conduct in many ways: from prohibitions on gun use by drunken New Year's Eve revelers to bans on dangerous and unusual weapons to restrictions on concealed carry." (citation omitted)), *petition for cert. filed sub nom. Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (U.S. May 20, 2025); *Royce*, 2023 WL 2163677, at *3 ("With these principles established by *Miller*, *Heller*, *McDonald*, and *Bruen* in mind, the Court concludes that short-barrel rifles fall within the historical tradition which prohibits the carrying of dangerous and unusual weapons.").

Indeed, this historical tradition stretches as far back as England's 1328 Statute of Northampton, which made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 40–45. That statute was understood to provide that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148–49 (10th ed. 1787); *see Rahimi*, 602 U.S. at 697–98. It was thus

17

consistent with the common law offense of "affray": "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13–14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716). Similarly, in 1686, the province of East New Jersey prohibited the concealed carry of "unusual and unlawful weapons." An Act Against Wearing Swords, &c., ch. 9, in Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881). Early American justice-of-the-peace manuals also empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[2] These statutes contemplated that it would naturally constitute affray to carry dangerous and unusual weapons. *See Bruen*, 597 U.S. at 46–47.

American legislatures have also long banned the possession of dangerous and unusual weapons, or weapons susceptible to unlawful use. For instance, New Jersey adopted a law banning the practice of rigging firearms to be fired without an actual finger on the firearm trigger. Act of Dec. 21, 1771, ch. DXL, § 10, 1771 N.J. Laws 346. States also banned certain knives—most notably, the bowie knife. Robert J. Spitzer, *Understanding Gun Law History after Bruen: Moving Forward by Looking Back*, 51

---

[2] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); *see also* William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

Fordham Urb. L.J. 58, 88–94 (2023). States banned blunt weapons like "slung shots," brass knuckles, and billy clubs. Because it was associated with crime, New York, for example, made it a felony to "be found in the possession of . . . any instrument or weapon of the kind usually known as a slung shot."[3] The Eleventh Circuit has acknowledged that there is a historical record of restricting "abnormally dangerous weapons." *See Nat'l Rifle Ass'n*, 133 F.4th at 1124 (noting Tennessee's 1858 ban on the possession of a "bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon").

Similarly, many states have historically regulated firearms based on size. For example, states like Tennessee, Georgia, and Arkansas banned or taxed pocket pistols.[4] Those regulations applied to "pistols of a small size which are not borne as arms but which are easily and ordinarily carried concealed." *State v. Kerner*, 107 S.E. 222, 225 (N.C. 1921); *accord Fife v. State*, 31 Ark. 455, 461 (1876). And *Miller* itself set forth historical analysis citing the nation's history of regulating the permissible length of firearms in the context of the militia. *See* 307 U.S. at 180 ("The musketeer should carry a 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length"; "Every officer and soldier

---

[3] Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 403, 404; *see also* Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 (prohibiting any person "to sell, or offer to sell, or to keep, or have about their person or elsewhere" bowie knives); Act of May 4, 1917, ch. 145, § 2, 1917 Cal. Stat. 221 ("prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons"); Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73 (penalizing "whoever shall have in his possession" "any slung-shot or metallic knuckles, or other deadly weapon of like character").

[4] Act of Mar. 27, 1879, ch. 186, § 1, 1879 Tenn. Pub. Acts 231, 231; Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90, 90; Act of Feb. 16, 1875, § 1, 1874–1875 Ark. Acts 156, 156 (1875).

shall appear . . . armed . . . with a good, clean musket . . . three feet eight inches long in the barrel.").

There is also a historical tradition of imposing regulatory requirements analogous to those imposed by the NFA—that is, there is also historical precedent for "how" the NFA burdens the Second Amendment right. To start, the NFA's registration procedures are comparable to the "objective licensing requirements," like "fingerprinting, a background check, [and] a mental health records check," that do not violate the Second Amendment. *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring); *United States v. Saleem*, 659 F. Supp. 3d 683, 699 n.9 (W.D.N.C. 2023) (explaining that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *accord United States v. Delauder*, 2023 WL 5658924, at *4 (N.D. W. Va. Aug. 31, 2023).

There is also a historical tradition of registration, survey, and inspection of firearms to ensure that the respective government had accurate and timely records of the individuals within its jurisdiction who owned firearms. *See United States v. Dangleben*, 2023 WL 6441977, at *8 (D.V.I. Oct. 3, 2023) ("[M]uster and registration laws . . . allowed the government to roughly account for and track the location of the firearms in colonial America."). Indeed, as early as 1631, Virginia required a regular survey of people, "arms[,] and munition" in the colony, and door-to-door surveys of firearms were authorized in Rhode Island (1667), South Carolina

(1747), and New Jersey (1781).[5] Militia members in Massachusetts also were required to have their firearms inspected (1775), with an official record documenting those inspections, and New York imposed similar requirements (1778).[6] And in 1805, Massachusetts required musket and pistol barrels manufactured in the state and offered for sale to be "proved" (inspected and marked by designated individuals) with payment of a fee to ensure their safe condition, and Maine enacted similar requirements in 1821.[7] *See United States v. Padgett*, 2023 WL 3483929, at *9 (D. Alaska Jan. 4, 2023) ("There was significant regulation of firearms in colonial America" like "registration and safety requirements," "designed to ensure responsible and safe gun ownership.").

Later enactments also carried on this tradition. Illinois passed a law in 1881 requiring sellers of certain "deadly weapons" like pistols and revolvers to "keep" and have ready for inspection "at all reasonable times" "a register of all such weapons sold or given away," including the purchaser's name and age and "the purpose for which it is purchased." Ill. Stat. Ann. Crim. ch. 38, ¶ 54 (1885). And Congress passed a law (1892) governing the sale of certain weapons in the District of Columbia, requiring retailers to "keep a written register of every purchaser." Act of July 13, 1892, ch. 159,

---

[5] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43; Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161–62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).
[6] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.
[7] Laws of the Commonwealth of Mass. from Nov. 28, 1780, to Feb. 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

§ 5, 27 Stat. 116, 117.

In addition to conditions on the sale and possession of firearms, early American governments enacted strict regulations regarding where and to whom some firearms could be sold. The colonies of Massachusetts, Connecticut, Maryland, and Virginia enacted "laws in the first half of the [17th] century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). And colonial Virginia made it a crime to "stray[] into an Indian town or more than three miles from an English Plantation[] while possessing more firearms than needed for personal use." *United States v. Bradley*, 2023 WL 2621352, at *5 (S.D. W. Va. Mar. 23, 2023).

Licenses or inspection were also required in certain states—Massachusetts (1651, 1809), Connecticut (1775), New Hampshire (1820)—to commercially export or sell gunpowder (like with modern ammunition).[8] *Id.* at *4 ("Early legislatures and Founders did not shy away from regulating the trade and movement of firearms."); *accord United States v. Libertad*, 681 F. Supp. 3d 102, 112–15 (S.D.Y.Y. 2023), *aff'd sub nom. United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025). Many of these laws were motivated by the same concerns animating the NFA: "controlling and tracing the sale of firearms" and "ensuring dangerous individuals did not obtain firearms." *United States v. Holton*, 639 F. Supp. 3d 704, 711–12 (N.D. Tex. 2022).

---

[8] Colonial Laws of Mass. Reprint. from the Ed. of 1672, at 126 (1890); 2 Gen. Laws of Mass. from the Adoption of the Const. to Feb. 1822, 199 (1823); 15 The Pub. Records of the Colony of Conn. 191 (1890); Laws of the State of N.H; with the Consts. of the U.S. and of the State Prefixed 277 (1830).

Early American governments also imposed various licensing costs and fees for firearm and ammunition sales as well as direct taxes on firearms. In 1820, Alabama imposed a $1 personal property tax on "pocket or side pistol[s]" and certain other weapons, revising this law while maintaining taxes on certain firearms in the mid-1800s.[9] Similarly, Florida (1838) imposed a $10 per year tax on individuals openly "carrying" "pocket pistols" and certain other weapons;[10] Mississippi (1844) required a $2 tax on "dueling or pocket pistol[s]," and in 1867 the state imposed taxes on, *inter alia*, rifles and shotguns, and that same year enacted a $5 to $15 tax "on every gun and pistol" in a certain county, with refusal to pay resulting in the firearm's seizure and sale[11]; and North Carolina (1851, 1857, 1859, 1866) imposed taxes on pistols and other weapons, often with the proviso that the taxes applied only to weapons intended for private use and "used or worn about the person" in the prior year.[12] And Georgia (1866) authorized certain counties to collect a tax "on every gun or pistol, musket or rifle over the number of three kept or owned" on plantations.[13] What's more, multiple states in the 19th century imposed occupational taxes or licensure fees on businesses associated with arms sales, such as those engaged in the retail sale of firearms,

---

[9] Act of Dec. 20, 1820, § 3, 1820 Ala. Acts 10, 10; Act of Feb. 10, 1852, No. 1, § 1, 1851–1852 Ala. Laws 3, 3; Act of Feb. 19, 1867, No. 260, § 10, 1866–1867 Ala. Laws 259, 263; Ala. Rev. Code § 434(10) (Joseph Abram Walker comp., Birmingham, Reid & Screws, State Printers 1867).

[10] Act of Feb. 10, 1838, No. 24, § 1, 1838 Fla. Acts 36, 36.

[11] Miss. Code ch. 8, art. 16, § 1 (1848) (effective Feb. 4, 1844); Act of Feb. 21, 1867, ch. 317, § 2, 1867 Miss. Laws 412, 412; Act of Feb. 7, 1867, ch. 244, § 1, 1867 Miss. Laws 327, 327.

[12] Act of Jan. 28, 1851, ch. 121, § 5, 1850–1851 N.C. Sess. Laws 241, 242–43; Revenue, ch. 34, § 23(4), 1856–1857 N.C. Sess. Laws 28, 34; Revenue, ch. 25, § 27(15), 1858–1859 N.C. Sess. Laws 28, 35; Act of Feb. 26, 1867, sec. 1, schedule A, class 3, § 14, 1866–67 N.C. Sess. Laws 95, 103.

[13] Act of Dec. 7, 1866, No. 41, § 1, Ga. Laws 27, 27–28.

gunpowder, or ammunition. Numerous states enacted such laws, or authorized their enactment on the local level, including in Alabama, California, Georgia, Minnesota, North Carolina, Ohio, and South Carolina.[14]

And finally, "[a]part from a well-defined list of exceptions . . . there was no freestanding right to travel armed under Anglo-American law." Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688-1868*, 83 Law & Contemp. Probs. 73, 75 (2020). And "[s]hortly after the adoption of the Second Amendment, Massachusetts enacted its own version of the Statute of Northampton," that "outlawed anyone who 'shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth," and "[a]rmed travel was thus a per se violation of the statute." *Id.* at 88-89 (quoting 1795 Mass. Acts 436). And even when Massachusetts eventually revised this law, it did so by implementing a "good cause exception to the traditional common law ban on armed travel." *Id.* at 91.

***

The NFA thus resembles historical laws in both "why" and "how" it burdens

---

[14] Ala. Code § 494(15) (Wade Keyes, *et al.*, comps., Montgomery, Barrett & Brown 1877); Act of Dec. 9, 1882, No. 18, § 2(18), 1882 Ga. Laws 34, 37; Act of Apr. 16, 1883, § 24, 80 Ohio Laws 129, 134; Act of Mar. 13, 1883, ch. 49, § 153, 1883 Cal. Stat. 93, 156; Act of Feb. 17, 1885, No. 337, sec. 2, 1884–85 Ala. Laws 601, 604; Act of Dec. 22, 1884, No. 52, § 2(18), 1884–85 Ga. Laws 20, 23; Act of Dec. 11, 1886, No. 4, sec. 5, § 17, 1886–87 Ala. Laws 31, 36; Gen. Tax Act for 1887 and 1888, § 2(18), 1886 Ga. Laws 14, 17; Act of Feb. 28, 1887, No. 221, sec. 2, 1888–89 Ala. Laws 530, 533; Ala. Code § 629(28) (1887); Act of Dec. 12, 1888, No. 190, § 21(25), 1888–89 Ala. Laws 185, 200; Gen. Tax Act for 1889 and 1890, No. 123, § 2(17), 1888 Ga. Laws 19, 22; Act of Mar. 9, 1891, ch. 327, § 44, 1891 N.C. Sess. Laws, Priv. Laws 1413, 1423; S.C. Rev. Stat. § 490 (1894); Act of Mar. 28, 1889, sec. 1, 86 Ohio Laws 164, 164; St. Paul, Minn., Ordinances no. 895, § 2 (1889).

"a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Because short-barreled rifles and shotguns combine high destructive power with easy concealability, they are especially susceptible to criminal misuse. *See, e.g.*, *Thompson/Center Arms Co.*, 504 U.S. at 517 ("short-barreled rifles" are "likely to be used for criminal purposes); *see also Johnson v. United States*, 576 U.S. 591, 640, 642 (2015) (Alito, J., dissenting) (short-barreled shotguns are "notoriously dangerous" and are "uniquely attractive to violent criminals" because they "combine the deadly characteristics of conventional shotguns with the more convenient handling of handguns"). Indeed, "sawed-off shotguns were a weapon of choice for gangsters and bank robbers during the Prohibition Era." *Johnson*, 576 U.S. at 640. "Al Capone's south-side Chicago henchmen used sawed-off shotguns when they executed their rivals from Bugs Moran's north-side gang during the infamous Saint Valentine's Day Massacre of 1929," and when "Bonnie and Clyde were killed by the police in 1934, Clyde was found 'clutching a sawed-off shotgun.'" *Id.* at 640 n.9 (citation omitted). And like their historical precursors, the NFA provisions at issue impose regulatory requirements on short-barreled rifles and shotguns, but do not prohibit those classes of firearms altogether. Accordingly, the regulatory requirements the NFA imposes on the possession of these weapons is consistent with the historical tradition cited above.

For all of these reasons, the NFA does not violate the Second Amendment.

### C. Plaintiffs' as-applied arguments do not change that conclusion.

Plaintiffs make a number of arguments contending that, even if the NFA is constitutional on its face, it is unconstitutional as applied to them. *See* Mot. at 19–24.

For the reasons previously set forth, *supra* pp. 10–25, these arguments fail. Defendants provide a few additional points in response.

To begin, Plaintiff Eric David Mele alleges that the NFA is unconstitutional as it applies to him because "the government's enforcement position forces him to choose between felony exposure or abandoning the functional utility of his firearm," and further, because "the government cannot identify a historical basis for prohibiting" him from either installing a replacement receiver, or a replacement receiver with a buttstock. *See id.* at 20–21. But even assuming that Mr. Mele's proposed course of action would amount to making an NFA firearm, nothing in the NFA prohibits from him doing so—it merely requires that, then, he must comply with the NFA's regulatory requirements. As explained, the Second Amendment does not guarantee his right to possess those firearms without attendant obligations, and further, the NFA's regulatory requirements are supported by the nation's historical tradition of firearms regulation. Accordingly, Mr. Mele has provided no basis to conclude that the statute is unconstitutional as applied to him.

Plaintiffs Josiah Colon and William Martin appear to argue simply to that, although they may fall within the NFA's purview, they do not wish to comply with it. *See id.* at 22–23. For all the reasons previously set forth, the NFA does not violate the Second Amendment. *See supra* pp. 10–25.

Plaintiff Brandon Kling's objections echo those of Mr. Mele, Mr. Colon, and Mr. Martin, though he emphasizes obligations involving interstate transport. *See id.* Importantly, any obligation that Mr. Kling may have under federal law should he

26

travel interstate with his firearm does not stem directly from the NFA; instead, it would arise from the Gun Control Act, 18 U.S.C. § 922(a)(4)—a separate statute not challenged in this case. At any rate, the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 602 U.S. at 691 (citation omitted). As cited above, both English common law and an early Massachusetts statute restricted armed travel, and there is thus historical precedent for interstate transport obligations. *See supra* p. 24. Accordingly, there is no basis to find any regulatory requirement unconstitutional as applied to Mr. Kling.

Lastly, Plaintiff 2nd Amendment Armory argues that, if the NFA applies to some of its inventory, it may incur additional costs; however, those costs are overstated. Even assuming that some of 2nd Amendment Armory's inventory is subject to the NFA—an assumption that is unsupported by evidence and therefore not warranted at summary judgment—in order to sell a particular firearm, 2nd Amendment Armory would only need to submit an ATF Form 1 Application to Make and Register (3-page form, estimated 8 days to process) and then an ATF Form 4 Application to Transfer (3-page form, estimated 10 days to process). *See* ATF, *Current Processing Times*, https://www.atf.gov/resource-center/current-processing-times. It may have done so tax free previously under the vacated Rule. And starting January 1, 2026, the tax to make and transfer any short-barreled rifle or short-barreled shotgun will be $0 pursuant to the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025). These regulatory burdens fall comfortably within the historical tradition of

27

imposing restrictions on the sale of firearms set forth above. *See supra* p. 21–24.

For these reasons, Plaintiffs cannot prevail on their as-applied challenge.

## III.   Plaintiffs' remaining claims challenging ATF's Rule should be dismissed as moot.

The Court should dismiss as moot Plaintiffs' remaining claims challenging the Rule because the Rule has been finally vacated. *See* Compl. ¶¶ 67, 77–96. Article III requires that "a case or controversy . . . exist throughout all stages of litigation[.]" *HM-Florida-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1222 (11th Cir. 2025) (quoting *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 55 F.4th 1312, 1315 (11th Cir. 2022)); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). But "[a] case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *HM-Florida-ORL*, 137 F.4th at 1222 (citation omitted). In other words, a case is moot when a court can no longer "give meaningful relief." *Id.* "[A] federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011) (citation omitted).

Plaintiffs' challenges to the Rule are moot because the Rule has already been vacated, and so the issues are no longer live, and the Court can grant no meaningful relief. Plaintiffs' Prayer for Relief requests only that "this court set aside the Final Rule

as unlawful, and/or vacatur of the Final Rule," Compl., Prayer for Relief ¶ 97(d)—the precise result made final in *Mock*. *See* 2024 WL 2982056, at *6 ("[T]he Court VACATES the Final Rule[.]").

Neither exception to mootness applies. Start with voluntary cessation. A defendant's "voluntary cessation of allegedly illegal conduct does not moot a case." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (citations omitted). But the basis for the exception is the "commonsense concern" that a defendant might "return to its old ways," which does not apply when "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citations omitted). This exception does not apply here because Defendants did not voluntarily cease enforcement of the Rule: the Rule was vacated by adverse judicial decision. And even if Defendants agreed to dismiss their appeal of that decision, the judicial vacatur of the Rule precludes them from enforcing it. *See also id.* at 1267–68 ("[G]overnmental entities and officials have considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.").

The capable of repetition yet evading review exception also does not apply. That exception may apply where (1) a challenged action is too short in duration to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation the same complaining party would be subjected to the same action again. *Wood v. Raffensperger*, 981 F.3d 1307, 1317 (11th Cir. 2020). But here, the Rule *was* fully litigated, was vacated as a result of that litigation, and further, a court order ensures that Plaintiffs will not be subject to the Rule again.

29

Accordingly, the Court should dismiss as moot Plaintiffs' APA claim against the Rule and Plaintiffs' Second Amendment claim to the extent it challenges the Rule.

## IV.    In all events, Plaintiffs are not entitled to injunctive relief.

Even if Plaintiffs had standing and were successful on their Second Amendment claim, the sweeping relief they request is unjustified and contrary to the constitutional and equitable constraints on this Court's remedial authority. To state the obvious, Plaintiffs' request for a universal injunction should be dead on arrival in light of *Trump v. CASA*, where the Supreme Court held that federal courts lack authority to issue such relief. 606 U.S. 831, 839–41, 856–58 (2025). On top of that, Plaintiffs have not satisfied the equitable factors necessary to permit entry of an injunction of *any* scope. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."). To justify an injunction, Plaintiffs needed to make a clear showing that (i) they will suffer irreparable harm without the injunction, (ii) other available remedies are inadequate, (iii) the balance of equities tips in their favor, and (iv) the injunction would serve the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–67 (2010). But they failed to address, much less establish, *any* of these prerequisites to injunctive relief, thus precluding issuance of an injunction. *See id.* at 158.

## CONCLUSION

The Court should dismiss as moot Plaintiffs' claims challenging the now-vacated Rule and grant Defendants summary judgment on Plaintiffs' remaining claim.

Dated: November 28, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ
CA Bar No. 332080
JODY D. LOWENSTEIN
MT Bar No. 55816869
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-5200
Email: taylor.n.pitz@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On November 28, 2025, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Middle District of Florida, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Taylor Pitz*
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice